13.1.2. any claim that any element of a Licensed Product (other than the Trademark or a design element furnished by Licensor in writing) infringes upon any trademark or rights of any other person; and

13.1.3. the manufacture, labeling, sale, importation, distribution or advertisement of any Licensed Product by Licensee.

13.1.4. as a condition to the indemnity set forth above, Licensor agrees to give Licensee prompt notice of any claim or occurrence, an opportunity to defend or handle such claim or occurrence prior to Licensor incurring fees, expenses or costs or any kind, and Licensor's cooperation with Licensee in the defense or handling of such claim or occurrence.

13.1.5. the use, by the Licensee, of the Licensor's New York showroom as described herein.

13.2    Licensor Indemnification.    Licensor agrees to indemnify, hold harmless and defend Licensee, its officers, directors, agents and employees and customers from and against any and all claims, suits or demands asserted against Licensee by any third party, including without limitation any and all losses, liabilities, expenses and damages, including costs of suit and reasonable attorneys' fees, arising out of and resulting from:

13.2.1. any claim that the use of the Trademark in the Territory and in the manner specified in Sections 3.4 and 3.5 of this Agreement infringes upon any trademark or rights of any other person; or

13.2.2. any violation of any warranty, representation or material agreement made by Licensor in this Agreement.

13.2.3. As a condition to the indemnity set forth above, Licensee agrees to give Licensor prompt notice of any claim or occurrence, an opportunity to defend or handle such claim or occurrence prior to Licensee incurring fees, expenses or costs or any kind, and Licensee's cooperation with Licensor in the defense or handling of such claim or occurrence.

13.3.    Defense of Claims.    The indemnifying party shall defend the indemnified party with respect to each and every claim for which such party is indemnified under this Agreement. All fees and expenses of legal counsel engaged with respect to such claims shall be paid for by the indemnifying party as incurred. The indemnified party shall provide its reasonable cooperation, at the indemnifying party's request and at the indemnifying party's sole cost and expense, in connection with the defense of all such claims.

13.4.     Notification of Claims and Consumer Complaints.   A party seeking indemnification under this Agreement shall immediately notify the indemnifying party, by telephone and in writing, of the subject matter and parties relating to such claim. Licensee shall promptly take steps promptly to correct, any material complaint by a consumer and/or governmental body related to the Licensed Products or any other matter related to Licensee's performance under this Agreement of which Licensee is made aware.

13.5.     Indemnity Unaffected.  Compliance by Licensee with the insurance provisions of this Agreement shall not relieve Licensee of its duties to indemnify Licensor under this Agreement.

13.6.     Licensor Representations and Warranties.  Licensor represents and warrants to Licensee that:

13.6.1. Licensor is the sole owner of the Trademark and the Trademark does not infringe upon any other trademarks or rights of any other entity or person;

13.6.2. Licensor is a corporation duly incorporated, validly existing and in good standing under the laws of the State of California;

13.6.3. Licensor has full power to grant the license granted and has the full right, power and authority to enter into this Agreement and to perform all of its obligations hereunder;

13.6.4. The person executing this Agreement on the part of Licensor is duly authorized to execute and deliver the Agreement for Licensor and to bind Licensor to the terms hereof; and

13.6.5. Licensor is under no legal impediment which would prevent it from entering into and performing fully its obligations under this Agreement.

13.6.6. SUBJECT ONLY TO THE FOREGOING SUBSECTION, LICENSOR HEREBY SPECIFICALLY DISCLAIMS ANY AND ALL WARRANTIES, EXPRESS OR IMPLIED, INCLUDING WITHOUT LIMITATION THE WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, TITLE AND NON-INFRINGEMENT OF THIRD PARTY RIGHTS, AND ANY WARRANTIES THAT MAY ARISE DUE TO COURSE OF PERFORMANCE, COURSE OF DEALING OR USAGE OF TRADE, WHETHER RELATED TO THE TRADEMARK OR OTHERWISE.

13.7.     Licensee Representations and Warranties.  Licensee represents and warrants to Licensor that:

13.7.1. Licensee is a corporation duly incorporated, validly existing and in good standing under the laws of the State of New York;

13.7.2. Licensee has the full right, power and authority to enter into this Agreement and to perform all of its obligations hereunder;

13.7.3. The person executing this Agreement on the part of Licensee is duly authorized to execute and deliver the Agreement for Licensee and to bind Licensee to the terms hereof; and

13.7.4. Licensee is under no legal impediment which would prevent it from entering into and performing fully its obligations under this Agreement and Licensee is financially capable of performing all of its obligations under this Agreement.

13.8     **LIMITATION OF LIABILITIES.** SUBJECT TO AND EXCEPTING THE INDEMNIFICATION OBLIGATIONS OF LICENSEE OR LICENSOR SET FORTH IN SECTION 13 OF THIS AGREEMENT, IN NO EVENT SHALL EITHER PARTY OR ANY OF ITS AFFILIATES, SUCCESSORS OR PERMITTED ASSIGNS, AND ITS OR THEIR DIRECTORS, OFFICERS, EMPLOYEES, AGENTS, LICENSORS, OR REPRESENTATIVES BE LIABLE FOR ANY INDIRECT, SPECIAL OR CONSEQUENTIAL DAMAGES, OR DAMAGES FOR LOSS OF PROFITS, BUSINESS INTERRUPTION, LOSS OF GOODWILL, ARISING FROM OR RELATING TO THIS AGREEMENT OR THE TRADEMARK, EVEN IF THE OTHER PARTY IS EXPRESSLY ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. The foregoing limitation of liability and exclusion of certain damages shall apply regardless of the failure of essential purpose of any remedies available to either party.

14. Trade Secrets and Confidentiality.

14.1.     Definition. "Confidential Information" means all information disclosed by one party ("Discloser") to the other party ("Recipient") (in writing, orally or in any other form) that is designated, at or before the time of disclosure, as confidential, or provided under circumstances reasonably indicating that the information is confidential, including without limitation trade secrets, customer lists, business plans, technical data, product ideas, personnel, and contract and financial information of Discloser or any third person to whom Discloser owes a duty of confidentiality. Confidential Information does not include information or material that (1) is now, or hereafter becomes, through no act or failure to act on the part of Recipient, generally known or available to the public; (2) is furnished to Recipient by a third person that is not under an obligation or duty of confidentiality to Discloser with respect to such information or material; or (3) is independently developed by Recipient without any breach of this Agreement, as evidenced by the Recipient's contemporaneous tangible (including written or electronic) records.

BM CO FINAL
Last printed 2/16/2004 10:00 AM

-- 21 --

BM INIT _ _ _ CO INIT _ _ _

14.2.    Restrictions on Use.  Each party shall take all reasonable measures to protect the confidentiality of the other party's Confidential Information in a manner that is at least protective as the measures it uses to maintain the confidentiality of its own Confidential Information of similar importance.  Recipient shall hold Confidential Information in strict confidence and shall not disclose, copy, reproduce, Sell, assign, license, market or otherwise dispose of such information, or give or disclose such information to third persons, or use such information for any purposes whatsoever other than as necessary in order to fulfill its obligations or exercise its rights under this Agreement. Notwithstanding the foregoing, Recipient may disclose the other party's Confidential Information (i) to employees and consultants that have a need to know such information, provided that Recipient shall advise each such employee and consultant of their obligations to keep such information confidential and shall require that each such employee and consultant sign a written nondisclosure agreement consistent with the confidentiality and nondisclosure provisions herein, and (ii) to the extent Recipient is legally compelled under legal process to disclose such Confidential Information, provided that Recipient shall give advance notice of such compelled disclosure to the other party, and shall cooperate with the other party in connection with any efforts to prevent or limit the scope of such disclosure and/or use of the Confidential Information.

15. Termination.

15.1.1. Other Rights Unaffected.  It is understood and agreed that termination by Licensor on any ground shall be without prejudice to any other rights or remedies which Licensor may have.

15.1.2. Grounds for Termination.  In addition to grounds for termination stated elsewhere in this Agreement, the following are grounds for termination of this Agreement;

15.1.3. Monetary Breaches of this Agreement.  If Licensee fails to pay any sum on the date due and such breach continues for a period of ten (10) days following Licensor's written notice of breach given to Licensee.

15.1.4. Non-Monetary Breaches.  Except as otherwise provided in Section 15.2.3?, if Licensee fails to timely and fully perform or breaches any non-monetary provision of this Agreement, Licensor shall give Licensee notice of breach and, to the extent such breach is capable of being cured, Licensee must cure such breach as soon as practicable and in any event within thirty (30) days except that, if the breach is such that it cannot be cured within thirty (30) days despite commercially reasonable efforts to do so, Licensee shall immediately commence to cure such breach and diligently prosecute such cure to completion.  Licensee shall report to Licensor, in writing, no later than ten (10) business days after the notice of breach, and at least once every two weeks after that until the breach is cured, what steps Licensee has taken and will take in order to cure such breach and to ensure that the breach does not occur again.

BM INIT ☒     CO INIT ☒

- 22 -

15.1.5. Grounds for Immediate Termination. Licensor may immediately terminate this Agreement:

15.1.5.1.　If a petition for relief under the Bankruptcy Code is filed by or against the Licensee, or if Licensee makes any assignment for the benefit of its creditors or becomes the subject of proceedings under any insolvency, reorganization, or receivership law, with termination to become effective automatically if Licensee fails within sixty days of commencement to discharge the bankruptcy or terminate the assignment or other proceedings. The license and rights granted hereunder are personal to Licensee. No assignee for the benefit of creditors, receiver, debtor in possession, trustee in bankruptcy, sheriff or any other officer or court charged with taking over custody of Licensee's assets or business, shall have any right to continue performance of this Agreement or to exploit or in any way use the Trademark if this Agreement is terminated pursuant to this subsection, except as may by required by law.

15.1.5.2.　Unless consented to by Licensor in writing in advance, such consent not to be unreasonably withheld, if there is any change of control of Licensee, consisting of one or more transfers (other than transfers among the existing shareholders of Licensee) which, in the aggregate, total fifty percent (50%) of the shares of stock of Licensee which are issued and outstanding upon execution of this Agreement, except for transfers to or between existing shareholders or members of their immediate families or trusts for their benefit, all of which shall be permitted.

16. Obligations at Expiration or Termination.

16.1.　　Termination of License. The License shall terminate for all purposes and all rights granted to Licensee to use the Trademark hereunder shall forthwith revert to Licensor; Licensee shall refrain from any use whatsoever of any Trademark; and neither Licensee nor its sub-contractors shall manufacture or Sell any Licensed Articles or any other products that may infringe upon the Trademark at any time following termination, subject only to the limited provisions of this Section hereof.

16.2.　　Limited Right of Sell-Off. Upon termination or expiration of this Agreement:

16.2.1. Licensee shall immediately provide Licensor with a complete and accurate written list of the current inventory of all units of Licensed Articles and Imported Articles which utilize the Trademark, either in hand as finished goods or which constituted work in process, as of the date of termination; and a complete and accurate written list of and evidence substantiating all uncancellable orders for the manufacture of Licensed Articles as of the date of termination (collectively, "Termination Inventory"). Such written lists shall be certified as complete and accurate by the President or Chief Financial Officer of Licensee.

16.2.2. In the event this Agreement is terminated other than for the material breach, nonpayment, within specified periods, of monies due herein or Bankruptcy of Licensee, then Licensee may, on a nonexclusive basis within the Licensed Territory only and in a manner otherwise consistent with this Agreement, dispose of quantities of the Termination Inventory for a period of six (6) months thereafter ("Sell-Off Period"); provided that (1) all payments then due are immediately reported and paid in full to Licensor or its designated nominee; (2) all statements and payments with respect to the Sell-Off Period are thereafter made in accordance with Sections 7.4 and 7.6 hereof for each of quarterly periods within such Period; (3) all units of Licensed Articles and Imported Articles to be Sold adhere to the quality and other standards provided for in this Agreement; (4) the quantities of units of Licensed Articles and Imported Articles to be Sold during the Sell-Off Period shall not materially exceed the quantities of the corresponding Licensed Articles or Imported Articles Sold by Licensee during the six-month period immediately prior to the termination of this Agreement; (5) no Sales shall occur directly or indirectly outside of the Licensed Territory; and (6) no Sales shall be made at any time directly or indirectly to any affiliate or successor or agent or representative of Licensee or any person related thereto.

16.2.3. A final certified written statement and payment for the final quarter of the Sell-Off Period shall be made within thirty (30) days after the end of the Period. Unless otherwise mutually agreed to in writing between the parties hereto, any Termination Inventory remaining after the Sell-Off Period pursuant to the terms hereof shall be destroyed or all reference to the Trademark shall be obliterated and written proof there of supplied to Licensor.

16.2.4. During the Sell-Off Period and for a period of six (6) months thereafter, Licensor or its representatives shall have the right to enter all relevant premises and conduct physical inventories and review all pertinent records in order to confirm that Licensee has complied with the terms of this Section 16. Any such inventories or reviews shall not be binding on Licensor. The foregoing further shall not limit or affect any other rights or remedies of Licensor hereunder or under applicable law, including but not limited to any right of audit or any pending; and shall not prejudice or affect any claim, action or cause of action of Licensor that shall survive the termination of this Agreement.

16.2.5. Notwithstanding the foregoing, in the event that this Agreement is terminated for the material breach, nonpayment, within specified periods, of monies due herein or Bankruptcy of Licensee, then Licensee may no longer Sell any units of the Licensed Articles or Import Articles or use the Trademark in any manner whatsoever, effective as of the date of termination. All units of the Licensed Articles or Import Articles shall be destroyed or all reference to the Trademark shall be obliterated and written proof there of supplied to Licensor.

16.3    Other Rights and Obligations. All other rights and obligations of the respective parties hereunder shall cease as of the date of termination, provided however that:

16.3.1. All rights and obligations of the respective parties under this Agreement relating to Royalties and Royalty statements and other payments due and owing, including all rights of audit;

16.3.2  All representations and warranties and disclaimers of the respective parties;

16.3.3. All rights and obligations of the respective parties under Section 2 hereof (Grant of Rights); Section 3 hereof (Limitations of Rights Granted); Section 4 hereof (Term of Agreement); Section 13.3 hereof (Limitation of Liabilities); Section 13 hereof (Indemnification); Section 12 hereof (Insurance); Section 14 hereof (Trade Secrets and Confidentiality); Section 15 hereof (Termination); this Section 16; Section 17.6 hereof (Assignability); Section 17.3 hereof (Equitable Relief); Section 10 (Force Majeure), and Section 17 hereof to the extent necessary or useful in the application or enforcement of the surviving provisions of this Agreement; and

16.3.4. Any claim or action or cause of action for breach or violation of this Agreement existing as of the date of termination;

16.3.4.1.  each shall not terminate and shall survive and remain in full force and effect for the period of the applicable statutes of limitation, until the relevant rights and obligations of the parties have been fully discharged and satisfied.

16.4.    No Liability or Prejudice. Neither party shall be liable to the other party for damages of any kind solely as a result of terminating this Agreement in accordance with its terms; and any such termination of this Agreement by a party will be without prejudice to any other rights or remedies of such party under this Agreement or applicable law.

17. General Provisions.

17.1.    Governing Law. This Agreement is to be construed in accordance with and governed by the internal laws of the State of California, United States of America, without giving effect to any choice of law rule that would cause the application of the laws of any jurisdiction other than the internal laws of the State of California to the rights and duties of the parties. All actions or disputes arising under this Agreement shall be brought exclusively in the Superior Court of the State of California for the County of San Francisco or in the Federal Court for the Northern District of California, United States of America, San Francisco Branch; and such courts shall have exclusive jurisdiction over disputes under this Agreement. Each of the parties expressly consents to jurisdiction and venue in such courts for all purposes of this Agreement or any dispute or controversy hereunder

17.2.    Disputes. Each of the parties irrevocably agrees to submit to the jurisdiction and venue of the United States District Court for the Northern District of California or the California State Supreme Court for resolution of any and all disputes relating to or arising out of this Agreement. Licensee acknowledges and agrees that the Trademark possesses a special, unique and extraordinary character, which makes difficult the assessment of monetary damages which Licensor might sustain by any use of the Trademark or other action of Licensee affecting the Trademark or Licensor's rights therein which is inconsistent with the terms and provisions of this Agreement, including any unauthorized use, and that irreparable injury would be caused to Licensor thereby, such that injunctive relief, specific performance and/or similar relief would be appropriate to prevent and restrain such uses or actions.

17.3.    Equitable Relief. Licensee acknowledges that a breach of its obligations under this Agreement would cause Licensor irreparable damage. Licensee therefore agrees that in the event of such breach or threatened breach, in addition to remedies at law, Licensor shall have the right to injunctive or other equitable relief to prevent Licensee's violations of its obligations hereunder.

17.4.    Attorneys' fees. The prevailing party in any action or proceeding relating to or arising out of this Agreement shall recover its reasonable attorney's fees and costs incurred in connection with such suit or proceeding in addition to its judgment, including fees and expenses incurred in any appellate proceedings.

17.5.    Independent Contractors. Each party is an independent contractor and the personnel of a party are not the employees or agents of the other party for federal, state or other taxes or any other purposes whatsoever, and are not entitled to compensation or benefits of the other party. This Agreement shall not create any relationship of agency or partnership or joint venture or franchise or other business entity between the parties of any kind or nature. No party has the right or authority to enter into any obligation for or to otherwise bind the other party to any extent.

17.6.    Assignability. This license and other rights granted in this Agreement are personal to Licensee, and Licensee may not assign or sublicense any of its rights or delegate any of its duties under, pledge or otherwise affect the license granted in, this Agreement without prior written consent of Licensor, except to an affiliate that agrees to be bound by this Agreement. Any attempted assignment or sublicense in violation of this provision shall be void. Licensor may assign this Agreement to any successor or to any person or entity which acquires the Trademark, subject to Licensor's obligations under this Agreement.

17.7.    Notices. Any notice or communication is effective when personally delivered in writing; or on the date when the notice or communication is telexed or telecopied and provided that any such telex or telecopy is confirmed on the day after the notice by overnight airmail courier (e.g., Federal Express); or upon receipt of a mailing by

certified mail, return receipt requested. All notices shall be sent to the parties at the notice addresses listed below, or such other addresses of which they hereafter notify each other in writing under the provisions of this Section.

To Licensor:
President
Blue Marlin Corp,
540 Florida Street
San Francisco, California 94410

To Licensee:
Concept One
362 Fifth Avenue, 2nd floor
New York, NY 10001

With a copy to:
Steve Gerber
666 Fifth Avenue
26th floor
New York, NY 10103

17.8.    Entire Agreement. This Agreement states the entire agreement between the parties, and supersedes all prior negotiations and agreements between the parties concerning its subject matter. This writing is intended as the final, complete and exclusive statement of the terms of the Agreement between the parties and cannot be changed or terminated orally. Each party to this Agreement acknowledges that no representations, inducements, promises, or agreements, oral or otherwise, have been made by either party, or anyone acting on behalf of either party, which are not embodied herein and no other agreement, statement, or promise not contained in this Agreement shall be valid or binding. Each party further states that such party is not relying upon any promise, representation, inducement or agreement, oral or otherwise, which is not expressly stated in this Agreement.

17.9.    Interpretation and Rules of Construction. Sections and section headings contained in this Agreement are for reference purposes only, and shall not affect in any manner the meaning of interpretation of this Agreement. Whenever the context requires, references to the singular shall include the plural and the plural the singular and any gender shall include any other gender. The parties acknowledge that each party has reviewed this Agreement, and no provision of this Agreement shall be interpreted for or against any party because such party or its representative drafted such provision.

17.10.    Survival. All obligations of the parties relating to protection of the Licensed Mark and indemnification, and such other provisions are intended to survive the termination or expiration of this Agreement.

BM CO FINAL                                    – 27 –                    BM INIT SS  CO INIT
Last printed 2/17/2004 12:42 PM

17.11    Severability. If any provision of this Agreement, or the application thereof to any person, place or circumstance, shall be held by a court of competent jurisdiction to be invalid, void or otherwise unenforceable, such provision shall be enforced to the maximum extent possible so as to effect the intent of the parties, or, if incapable of such enforcement, shall be deemed to be deleted from this Agreement, and the remainder of this Agreement and such provisions as applied to other persons, places and circumstances shall remain in full force and effect.

17.12    Binding Agreement. This Agreement shall be binding on and inure to the benefit of the parties and their respective successors, agents, affiliates, representatives and permitted assigns.

17.13    Counterparts. This Agreement may be executed in any number of counterparts, each of which shall be deemed an original of this Agreement, but all of which together shall constitute on and the same instrument.

IN WITNESS WHEREOF, the parties have executed this Agreement to be effective as of the Effective Date.

LICENSEE:                                            LICENSOR:

By:_____          By:_____
    Its' Authorized Officer                          Its' Authorized Officer

<u>SCHEDULE A</u>

1. <u>Trademarks, Logos, etc.:</u>

   <u>Serial #: 76/370876:</u>

   

   "BLUE MARLIN"

   <u>Serial #: 78/152681:</u>

   

   "BLUE MARLIN
   FIVE STAR VINTAGE"

   <u>Serial #: 76/325790:</u>
   "BLUE MARLIN
   FIVE STAR VINTAGE"

   <u>Serial #: 76/325789:</u>

   

   "FIVE STAR
   VINTAGE"

   <u>Serial #: 76/370837:</u>

2. <u>Licensed Products</u>

   (a)    Men's, women's, and young men's Hats including but not limited to Knitted hats.

BM CO FINAL
Last printed 2/17/2004 12:42 PM

BM INIT __SG__  CO INIT __AV__

EXHIBIT B

Yahoo! Mail · randall_riccardo@yahoo com

Page 1 of 3



Welcome, randall_riccardo
[Sign Out, My Account]

Mail Home · Mail Tutorials · Help

Mail    Addresses    Calendar    Notepad    What's New · Mail For Mobile · Upgrades · Options

| Check Mail | Compose |

Search Mail    Search the Web

Previous | Next | Back to Search Results

| Delete | Reply | Forward | Spam | Move... |

This message is not flagged. [ Flag Message · Mark as Unread ]    Printable View

**From:**    Erik Stuebe  <estuebe@bluemarlincorp com>  [ View Contact Details ]
     Add Mobile Alert

**To:**    'randall_riccardo' <randall_riccardo@yahoo.com>

**Subject:**    Fw:

**Date:**    Wed, 29 Mar 2006 13:59:56 -0800

Randy,

let's discuss

erik

--- Original Message ---
**From:** Sam Hafif
**To:** Erik Stuebe
**Cc:** Rick Ashley ; Bernie Hafif ; Steven Gerber ; sam@concept1 com
**Sent:** Wednesday, March 29, 2006 1:16 PM

Dear Erik,

Randal Ricardo called on your behalf on Monday to advise that you were not willing to renegotiate the terms of the license agreement between Concept One and Blue Marlin   My response was that we would not agree to pay the minimum royalties as stated in the contract based on the following:

    1)  Breach of exclusivity –  For several months after the license agreement went into effect Blue Marlin continued to distribute headwear from their inventory into the market

    2)  Misrepresentation – As our initial meetings with you and Per, you stated that at peak your headwear business had achieved $3,000,000 in revenue, and for the year prior to

http: us f318 mail yahoo com/ym/ShowLetter;_ylc=X3oDMTIR1MmpwM2puBEf jdGIvbg     6/14/2006

Netflix-$5.99/mo
No Late Fees!

✉ Find Any
  Email Address

🎓 Online Degree
   Programs

our entering into license with you, it was $700,000. We based
our proposals and sales projections on that advice
Subsequent to signing the license we learned that
information to be false. Further, account lists that were
provided to us as a basis for distribution turned out to be
outdated as 75% of the specialty stores on those lists were
inactive for a period of time and advised us that they had
dropped Blue Marlin and had no interest in buying the
brand.

3) Changes to the marks -- Prior to our entering into the
agreement, Blue Marlin had been using several marks
including the Blue Dot mark for many years, shortly after
signing the license we were advised that you were not
going forward with those marks, and we were prohibited
from using them on product, packaging, and displays. You
never adopted a permanent mark thereafter changing your
mark every 3-4 months (shields, lions, stars, shields w lions
and stars, no stars etc). This diminished the value of the
Blue Marlin brand, and did not enable us to develop the
business using the mark that was presented to us prior to
signing

4) Delay of approvals -- This year you held us off for 4 months
from developing Fall while you were deciding whether or
not to pull the license back in house. This caused us to
miss an entire shipping period of merchandise.

For months now, you have aluded that you wish to discontinue the
license agreement with Concept One, but have not directly
addressed the minimum royalty issue. There is no point in
tiptoeing around this issue, so I am stating directly that we will not
accept that obligation. If need be we are prepared to defend our
position legally

I offer you the following two alternatives

1) Concept One continues to exploit the license to the best of
it's ability, and minimum royalties are reduced to actual
royalties earned for 04-05, 50k for 05-06, and 75k for 06-
07
2) The license is immediately terminated with no obligation to
Concept One to pay additional royalties (except for actual
sales). Merchandise is either sold to you at landed cost, or
to the market during a 90 day sell-off period.

We do not wish to attend your design and sales meetings next

week, unless this issue is resolved prior to. Unless we hear from you, we will not attend.

The intent of this letter is for the purpose of trying to reach a settlement only, and we're reserving all of our rights, and making no admissions.

We look forward to your response.

Best Regards,

Sam Hafif

Delete | Reply ∨ | Forward ∨ | Spam | Move... ∨

Previous | Next | Search Results                    Save Message Text | Full Headers

Check Mail | Compose |                        Search Mail | Search the Web |

Copyright © 1994-2006 Yahoo! Inc. All rights reserved. Terms of Service - Copyright/IP Policy - Guidelines - Ad Feedback
NOTICE: We collect personal information on this site.
To learn more about how we use your information, see our Privacy Policy

http://us.f318.mail.yahoo.com/ym/ShowLetter;_ylc=X3oDMTRrMmpwM2puBEFjdGlvbg...  6/14/2006



Exhibit B

SOMMERS LAW GROUP
STEPHEN A. SOMMERS, SBN 225742
JACOB W. SIDER, SBN 236084
870 Market Street, Ste. 1142
San Francisco, CA 94102
(415) 839-8569 (Tel)
(415) 956-0878 (Fax)
slg@sommers-law.net

Attorneys for Plaintiff/Cross Defendant
Blue Marlin Corp.

SUPERIOR COURT OF THE STATE OF CALIFORNIA
COUNTY OF SAN FRANCISCO
UNLIMITED JURISDICTION

| | |
|---|---|
| BLUE MARLIN CORP., <br><br> Plaintiff, <br><br> vs. <br><br> USPA ACCESSORIES, LLC dba CONCEPT ONE ACCESSORIES, <br><br> Defendant. <br><br>———————————————— <br><br> USPA ACCESSORIES, LLC dba CONCEPT ONE ACCESSORIES, <br><br> Cross Complainant, <br><br> vs <br><br> BLUE MARLIN CORP., an Illinois corporation; and Does 1 to 25, inclusive, <br><br> Cross Defendants | Case No. CGC-453170 <br> **PLAINTIFF BLUE MARLIN'S FIRST AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF** <br><br><br><br><br><br><br> Complaint Filed:   June 15, 2006 <br> Trial Date:         July 2, 2007 |

///

///

Plaintiff alleges:

## PARTIES AND JURISDICTION

1. At all material times hereto plaintiff, Blue Marlin Corp., has been a California corporation doing business as an apparel wholesaler.

2. Plaintiff is informed and believes and thereon alleges, that at all material times hereto, defendant, USPA Accessories, LLC, and Does 1-10, has been a New York Corporation, located in the city of New York.

3. The true names and capacities of defendants named herein as Does 1-10 inclusive are unknown to plaintiff at this time, who therefore sues defendants by such fictitious names and plaintiff will ask leave of court to amend this complaint to insert the true names and capacities of such fictiously named defendants when they have been ascertained. Plaintiff alleges on information and belief that such defendants are responsible for the debts hereinafter alleged.

4. Jurisdiction will be properly exercised by this Court because the claims and obligations sued upon herein were made and entered into and are due and payable in this judicial district. Additionally, under the terms of the contract entered into between the parties, such contract being subject of the instant action, the defendant has voluntarily agreed to submit all disputes arising under such contract to this Court.

## GENERAL ALLEGATIONS

5. Blue Marlin was founded in 1994 as a headwear wholesaler. Its initial line of product was inspired by teams from the Negro Leagues, the Latin Leagues, the Pacific Coast Leagues, and other defunct baseball teams from the early 1900's. Its early product offering featured baseball caps; these hats were in an instant success and were soon worn by various celebrities including Bruce Springsteen, Dusty Baker, Bruce Willis, Bono and others.

SOMMERS LAW GROUP

1    6.   Beginning in 1996, Blue Marlin expanded into vintage-inspired sportswear

2    consisting of sweatshirts, sweatpants, track jackets, polo shirts, T-shirts, jeans, bags, belts,

3    footwear, and other items. Blue Marlin is currently sold in over 500 stories nationwide

4    including Bloomingdale's, Macy's, Marshall Field's, Lord & Taylor, Nordstrom and a

5    variety of specialty stores.

6    7.   January 1, 2004, defendant entered into a contract agreement under which USPA

7    would design, manufacture, market and sell Blue Marlin headwear under a license agreement

8    (hereinafter the "License Agreement"). The License Agreement term ran from February 1,

9    2004 through June 30, 2007 (See Exhibit A). Under the terms of the License Agreement

10   defendant obligated itself to pay guaranteed minimum royalties of $75,000 for the first year

11   of the license, $120,000 for the second year of the license and $150,000 for the third year of

12   the license. The license royalty was 8% on any amounts exceeding the minimum guaranteed

13   royalty. These minimum royalties are due and payable regardless of the quantity of product

14   defendant actually sells. Additionally, the defendant must to pay a 2% advertising royalty

15   and expend another 2% on advertising on the defendant's net sales.

16   8.   Through March 1, 2006, defendant has underpaid plaintiff on the guaranteed

17   minimum royalties and advertising royalties and contributions by $78,139.23.

18   9.   On March 29, 2006, defendant's CEO, Sam Hafif, sent an email to Erik Stuebe,

19   CEO for plaintiff, in which Hafif stated, inter alia, that "we would not agree to pay the

20   minimum royalties as stated in the contract.." and "there is no point in tiptoeing around this

21   issue, so I am stating directly that we will not accept that obligation. " (See Exhibit B).

22   Defendant, through Hafif, also expressed the same message to CEO Stuebe in a telephone

23   conversation on March 21, 2006.

24   10.  On June 14, 2006, plaintiff, through the undersigned counsel, sent a letter via

25   Federal Express, to defendant informing defendant that they were in breach of the License

26   Agreement and demanding payment. This notice of breach was required under the terms of

27   the attached License Agreement. Plaintiff demanded that defendant remit payment for

28   royalties currently owed under the License, totaling $78, 139.23. Defendant was also

1  informed that if it wished to not honor its obligations under the License Agreement, plaintiff

2  would accept immediate payment of $234,139.23: such amount constituting the balance

3  owed on the License Agreement along with the outstanding royalty payments.

4      11. Plaintiff has at all times performed all conditions, covenants and promises

5  required to be performed in accordance with the terms of the License.

6      12. Based on the unequivocal statements made by the defendant, through the attached

7  email, and statements made orally to the plaintiff's CEO, Erik Stuebe, plaintiff considers

8  defendant to have anticipatorily breached the Agreement.

9      13. Upon information and belief, plaintiff became aware that defendant was

10  continuing to sell headwear previously the subject of the License Agreement, bearing Blue

11  Marlin's BLUE MARLIN, BLUE MARLIN (and design), FIVE STAR, FIVE STAR

12  VINTAGE, FIVE STAR (design) trademarks (hereinafter the "Blue Marlin trademarks")

13  which were the subject of the License Agreement, at severe discounts. As the License

14  Agreement had long since terminated, such sales of headwear by defendant constitute clear

15  willful trademark infringement, tarnishing Blue Marlin's brand, image, reputation and good

16  will and misleading the public.

17      14. Defendant's sale of the infringing headwear is likely to cause confusion, mistake

18  and deception among the customers of the headwear and such customers are likely to be

19  confused into believing there is an association still in existence between the plaintiff and

20  defendant.

21      15. Defendant acted in bad faith by willfully selling and distributing product bearing

22  plaintiff's BLUE MARLIN trademarks when it knew full well that it was no longer

23  authorized to distribute product bearing the BLUE MARLIN trademarks under the License

24  Agreement. The BLUE MARLIN trademarks are federally registered, valid and subsisting.

25  (See Exhibit C). The License Agreement called for the defendant to immediately cease using

26  the Blue Marlin trademarks upon the termination of the agreement.

27      16. Upon information and belief, plaintiff became aware that defendant had

28  appropriated a copyright in the form of a design graphic featuring a stylized rendering of the

1   letter "NYC" (hereinafter the "NYC copyright"). The NYC copyright had been used by the

2   plaintiff on their FIVE STAR brand of apparel and headwear. Defendant had access to these

3   copyright designs; however, they were licensed for use only in connection with the License

4   Agreement and such License Agreement had been terminated months previously by the

5   plaintiff. Defendant willfully and intentionally used these copyright designs on headwear

6   which was sold under another brand, entitled "ROMA", owned by plaintiff and licensed to

7   defendant. The ROMA brand is the subject of a different license agreement between the

8   parties.

9          17. Defendant had access to the NYC copyright through the plaintiff's on-line design

10  database made available to its licensees.   The NYC copyright is being used without the

11  authorization or consent of plaintiff. The use of the NYC copyright on an inferior grade

12  product, at a lower-tier retailer than the copyright design had hitherto been used, has severely

13  damaged the underlying value of the work. An example of product, bearing the infringing

14  NYC copyright design, is attached as Exhibit D

15         18. As a result of defendant's copyright and trademark infringement, plaintiff seeks

16  seizure, impoundment and destruction of all product used to perpetuate the infringing acts

17  pursuant to 17 U.S.C. § 503. Plaintiff is also entitled to an accounting for profits, damages,

18  costs and reasonable attorneys' fees in connection therewith.   Plaintiff prays for preliminary

19  and injunctive relief enjoining and restraining defendant and its officer, employees and

20  agents from directly or indirectly using, selling, marketing manufacturing or distributing

21  product bearing plaintiff's copyright designs and trademarks. Plaintiff is entitled to the costs

22  of corrective advertising, and because defendant's actions are willful, is entitled to a trebling

23  of all damages pursuant to 15 U.S.C. § 1117.

24

25                          **FIRST CAUSE OF ACTION**

26                          **OPEN BOOK ACCOUNT**

27         19. Within four years preceding the commencement of this action, the defendant

28  entered into the aforementioned License Agreement, obligating and indebting itself on a

SOMMERS LAW GROUP

SOMMERS LAW GROUP

1  book account for a sum of $358,800 as defined by § 337 of the California Code of Civil

2  Procedure for payments to be made under a written agreement. While demand has been

3  made, no payment has been made, and there is now due, owing and unpaid the sum

4  $234,139.23 together with legal interest thereon at the legal rate of 10% per annum from

5  March 31, 2006.

6

7  ## SECOND CAUSE OF ACTION

8  ### ACCOUNT STATED

9  20. Plaintiff repeats and realleges each and every allegation contained in paragraphs

10  1-19 of the complaint as full set forth herein

11  21. Within four years preceding the commencement of this action, an obligation on an

12  account was stated in writing by and between plaintiff and defendant, wherein it was agreed

13  that defendant was indebted to the plaintiff in the sum of no less than $358,800. together with

14  interest thereon at the legal rate of 10% per annum from March 31, 2006 which amount

15  remains unpaid despite defendants promise to pay.

16

17  ## THIRD CAUSE OF ACTION

18  ### BREACH OF CONTRACT-COMMON COUNT

19  22. Plaintiff repeats and realleges each and every allegation contained in paragraphs

20  1-21 of the complaint as full set forth herein.

21  23. On January 1, 2004, plaintiff and defendant entered into a written contract, the

22  License Agreement, (a copy of which has been attached as Exhibit A and made a part of this

23  pleading). On March 29, 2006, defendant, by email (a copy of which is attached as Exhibit B

24  and made part of this pleading) gave notice that defendant would not perform the contract,

25  whereby defendant totally repudiated the License Agreement. Defendant's repudiation has

26  not been retracted despite plaintiff's demand that defendant perform its obligations and pay

27  $234,139.23

28

24. At the time plaintiff received defendant's repudiation plaintiff had performed all of the conditions on its part to be done and performed, and was ready, able and willing to perform those conditions.

## FOURTH CAUSE OF ACTION

### FEDERAL TRADEMARK INFRINGEMENT

25. Plaintiff repeats and realleges each and every allegation contained in paragraphs 1-24 of the complaint as full set forth herein.

26. The acts and omissions of the defendant described above are likely to cause confusion, or to cause mistakes, or to deceive and therefore constitute infringement of plaintiff's federally registered trademarks under Section 32 of the Lanham Act, 15 U.S.C. § 1114.

27. As alleged above, plaintiff has valid federal trademark registrations for the BLUE MARLIN trademarks (copies of which are attached as Exhibit C).

28. Defendant's use of the BLUE MARLIN trademarks is likely to cause confusion for consumers as to the origin of defendant's products.

29. Defendant's wrongful acts will permit defendants to make substantial sales and profits on the strength of plaintiff's success, goodwill and consumer recognition of its BLUE MARLIN trademarks.

30. As a direct and proximate result of defendant's wrongful conduct, plaintiff will be deprived of the value of, among other things, its BLUE MARLIN trademarks as commercial assets.

31. As a direct and proximate result of defendant's wrongful conduct, plaintiff has been damaged by defendant's wrongful acts, and such damage will continue unless the Court enjoins defendant's acts.

## FIFTH CAUSE OF ACTION

### FEDERAL UNFAIR COMPETITION

32. Plaintiff repeats and realleges each and every allegation contained in paragraphs 1-31 of the complaint as full set forth herein.

SOMMERS LAW GROUP

1   33. The acts of the defendant described above constitute unfair competition and false

2   designation of origin in violation of Section 43(a) of the Lanham Act § 1125(a)

3   34. As alleged above, plaintiff has used its BLUE MARLIN trademarks to distinguish

4   its products from those offered by others. Those products have been distributed in trade

5   channels similar to those in which defendant does business.

6   35. Defendant's use of the BLUE MARLIN trademarks is likely to cause confusion

7   for consumers as to the origin of defendant's products.

8   36 In addition, defendant's use of plaintiff's BLUE MARLIN trademarks under the

9   circumstances constitutes false designation of origin of products and services.

10   37. As a direct and proximate result of defendant's wrongful conduct, plaintiff has

11   been damaged by defendant's wrongful acts, and such damage will continue unless the Court

12   enjoins defendant's acts.

13   ## SIXTH CAUSE OF ACTION

14   ## TRADEMARK INFRINGEMENT UNDER CALIFORNIA LAW

15   ## (CALIFORNIA BUS. & PROF. CODE § 14320)

16   38. Plaintiff repeats and realleges each and every allegation contained in paragraphs

17   1-37 of the complaint as full set forth herein.

18   39. By the acts and omissions set forth above, defendants have infringed and continue

19   to infringe plaintiff's rights regarding plaintiff's federal trademark registrations, in violation

20   of California Business and Professions Code §§ 14320 and 14330. Defendant's conduct is

21   likely to cause confusion, mistake and deception among the general purchasing public, and

22   interfere with plaintiff's ability to use its BLUE MARLIN trademarks to in indicate a single

23   quality control source of goods and services.

24   40. Plaintiff has suffered, and is suffering, and will continue to suffer irreparable

25   injury for which plaintiff has no adequate remedy at law. Plaintiff is therefore entitled to a

26   permanent injunction against further infringing conduct by the defendant.

27   ///

28   ///

SOMMERS LAW GROUP

## SEVENTH CAUSE OF ACTION

### FALSE ADVERTISING UNDER STATE LAW

### (CALIFORNIA BUS. & PROF. CODE §§ 17500, 17535)

41. Plaintiff repeats and realleges each and every allegation contained in paragraphs 1-40 of the complaint as full set forth herein.

42. Defendant's acts as alleged herein constitute the use of deceptive, untrue and misleading advertising, of which defendant's knew or should have known, thereby impairing plaintiff's goodwill and otherwise adversely affecting plaintiff's business and reputation. These acts constitute false advertising under California Business and Professions Code §§ 17500 and 17535, and California common law.

43. Money damages will not adequately remedy plaintiff's injuries. Plaintiff is therefore entitled to injunctive relief prohibiting defendant from continuing such acts of false and misleading advertising.

44. Plaintiff is also entitled to damages, defendant's profits and other damages according to proof at trial, including costs and attorneys' fees.

### EIGHTH CAUSE OF ACTION

### UNFAIR BUSINESS PRACTICES—CALIFORNIA LAW

### (CALIFORNIA BUS. & PROF. CODE §§ 17200 AND 17203)

45. Plaintiff repeats and realleges each and every allegation contained in paragraphs 1-44 of the complaint as full set forth herein.

46. The acts of the defendant described above are likely to mislead the general public and therefore constitute unfair and fraudulent business practices and unfair, deceptive, untrue, and misleading advertising in violation of California Business and Professions Code §§ 17200 and 17203.

47. The acts of untrue and misleading advertising by the defendant described above present a continuing threat to members of the public in that the defendant will misrepresent the source of their headwear.

SOMMERS LAW GROUP

SOMMERS LAW GROUP

48. The defendant's false and misleading advertising will permit the defendant to make substantial sales and profits on the strength of the plaintiff's success, goodwill, and consumer recognition.

49. As a direct and proximate result of the defendant's wrongful conduct, plaintiff has been damaged by the defendant's wrongful acts, and such damage will continue unless the Court enjoins defendant's wrongful acts.

## NINTH CAUSE OF ACTION

## COPYRIGHT INFRINGEMENT

50. Plaintiff repeats and realleges each and every allegation contained in paragraphs 1-49 of the complaint as full set forth herein.

51. Plaintiff is the sole and exclusive owner of all right, title and interest to the NYC copyright.

52. Defendant had access to the NYC copyright prior to the design and manufacture of the ROMA branded headwear on which the NYC copyright appears. Plaintiff is informed and believes that defendant copied the design covered by the NYC copyright and have published, marketed and distributed infringing product bearing the plaintiff's NYC copyright. Plaintiff sold product, containing plaintiff's NYC copyright, nationwide through Target stores (a copy of the infringing cap is attached as Exhibit D).

53. Defendant's actions were willful, intentional, and purposeful, in disregard of plaintiff's copyright rights.

54. Because of defendant's activities, which are likely to continue causing substantial and irreparable injury to the plaintiff and to the public, plaintiff is entitled to preliminary and permanent injunctive relief, damages and defendant's profits pursuant to U.S.C. §§ 502 and 504(b) for each infringement. Plaintiff is also entitled to attorney's fees and costs pursuant thereto.

///

///

///

///

## PRAYER FOR DAMAGES

WHEREFORE, plaintiff respectfully prays for judgment against defendant as follows:

1. For damages on the first, second and third causes of action in the amount of $234,139.23;

2. For interest thereon at the legal rate of 10% per annum;

3. For costs of suit incurred herein;

4. That defendant be required to account for all gains, profits and advantages derived from each of its infringements of the trademarks and copyrights of plaintiff and to pay plaintiff such damages as plaintiff has sustained in consequence of each of defendant's infringements of the trademarks and copyrights owned by plaintiff;

5. That all infringing product bearing the plaintiff's trademarks and copyrights be seized, impounded and destroyed;

6. That a permanent injunction issue restraining and enjoining defendant, its officers, agents, attorneys, directors, employees and those acting in privity or in concert with them from direct or indirectly using, in any fashion, any of plaintiff's trademarks or copyrights;

7. That defendant be ordered to pay compensatory damages;

8. For nominal damages;

9. For attorney's fees incurred in this action;

10. That treble damages and enhanced profits be paid to the plaintiff pursuant to 15 U.S.C. § 1117(a);

11. That defendant be ordered to pay punitive damages as a consequence of the willful and wonton acts alleged herein;

12. That defendant pay plaintiff's costs of corrective advertising;

13. For such other and further relief as the Court deems just and equitable.

SOMMERS LAW GROUP

1

2   June 18, 2007

3

SOMMERS LAW GROUP

By: _____

STEPHEN SOMMERS
JACOB W. SIDER
Attorneys for Plaintiff/Cross Defendant
Blue Marlin Corp.

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

POS-040

| ATTORNEY OR PARTY WITHOUT ATTORNEY (Name, State Bar number, and address): | FOR COURT USE ONLY |
|---|---|
| Stephen Sommers, SBN 225742<br>Sommers Law Group<br>870 Market Street, Suite 1142<br><br>San Francisco, CA 94102<br>TELEPHONE NO: 415-839-8569    FAX NO (Optional): 415-956-0878<br>E-MAIL ADDRESS (Optional): slg@sommers-law.net<br>ATTORNEY FOR (Name): Blue Marlin Corp. | |

SUPERIOR COURT OF CALIFORNIA, COUNTY OF San Francisco
    STREET ADDRESS: 400 McAllister Street
    MAILING ADDRESS:
    CITY AND ZIP CODE: San Francisco, CA 94102
    BRANCH NAME: Civic Center

PETITIONER/PLAINTIFF: Blue Marlin Corp., Plaintiff

RESPONDENT/DEFENDANT: USPA Accessories, LLC dba Concept One Accessories

| | CASE NUMBER: |
|---|---|
| **PROOF OF SERVICE—CIVIL**<br>Check method of service (only one): | CGC-06-453170 |

| | | | JUDGE: |
|---|---|---|---|
| ☐ By Personal Service | ☒ By Mail | ☐ By Overnight Delivery | |
| ☐ By Messenger Service | ☐ By Facsimile | ☐ By E-Mail/Electronic Transmission | DEPT: |

*(Do not use this Proof of Service to show service of a Summons and Complaint.)*

1. At the time of service I was over 18 years of age and **not a party to this action.**

2. My address is (specify one):
    a. ☒ Business: 870 Market Street, Suite 1142, San Francisco, CA 94102    b. ☐ Residence:

3. On (date): June 20, 2007    I served the following **documents** (specify): First Amended Complaint

    ☐ The documents are listed in the *Attachment to Proof of Service—Civil (Documents Served)* (form POS-040(D))

4. I served the documents on the **persons** below, as follows:
    a. Name of person served: Peter M. Cho

    b. Address of person served: 2029 Century Park East, 14th floor, Los Angeles, CA 90067

    c. Fax number or e-mail address of person served, if service was by fax or e-mail:

    d. Time of service, if personal service was used:

    ☐ The names, addresses, and other applicable information about the persons served is on the *Attachment to Proof of Service—Civil (Persons Served)* (form POS-040(P))

5. The documents were served by the following means (specify):
    a. ☐ **By personal service.** I personally delivered the documents to the persons at the addresses listed in item 4. (1) For a party represented by an attorney, delivery was made to the attorney or at the attorney's office by leaving the documents in an envelope or package clearly labeled to identify the attorney being served with a receptionist or an individual in charge of the office. (2) For a party, delivery was made to the party or by leaving the documents at the party's residence with some person not less than 18 years of age between the hours of eight in the morning and six in the evening.

| | | |
|---|---|---|
| Form Approved for Optional Use<br>Judicial Council of California<br>POS-040 [New January 1, 2005] | **PROOF OF SERVICE—CIVIL**<br>**(Proof of Service)** | Legal<br>Solutions<br>ᒪᒪ Plus | Code of Civ. Proc., §§ 1011,<br>1013, 1013a, 2015.5 |

| CASE NAME Blue Marlin Corp. v. USPA | CASE NUMBER:<br>CGC-06-453170 |
|---|---|

5  b  [X]  **By United States mail.** I enclosed the documents in a sealed envelope or package addressed to the persons at the addresses in item 4 and *(specify one):*

    (1)  [X]  deposited the sealed envelope with the United States Postal Service, with the postage fully prepaid.

    (2)  [ ]  placed the envelope for collection and mailing, following our ordinary business practices. I am readily familiar with this business's practice for collecting and processing correspondence for mailing. On the same day that correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service, in a sealed envelope with postage fully prepaid.

    I am a resident or employed in the county where the mailing occurred. The envelope or package was placed in the mail at *(city and state):* San Francisco, California

  c.  [ ]  **By overnight delivery.** I enclosed the documents in an envelope or package provided by an overnight delivery carrier and addressed to the persons at the addresses in item 4. I placed the envelope or package for collection and overnight delivery at an office or a regularly utilized drop box of the overnight delivery carrier.

  d.  [ ]  **By messenger service.** I served the documents by placing them in an envelope or package addressed to the persons at the addresses listed in item 4 and providing them to a professional messenger service for service. *(A declaration by the messenger must accompany this Proof of Service or be contained in the Declaration of Messenger below.)*

  e.  [ ]  **By fax transmission.** Based on an agreement of the parties to accept service by fax transmission, I faxed the documents to the persons at the fax numbers listed in item 4. No error was reported by the fax machine that I used. A copy of the record of the fax transmission, which I printed out, is attached.

  f.  [ ]  **By e-mail or electronic transmission.** Based on a court order or an agreement of the parties to accept service by e-mail or electronic transmission, I caused the documents to be sent to the persons at the e-mail addresses listed in item 4. I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Date: June 20, 2007

Rory Quintana
(TYPE OR PRINT NAME OF DECLARANT)                                   (SIGNATURE OF DECLARANT)

*(If item 5d above is checked, the declaration below must be completed or a separate declaration from a messenger must be attached.)*

### DECLARATION OF MESSENGER

[ ]  **By personal service.** I personally delivered the envelope or package received from the declarant above to the persons at the addresses listed in item 4. (1) For a party represented by an attorney, delivery was made to the attorney or at the attorney's office by leaving the documents in an envelope or package, which was clearly labeled to identify the attorney being served, with a receptionist or an individual in charge of the office. (2) For a party, delivery was made to the party or by leaving the documents at the party's residence with some person not less than 18 years of age between the hours of eight in the morning and six in the evening.

At the time of service, I was over 18 years of age. I am not a party to the above-referenced legal proceeding.

I served the envelope or package, as stated above, on *(date):*

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Date:

(NAME OF DECLARANT)                                                   (SIGNATURE OF DECLARANT)

POS-040 [New January 1 2005]                **PROOF OF SERVICE—CIVIL**
                                            **(Proof of Service)**