David M. Bass (State Bar No. 117199)
Peter M. Cho (State Bar No. 213870)
DAVID M. BASS & ASSOCIATES
2029 Century Park East, 14th Floor
Los Angeles, California 90067
Telephone: (310) 789-1152
Facsimile: (310) 789-1149
E-mail: dbass@basslawla.com

Attorneys for Defendant and Counterclaim
Plaintiff USPA ACCESSORIES, LLC

ORIGINAL
FILED

JUN 2 7 2007

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

|  |  |
|---|---|
| BLUE MARLIN CORP., <br><br> Plaintiff, <br><br> vs. <br><br> USPA ACCESSORIES, LLC dba CONCEPT ONE ACCESSORIES, <br><br> Defendant. | Case No. C 07 3368 EMC <br><br> **PLEADINGS AND ORDERS FROM STATE COURT ACTION RE NOTICE OF REMOVAL OF ACTION UNDER 28 U.S.C. § 1441(b)** <br><br> [Notice of Removal of Action filed concurrently herewith] |
| USPA ACCESSORIES, LLC dba CONCEPT ONE ACCESSORIES, <br><br> Counterclaim Plaintiff, <br><br> vs. <br><br> BLUE MARLIN CORP., a California corporation; and ROES 1 to 25, inclusive, <br><br> Counterclaim Defendants. | |

///

///

///

///

///

**TO THE CLERK OF THE ABOVE-ENTITLED COURT:**

Pursuant to 28 U.S.C. § 1446(a), Defendant and Counterclaim Plaintiff USPA Accessories, LLC ("USPA") hereby files, concurrently with its Notice of Removal of Action, copies of the pleadings and orders filed with the Superior Court of California in and for the County of San Francisco in an action entitled *Blue Marlin Corp. v. USPA Accessories, LLC*, case number CGC-06-453170. These pleadings and orders are as follows:

| Tab No. | Date | By | Pleading/Order |
|---------|------|----|----------------|
| 1. | 6/15/06 | Blue Marlin Corp. ("BMC") | Summons and Complaint |
| 2. | 6/15/06 | Court | Notice to Plaintiff of Case Management Conference |
| 3. | 8/23/06 | USPA | Motion to Strike |
| 4 | 9/8/06 | BMC | Opposition to Motion to Strike |
| 5 | 9/14/06 | USPA | Reply in support of Motion to Strike |
| 6 | 9/22/06 | USPA | Request to Appear at Hearing by Telephone |
| 7. | 11/2/06 | USPA and BMC | Case Management Statement |
| 8 | 11/8/06 | Court | Order Continuing Case Management Conference |
| 9. | 11/13/06 | BMC | Motion for Preliminary Injunction |
| 10. | 11/29/06 | USPA | Request to Appear at Hearing by Telephone |

1

| 11. | 11/30/06 | USPA | Ex Parte Application for Order (1) Taking Improperly Served Motion Off Calendar, and (2) Resetting Hearing on Motion |
| 12. | 12/1/06 | Court | Order Granting Ex Parte Application |
| 13. | 12/1/06 | BMC | Motion for Preliminary Injunction |
| 14. | 12/1/06 | BMC | Notice of Entry of Order Denying Motion to Strike |
| 15 | 12/14/06 | USPA | Answer to Complaint |
| 16. | 12/14/06 | USPA | Cross-Complaint |
| 17 | 12/19/06 | USPA | Ex Parte Application for Entry of Stipulation on Briefing Schedule as Order |
| 18. | 12/20/06 | Court | Order Extending Time to File Briefs re Motion for Preliminary Injunction |
| 19. | 12/21/06 | Court | Notice of Trial Date and Mandatory Settlement Conference |
| 20. | 12/21/06 | USPA | Opposition to Motion for Preliminary Injunction |
| 21. | 12/28/06 | BMC | Reply in support of Motion for Preliminary Injunction |
| 22 | 1/7/07 | BMC | Notice of Rescheduled Hearing on Motion for Preliminary Injunction |
| 23. | 1/29/07 | Court | Notice of Early Settlement Conference |
| 24. | 2/5/07 | BMC | Answer to Cross-Complaint |
| 25. | 2/15/07 | Court | Order Denying Motion for Preliminary Injunction |

2

| 26. | 2/22/07 | USPA | Notice of Entry of Order Denying Motion for Preliminary Injunction |
| 27. | 5/17/07 | BMC | Notice of Association of Counsel |
| 28. | 5/24/07 | BMC | Stipulated Ex Parte Application for Order to Continue Trial Date |
| 29 | 5/24/07 | Court | Order Granting Stipulated Ex Parte Application to Continue Trial Date |
| 30. | 5/24/07 | Court | Notice of Rescheduled Mandatory Settlement Conference |
| 31. | 6/7/07 | Court | Order re: Stipulated Protective Order |
| 32. | 6/21/07 | Court | Order re: Stipulation Setting Hearing Date for Motion to Compel Further Discovery and Depositions |
| 33. | 6/21/07 | Court | Order re: Stipulation to Filing of First Amended Complaint |
| 34 | 6/21/07 | BMC | First Amended Complaint |

Dated: June 26, 2007

DAVID M. BASS & ASSOCIATES

By: _____

Peter M. Cho
Attorneys for Defendant and Counterclaim
Plaintiff USPA ACCESSORIES, LLC

1

**PROOF OF SERVICE**
[C.C.P., §§1013(a) and 2015.5]

2

3   **UNITED STATES DISTRICT COURT**          )   Case No
                                              )
4   **NORTHERN DISTRICT OF CALIFORNIA**       )

5          I am employed in the county of Los Angeles, State of California. I am over the age of
6   18 and not a party to the within action; my business address is 2029 Century Park East,
    14th Floor, Los Angeles, California 90067

7          On June 26, 2007, I served the foregoing document described as **PLEADINGS AND
8   ORDERS FROM STATE COURT ACTION RE NOTICE OF REMOVAL OF ACTION
    UNDER 28 U.S.C. § 1441(b)** on all interested parties in this action by placing the original/true
9   copies thereof enclosed in (a) sealed envelope(s) addressed as stated below:

10         Randall Riccardo, Esq.              Stephen A. Sommers, Esq.
           299 Kansas Street                   Sommers Law Group
           San Francisco, CA 94103            870 Market Street
11                                             Suite 1142
                                               San Francisco, CA 94102
12

13   ☐   **BY MAIL**     I am "readily familiar" with the firm's practice of collection and
         processing of correspondence for mailing. Under that practice it would be deposited
14       with U.S. Postal Service on that same day with postage thereon fully prepaid at Los
         Angeles, California in the ordinary course of business. I am aware that on motion of the
15       party served, service is presumed invalid if postal cancellation date or postage meter
         date is more than one day after date of deposit for mailing in affidavit

16   ☐   **BY (PERSONAL SERVICE)**       I caused the envelope to be delivered by hand to
         N/A.
17

18   ☒   **BY (OVERNIGHT COURIER)**     I deposited such envelope in the receptacle for
         **Federal Express** and requested that it be delivered to the above-named
19       attorneys/parties by way of priority next day delivery (to be delivered by 10:00 a.m. the
         following morning).

20         I declare that I am employed in the offices of a member of the bar of this court at whose
     direction the service was made.

21
           Executed on June 26, 2007, at Los Angeles, California.
22

23

24                                          _____
                                                    Leslie Fritz
25

26

27

28

_____
                              PROOF OF SERVICE

TAB 1

1 | Randall Riccardo, Esq. (#224672)
2 | 299 Kansas Street
  | San Francisco, CA 94103
3 | Telephone: 415-252-9630
  | Fax: 415-252-9633
4 | Attorney for Plaintiff

ENDORSED
F I L E D
San Francisco County Superior Court

JUN 1 5 2006

GORDON PARK-LI, Clerk
BY: CRISTINA E. BAUTISTA
Deputy Clerk
CASE MANAGEMENT CONFERENCE SET

NOV 1 7 2006  9:00 AM

DEPARTMENT 212

SUPERIOR COURT OF CALIFORNIA

COUNTY OF SAN FRANCISCO

BLUE MARLIN CORP.,

    Plaintiff,

vs.

USPA ACCESSORIES, LLC dba CONCEPT
ONE ACCESSORIES,

    Defendant

)
)
)
)
)
)
)
)
)
)
)
)
)

Case No. CGC-06-453170

COMPLAINT FOR DAMAGES UPON
OPEN ACCOUNT, ACCOUNT STATED
AND BREACH OF CONTRACT

AMOUNT DEMANDED EXCEEDS $10,000

Plaintiff alleges:

## PARTIES AND JURISDICTION

1.  At all material times hereto plaintiff, Blue Marlin Corp., has been a California

corporation doing business as an apparel wholesaler.

1

PLAINTIFF'S COMPLAINT

2.  Plaintiff is informed and believes and thereon alleges, that at all material times hereto, defendant, USPA Accessories, LLC, and Does 1-10, has been a New York Corporation, located in the city of New York.

3.  The true names and capacities of defendants named herein as Does 1-10 inclusive are unknown to plaintiff at this time, who therefore sues defendants by such fictitious names and plaintiff will ask leave of court to amend this complaint to insert the true names and capacities of such fictiously named defendants when they have been ascertained. Plaintiff alleges on information and belief that such defendants are responsible for the debts hereinafter alleged.

4.  Jurisdiction is properly exercised by this Court because the claims and obligations sued upon herein were made and entered into and are due and payable in this judicial district. Additionally, under the terms of the contract entered into between the parties, such contract being subject of the instant action, the defendant has voluntarily agreed to submit all disputes arising under such contract to this Court.

## GENERAL ALLEGATIONS

5.  Blue Marlin was founded in 1994 as a headwear wholesaler. Its initial line of product was inspired by teams from the Negro Leagues, the Latin Leagues, the Pacific Coast Leagues, and other defunct baseball teams from the early 1900's. Its early product offering featured baseball caps; these hats were in an instant success and were soon worn by various celebrities including Bruce Springsteen, Dusty Baker, Bruce Willis, Bono and others.

2

6.  Beginning in 1996, Blue Marlin expanded into vintage-inspired sportswear consisting of sweatshirts, sweatpants, track jackets, polo shirts, T-shirts, jeans, bags, belts, footwear, and other items. Blue Marlin is currently sold in over 500 stories nationwide including Bloomingdale's, Macy's, Marshall Field's, Lord & Taylor, Nordstorm and a variety of specialty stores.

7.  January 1, 2004, defendant entered into a contract agreement under which USPA would design, manufacture, market and sell Blue Marlin caps under a license agreement (hereinafter the "License Agreement"). The License Agreement term ran from February 1, 2004 through June 30, 2007 (See Exhibit A). Under the terms of the License Agreement defendant obligated itself to pay guaranteed minimum royalties of $75,000 for the first year of the license, $120,000 for the second year of the license and $150,000 for the third year of the license. The license royalty was 8% on any amounts exceeding the minimum guaranteed royalty. These minimum royalties are due and payable regardless of the quantity of product defendant actually sells. Additionally, the defendant must to pay a 2% advertising royalty and expend another 2% on advertising on the defendant's net sales.

8.  Through March 1, 2006, defendant has underpaid plaintiff on the guaranteed minimum royalties and advertising royalties and contributions by $78,139.23.

9.  On March 29, 2006, defendant's CEO, Sam Hafif, sent an email to Erik Stuebe, CEO for plaintiff, in which Hafif stated, inter alia, that "we would not agree to pay the minimum royalties as stated in the contract." and "there is no point in tiptoeing around this issue, so I am stating directly that we will not accept that obligation. "

3

(See Exhibit B)   Defendant, through Hafif, also expressed the same message to CEO Stuebe in a telephone conversation on March 21, 2006.

10. On June 14, 2006, plaintiff, through the undersigned counsel, sent a letter via Federal Express, to defendant informing defendant that they were in breach of the License Agreement and demanding payment. This notice of breach was required under the terms of the attached License Agreement. Plaintiff demanded that defendant remit payment for royalties currently owed under the License, totaling $78,139.23. Defendant was also informed that if it wished to not honor its obligations under the License Agreement, plaintiff would accept immediate payment of $234,139.23: such amount constituting the balance owed on the License Agreement along with the outstanding royalty payments.

11. Plaintiff has at all times performed all conditions, covenants and promises required to be performed in accordance with the terms of the License.

12. Based on the unequivocal statements made by the defendant, through the attached email, and statements made orally to the plaintiff's CEO, Erik Stuebe, plaintiff considers defendant to have anticipatorily breached the Agreement and has instituted this action, whereby it alleges:

## FIRST CAUSE OF ACTION

### (Open Book Account)

13. Within four years preceding the commencement of this action, the defendant entered into the aforementioned License Agreement, obligating and indebting itself on a book account for a sum of $358,800 as defined by §337 of the California Code of Civil

4

Procedure for payments to be made under a written agreement. While demand has been made, no payment has been made, and there is now due, owing and unpaid the sum $234,139.23 together with legal interest thereon at the legal rate of 10% per annum from March 31, 2006.

## SECOND CAUSE OF ACTION

### (Account Stated)

14. Plaintiff incorporates the allegations of paragraphs 1-13 of the general allegations and first cause of action as though fully set forth.

15. Within four years preceding the commencement of this action, an obligation on an account was stated in writing by and between plaintiff and defendant, wherein it was agreed that defendant was indebted to the plaintiff in the sum of no less than $358,800. together with interest thereon at the legal rate of 10% per annum from March 31, 2006 which amount remains unpaid despite defendants promise to pay.

## THIRD CAUSE ACTION

## BREACH OF CONTRACT

### (Common Count)

16. Plaintiff incorporates the allegations of paragraphs 1-15 of the general allegations and first and second causes of action as though fully set forth.

17. On January 1, 2004, plaintiff and defendant entered into a written contract, the License Agreement, (a copy of which has been attached as Exhibit A and made a part of this pleading). On March 29, 2006, defendant, by email (a copy of which is

5

attached as Exhibit B and made part of this pleading) gave notice that defendant would not perform the contract, whereby defendant totally repudiated the License Agreement. Defendant's repudiation has not been retracted despite plaintiff's demand that defendant perform its obligations and pay $234,139.23.

18. At the time plaintiff received defendant's repudiation, plaintiff had performed all of the conditions on its part to be done and performed, and was ready, able and willing to perform those conditions.

WHEREFORE, plaintiff respectfully prays for judgment against defendant as follows:

19. For damages on the first, second and third causes of action in the amount of $234,139.23.

20. For interest thereon at the legal rate of 10% per annum.

21. For costs of suit incurred herein;

22. For attorney's fees incurred in this action;

23. For such other and further relief as the Court deems just and equitable.

Dated: June 14, 2006

R. Randall Riccardo
Attorney for Plaintiff

6

**EXHIBIT A**

# EXCLUSIVE LICENSE AGREEMENT

This Exclusive License Agreement (the "Agreement") is made and entered into effective January 1, 2004 (the "Effective Date") by and between Blue Marlin Corp., a California corporation with its principal place of business at 540 Florida Street, San Francisco, California 94110 ("Licensor") and USPA Accessories, LLC dba Concept One Accessories, a New York corporation with its principal place of business at 362 Fifth Ave, 2nd Fl, New York, NY 10001 ("Licensee").

## RECITALS

A.    Licensor is the owner of certain names, labels and trademarks and related rights which Licensor uses in the manufacture and sale of various products, including the name, label and trademark Blue Marlin and related trademark and design rights, depictions and logos and variations and derivations thereof, as more particularly set forth in Schedule A (the "Trademark").

B.    Licensee desires to utilize the Trademark and related rights in the manufacture, distribution, promotion and sale of the products as set forth on Schedule A attached hereto, Products which bear the Trademark are hereinafter referred to as the "Licensed Products".

C.    Licensor's Trademark and related rights, and the goodwill associated therewith, are of great value to Licensor, making adherence to the quality control standards provided in this Agreement essential to maintaining the significant value of Licensor's Trademark and related rights and such associated goodwill.

D.    Licensor is willing to license Licensee to use the Trademark and related rights on Licensed Products, but only under the terms and conditions set forth in this Agreement.

NOW, THEREFORE, in consideration of the mutual promises and representations set forth herein, Licensor and Licensee agree as follows:

1.    Definitions.  The following terms shall have the meanings set forth in this Section for purposes of this Agreement:

1.1.    "Affiliates" means any person or entity controlling, controlled by or under common control of any party now or in the future.

1.2.    "Advertising Materials" means all advertising, publicity and promotional programs and materials related to any Licensed Product.

BM INIT ___ CO INIT ___

1.3.    "Channels of Distribution" - Better department stores and specialty stores within the Territory. In addition, non-full price stores and such other accounts, with Licensors' prior written approval, for retail sale (excluding Mail order and the Internet) within the Territory. Final sales to off price retailers shall be permitted with an aggregate limit of ten (10) percent of the current quarter's regular Net Sales.

1.4    "Contract Year" means the period of time from the Effective Date of this Agreement until June 30, 2005 (the "First Contract Year") and each successive one year period during the Term, including, if applicable, extensions of the Term under Section 4.2, except that the first Contract Year shall date from the Effective Date through the 30th day of June, 2005.

1.5.    "Designs" means (a) all designs for the Licensed Products and any and all copyrights and other intangible or intellectual property rights therein and in any package design, label, insert or other material displaying the Trademarks; (b) all drawings, sketches and other materials furnished by Licensor; (c) any and all modifications or improvements or derivative works of the foregoing; and (d) any and all copyrights or other intangible or intellectual property rights in the foregoing. For purposes hereof all designs submitted to Licensor for approval shall have been created exclusively for Licensor and shall not have been offered for sale by Licensee or its agents prior to submission to Licensor.

1.6.    "Licensed Product" means the product as listed on Schedule A hereof, either physically bearing the Trademarks or to which the Trademarks are affixed, that are manufactured either by Licensee directly or by a sub-contractor of Licensee.

1.7.    "Net Sales" means Gross Sales of the Licensed Products by Licensee (including its Affiliates and specifically excluding non-final sales transactions between Affiliates of Licensee) less only (i) returns actually received from customers; (ii) actual Trade Discounts and documented discounts given pursuant to retailer programs; (iii) allowances and post invoice credits granted to customers, but only to the extent that Licensee documents that the allowance or post invoice credit relates to its sale of Licensed Products; (iv) product sales to the Licensor as defined in Section 3.4.3; (v) sales taxes, excise taxes and duties or other taxes paid by customers; and (vi) freight charges actually incurred by the Licensee, all calculated as stated in Section 7.5.

1.8.    "Packaging" means all packaging, cartons, containers, hang-tags, interior woven labels, inserts, in-packs, wrapping materials and artwork, copy and literary text incorporated therein for the Licensed Products.

1.9.    "Person" shall mean any individual, firm, company, corporation, limited liability company, unincorporated association, partnership, trust, joint venture, governmental authority or other entity of any kind in any jurisdiction, and shall include any successor (by merger or otherwise) of such entity.

BM INIT_____ CO INIT_____

- 2 -

1.10.   "Sell" or "Sale" (or any such derivation of the word "sale") means any and all sales, transfers, distributions or other dispositions of any kind or nature, directly or through third persons, of units of the Licensed Products at any level of wholesale or retail distribution channels, including final Sales to Affiliates of Licensee.

1.11.   "Territory" - United States, its territories, possessions and military bases.

1.12.   "Trade Discounts" - Reductions in the list wholesale selling price of the Licensed Products by line item or by invoice sub-total, granted by Licensee in writing prior to or after delivery.

1.13.   "Trade Secrets" - Information including any formula, pattern, compilation, program, device, method, technique, or process, that derives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use and that is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

2.  Grants of Rights.

2.1.   Trademark and Design Rights.  Licensor hereby grants to Licensee the exclusive, non-transferable, non-assignable license to use the Trademark on or in connection with the design, merchandising, manufacture, advertising, promotion, distribution and sale of Licensed Products solely in the Territory to customers in the Channels of Distribution provided, however, that Licensee may utilize the Trademark in connection with the manufacture of the Licensed Products outside the Territory but only for the Sale of such Licensed Products within the Territory.

2.2.  Rights Reserved To Licensor.  All rights other than those expressly granted to Licensee are reserved to Licensor, including but not limited to the right to use, license and sublicense the manufacture, merchandising, promotion, distribution and sale of (a) products of any and all types and descriptions other than the Licensed Products in the Territory; (b) Licensed Products outside of the Territory, except for the right to manufacture outside the Territory as provided for in Section 2.1; and (c) all products of any and all types and descriptions sold under names, labels and trademarks other than the Trademark.

2.3.   Efforts   At all times while this Agreement is in effect, Licensee shall use commercially reasonable efforts to exploit the rights herein granted on a commercially reasonable basis throughout the Territory, including but not limited to, endeavoring to sell the maximum quantity of Licensed Products to retail stores in the Channels of Distribution consistent with good business practices and the quality standards set forth in this Agreement; offering Licensed Products for sale such that they may be sold to the

BM CO FINAL
Last printed 2/16/2004 10:00 AM

BM INIT 𝓔𝓢   CO INIT 𝟬𝟬

consumer on a timely basis; and maintaining a sales force sufficient to provide effective distribution to the Channels of Distribution throughout the Territory.

2.4.    Conduct of Business. Licensee shall conduct its business at all times in a manner that will reflect positively on the Trademarks. Licensee shall use the Trademarks in a manner that does not derogate Licensor's rights in the Trademarks or the value of the Trademarks, and shall take no action that would interfere with, diminish or tarnish those rights or value of the goodwill of Licensor in such Trademarks.

3.    Limitations on Rights Granted.

3.1.    Third Parties. The license granted conveys no right to grant any sublicense, concession, right or privilege relating to the Trademark or Licensed Products, and the license granted is not to be deemed transferable by operation of law for any purpose and is indivisible and non-assignable, including, but not limited to, any affiliates and/or business successors of Licensee except with Licensor's prior written consent, which shall not be unreasonably withheld.

3.2    Licensee shall adopt and utilize reasonable commercial procedures to monitor all persons and entities, including domestic and foreign subcontractors, engaged in the manufacture or sale of Licensed Products to endeavor to confirm that they comply fully with all applicable laws, rules and regulations, including without limitation, all applicable state, federal and local wage and hour, child labor, overtime and other labor laws.

3.3.    In furtherance of the foregoing, and in a timely manner, Licensee shall cooperate with Licensor, and shall provide such information to Licensor, as is reasonably required for Licensor to comply with any and all reasonable or legally enforceable demands or requests by any governing or judicial entity for any information regarding any or all manufacturers and subcontractors who have or are manufacturing components of the Licensed Products. Such information to include all necessary information to clearly identify which Licensed Products and related components such manufacturers and subcontractors have produced or are producing. The Licensor shall maintain all such information under this section in strict confidence and shall not use any such information for its own benefit, commercial or otherwise, or other than in accordance with this Agreement and the purposes contemplated herein. Licensee shall be responsible for keeping such related records in safekeeping for a period not to exceed three (3) years from the expiry of this Agreement.

3.4.    Distribution of Licensed Products. The parties acknowledge that the manner and scope of the distribution of the Licensed Products are critical to the promotion and enhancement of Licensor's image, and to the protection of the Trademark and associated goodwill. Accordingly, Licensee agrees to abide by the following restrictions throughout the Territory:

3.4.1.  Licensee shall use the Trademark solely in connection with the manufacture and wholesale distribution of the Licensed Products.

3.4.2.  Licensee shall sell the Licensed Products only for resale in retail establishments within the Channels of Distribution.

3.4.3.  At the request of the Licensor, Licensee shall sell, at its regular wholesale price, less twenty percent (20%), any Licensed Product, to the Licensor for Licensor's distribution to end user's through Licensor's Internet sales channel. Such sales shall be excluded from the definition of Net Sales in Section 1.5, Licensor shall sell such product at no less than regular retail price.

3.4.4.  No Extraterritorial Sales.  Notwithstanding any contrary provision of this Agreement, Licensee agrees and covenants that it shall Sell the Licensed Products solely within the Licensed Territory; and that Licensee shall not, either directly or indirectly through its affiliates or other third persons, export or Sell any of the Licensed Products to (i) any person outside of the Licensed Territory, or (ii) any person within the Licensed Territory whom Licensee knows or has good reason to know intends or is likely to export or Sell Licensed Articles in any country or region outside of the Licensed Territory, except by specific written approval of Licensor in a specific case granted in its sole discretion.

3.4.5.  Licensee shall, upon request and within thirty (30) days of such written notice but no more than twice annually, advise Licensor, in writing, of its specific marketing plans.

3.5.    Licensee's Use of Other Marks.  Licensee shall not, on any Licensed Products or in conjunction with any use of the Trademark, use or associate the Trademark with any other name, trademark, character or personality, except with prior written consent or as permitted under this Agreement.

3.6.    No Premiums.  In addition to the other limitations hereunder, the rights of Licensee shall not include the right to, and Licensee warrants and represents that neither Licensee nor any of its affiliates will, use the Trademark or the Licensed Products for an endorsement of any other product or service. Licensee shall not use or permit the use of any Licensed Product as a premium except with the prior written consent of Licensor and shall not distribute any Licensed Product to any person which Licensee has good reason to believe would distribute such Licensed Product in contravention of the foregoing. "Premium" shall mean any Licensed Product distributed at no charge or minimal charge for the purpose of increasing the sale of any other article of merchandise or product, or any service, including any distribution or display for publicity, promotional purposes, combination sales, giveaways or in any other similar transaction.

3.7.    Design Non-Infringement. Licensee agrees not to infringe on any of Licensor's past, current or future designs and/or trade dress, including but not limited to, "Vintage

Sportswear" image(s) or other intellectual property rights belonging to Licensor in any of Licensees' affiliates' and/or subsidiaries' business activities without the express written approval of the Licensor.

4. Term of Agreement

4.1.    Term. The "Term" of this Agreement shall commence on the Effective Date and expire on June 30, 2007, unless renewed as provided herein.

4.2.    Renewal Terms. Licensee shall have one (1) option ("Renewal Option") to renew the term of this Agreement; the option period shall be for a period of three Contract Years (36 months). The Renewal Option shall be for the period dating from the 1st day of July 2007 through June 30, 2010. Licensee shall exercise its option to renew, if at all, by delivering written notice of renewal to Licensor at any time prior to ninety (90) days prior to the expiration of the then existing Term. As used in this Agreement, the "Term" shall be deemed to consist of the initial term described in Section 4.1. Notwithstanding the foregoing, Licensee shall not have any further rights to renew in the event that, before Licensee's exercise of its' renewal right: (a) Licensee breaches this Agreement and fails to cure such breach within the applicable cure period, if any, specified in Section 16 of this Agreement; as a result of which Licensor elects in writing to terminate this Agreement; (b) Licensee fails to meet ninety (90) percent of any of the sales minimums in paragraph 7.3 during the Term; (c) Licensee breaches any monetary provision (i.e., a provision requiring payment of money by Licensee) of this Agreement and fails to cure such breach within ten (10) days of written notice of such breach as a result of which Licensor elects in writing to terminate this Agreement.

4.3.    Any transaction between the parties following the termination or expiration of this Agreement shall not be construed as a renewal or extension or waiver hereof; but as a separate transaction terminable at will by either party without cause.

5. Ownership and Protection of Intellectual Properties.

5.1.    Ownership. Licensee acknowledges Licensor's ownership of the Trademark and each and all of the Designs and further acknowledges that all of Licensee's uses of the Trademark and Designs shall inure to the exclusive benefit of Licensor. If not created by Licensor, the Designs shall be deemed "works made for hire" for the Licensor within the meaning of United States Copyright Law or any other applicable industrial or intellectual property law. If the Designs do not so qualify, the Designs and all intangible or intellectual property rights therein will be deemed irrevocably transferred and assigned by Licensee under this Agreement to Licensor on a continuous basis as of the time or creation or development, without the payment of additional consideration. The provision of this Section 5.1 shall survive the expiration or earlier termination of this Agreement.

Licensee also represents that it has not registered and in the future will not attempt to register the Trademark in its own name or for its own benefit in any country or territory in the world. For the purposes of protection of ownership in the Trademark only, all uses of the Trademark made by or on behalf of the Licensee will be deemed to have been made by Licensor. During the term of this Agreement and thereafter, Licensee shall not:

5.1.1. Claim ownership of or attempt to register the Trademarks in any country or state;

5.1.2. Do or commit any act which would adversely affect the validity of the Trademarks in any country;

5.1.3. Infringe the Trademarks anywhere in the world;

5.1.4. Attack the validity of this Agreement;

5.1.5. Display the Trademarks in a manner which might mislead purchasers into believing that Licensee was itself Licensor or an affiliate or subsidiary thereof; and

5.1.6. Engage in any other activity which can reasonably be expected to materially dilute or otherwise materially impair the right, title and interest of Licensor in the Trademark;

5.1.7. provided that before Licensor declares a breach of Section 5.1.6 above, Licensor shall advise Licensee of its claim of breach and afford Licensee a reasonable period of time, not to exceed thirty (30) days, to rectify such breach.

5.2.    Registrations. Licensee shall, at Licensor's expense, cooperate with Licensor in the execution, filing and prosecution of any trademark, copyright or patent application that Licensor may desire to file, and shall supply Licensor with Licensed Products, samples, containers, labels and all uses of the Trademark as may be reasonably requested for use in connection therewith. Licensee shall cooperate with Licensor in making and terminating registered user entries. Licensor shall pay all costs and fees in connection with filing and prosecution of trademarks, copyrights and patents. The obligations under this Section 5.2 shall survive termination of this Agreement.

5.3.    No Implied Licenses. Nothing in this Agreement shall constitute the grant of any implied licenses or rights.

5.4.    Infringements. Licensee shall immediately give notice to Licensor, in writing, of any infringement or misuse of any Trademark by any third party of which Licensee becomes aware. Licensor shall have the option to commence legal action regarding any such misuse at its expense. Upon Licensor's request, Licensee shall cooperate fully and promptly in any infringement action commenced by Licensor (which cooperation shall not require Licensee to initiate legal action against a third party); provided, however, that

any and all costs incurred by Licensee in connection with such litigation shall be borne solely by Licensor. If Licensee decides to take any action against an infringement or misuse, Licensee may do so at its own expense (and shall be entitled to keep all of any recovery) provided it obtains the prior written consent of Licensor, in which event Licensee shall indemnify Licensor against all loss, damage, attorneys' fees, judgments and other costs or expenses incurred or suffered by Licensor as a result of such action. Licensee shall not settle any such action without Licensor's prior written approval of the settlement terms and conditions, which approval shall not be withheld unreasonably.

6.  Quality Control and Approvals.

6.1.     Quality Standards.   Licensee acknowledges that the maintenance of the high quality of the Licensed Products, and the control by Licensor over the nature, quality and manner of distribution of all Licensed Products are essential elements of the license being granted herein. Therefore, the quality of the Licensed Products and the quality of all promotional and packaging materials bearing the Trademark shall be at least as high as the best quality of similar products and promotional, advertising and packaging material presently shipped, distributed, manufactured or sold by Licensee in the Territory and shall conform fully with all applicable laws and regulations.

6.2.     Standards for Licensor Approval.   In order to maintain the high quality standard prescribed by Licensor, Licensee may not manufacture, use, offer for sale, advertise, promote, ship or distribute any Licensed Product, promotional or packaging materials or advertising materials bearing the Trademark until approved in writing by Licensor. All matters in this Agreement requiring approval of Licensor or the exercise of its discretion shall be at the reasonable discretion of Licensor. Any matter not approved, in writing, by Licensor within fifteen (15) days from submission shall be deemed disapproved, unless the Licensee shall submit a second written request within seven (7) days of the fifteenth (15th) day and the Licensor does not provide a written response within seven (7) days of receipt, either approving or disapproving of the request, the second request shall be considered approved. Approval by Licensor does not constitute, nor shall it be construed as, a determination that the approval matter complies with any applicable laws, rules or regulations.

6.3. Approval of Specific Elements.

6.3.1.   Licensee shall submit for Licensor's prior written approval all final designs, specifications, fabrications, color information, Packaging and Advertising. Licensor shall exercise its best efforts to advise Licensee in writing of its approval or disapproval of any approval request from Licensee within fifteen (15) days of receipt by Licensor, provided that no request shall be deemed approved by Licensor unless such approval is given in writing.

6.3.2. Prior to the production of each line of Licensed Products, Licensee shall submit to Licensor at least one (1) final sample of each style in the collection. Samples submitted for approval shall be of at least equal quality as the Licensed Products that are produced and distributed. Once a proposed element of a Licensed Product has been approved, Licensee shall not deviate in any material respect from the elements so approved. No disapproved proposed Licensed Product shall be manufactured or sold as a Licensed Product under this Agreement. Licensee may revise any disapproved sample and resubmit it for approval.

6.3.3. Following commencement of the first of each seasonal production run of the Licensed Products (or, if production of the various styles of the Licensed Product commences at different times, within two weeks after commencement of each style's first production run), Licensee shall deliver to Licensor a finished production sample of each style of Licensed Product solely for the purpose of confirming that the production goods are at least equal in quality as the approved samples. If the production sample is not at least equal in quality to that of the sample previously approved, Licensee shall immediately make all changes necessary to conform fully to the original sample approved by Licensor. Any Licensed Product which is not of at least equal quality may only be sold upon mutual written agreement, except in the event there are minor defects or difference from the sample approved by Licensor, such changes or corrections may be made per a "running change" as soon as reasonably practical.

6.3.4. To the extent not approved concurrently with a Licensed Product, Licensee shall submit for Licensor's prior written approval, as provided above, at least one sample of all promotional, labeling and packaging materials bearing the Trademark. No disapproved promotional, labeling or packaging materials shall be used in commerce by Licensee in connection with the Trademark.

6.3.5. Licensee shall be solely responsible for taking commercially reasonable action to endeavor to ensure that all Licensed Products comply fully, to the extent applicable, with the Textile Fiber Product Identification Act, the Flammable Fabrics Act and all other applicable consumer product and safety laws, rules and regulations. Licensee will prior to shipment of any Licensed Product for which flammability standards have been issued, amended or continued in effect under the Flammable Fabrics Act, reasonable and representative tests as prescribed by the Consumer Products Safety Commission have been or prior to shipment for sale will be performed, which show that such Licensed Products conform to all applicable flammability standards. Licensee shall promptly investigate and respond to product safety concerns and/or complaints made by consumers who purchase Licensed Products upon Licensee being made aware of the same.

6.3.6. Licensee shall affix to all Licensed Products such legends, markings and notices as required by laws and regulations in the Territory or reasonably required by

Licensor, including but not limited to, information about the proper care and use of the Licensed Products

6.3.7.  Anti-Counterfeiting.  Licensee and its sub-contractors at all times shall each comply with all shipment tracking, identification and anti-counterfeiting systems and labels and procedures that Licensor may reasonably establish from time to time, provided not commercially prohibitive.  Licensee further shall use commercially reasonable measures to endeavor to ensure that all of its distributors and retailers purchasing Licensed Products each comply with such anti-counterfeiting systems and labels and procedures

6.3.8.  Use of Sub-contractors.  Licensee shall be entitled to sub-contract directly with third party sub-contractors solely for the manufacturing of the Licensed Products by such firms ("sub-contractors"); provided however that (i) all sub-contracting work shall be limited to manufacturing units of the Licensed Products for the sole account of Licensee and for the sole use or Sale by Licensee under its own name or under the name of Licensor; (ii) all quality standards and specifications provided for in this Section shall be followed at all times by such sub-contractors; (iii) prior to the start of manufacturing Licensee and each sub-contractor shall enter into a legally enforceable written agreement in the English language that (1) prohibits the manufacturing of any Licensed Article for any third person or for its own account; (2) grants Licensor the right to directly enforce such contract as a third party beneficiary; (3) prohibits all Sales or transshipping or grey marketing of any Licensed Products or any other goods incorporating any of the Trademark by such sub-contractor or its affiliates or agents for any purpose; (4) requires compliance by the sub-contractor with Applicable Laws and Applicable Standards (as herein defined) at all times; and (5) otherwise shall contain such terms and conditions and be in the form reasonably approved in advance by Licensor in each case. Licensee shall be directly liable to and shall fully indemnify Licensor for any breach by any sub-contractor.

6.3.9.  Applicable Laws.  Licensee will and Licensee will endeavor to cause its sub-contractors to comply with all applicable laws, rules, regulations, ordinances, treaties, governmental orders and employment standards in connection with the manufacturing, assembly, labeling, packaging, Sale, promotion or marketing of the Licensed Products or the Packaging or Advertising Materials or any components; including but not limited to laws concerning import, export, customs, certificate licenses, quota allocations, country or origin, safety, public health, employment standards, wages and benefits, child or involuntary labor, working hours and employee health and safety (collectively "Applicable Laws").  Licensee shall obtain at its own expense all approvals of all governmental authorities as may be necessary in connection with its performance under this Agreement.

6.3.10.  Applicable Standards.  Licensee will and Licensee will endeavor to cause its sub-contractors to comply with all established industry standards and good

manufacturing and storage practices related to the Licensed Products or the Packaging; and shall maintain a commercially reasonable quality control and safety assurance program with the respect to the Licensed Products and the Packaging (collectively "Applicable Standards"). Where no such standards and practices are established, the Licensed Products and the Packaging shall meet the higher of (i) the level of quality used for similar products of Licensee, or (ii) the level of quality comparable to the quality standards and practices generally accepted for other leading brands of the same type of product in similar markets.

6.3.11. Material Breach. Licensee agrees and acknowledges that its compliance with each of the foregoing standards and requirements shall be deemed material to this Agreement.

6.4.     Uses of the Trademark. Licensee agrees that the Trademark will appear on each Licensed Product and its packaging, if any. Licensee shall use only those promotional and packaging materials which have been approved in writing by Licensor. Licensee shall have the right to place its corporate designation on any packaging, the form of which shall have the prior written approval of the Licensor as specified above. No other combination of third party logos, marks, trade names or characters shall be used with the Trademark unless specifically approved by Licensor as specified above.

6.5. Advertising and Promotion.

6.5.1. All advertising and promotion of the Licensed Products undertaken or approved by Licensee must be consistent with the quality, image and standards of Licensor. All advertising copy and art work and any other advertising materials (including without limitation any proposed advertising to be submitted or provided to retailers or customers of Licensee for any use by them) and all display and merchandising materials and merchandising aids which will be provided or approved by Licensee for use in retail stores or showrooms shall be submitted to Licensor in writing for its prior approval; any such item which is not approved by Licensor within fifteen (15) days shall be deemed disapproved. Licensee shall comply with all Licensor decisions in such matters. If Licensor provides Licensee with written guidelines regarding use of the Trademarks in retail advertising, Licensee shall promptly provide such guidelines to its customers.

6.5.2. Advertising Expenditures. Licensee shall expend the minimum of two percent (2%) of the Net Sale Proceeds for each respective period as defined in Schedule A for advertising Licensed Articles via television, print media, radio, billboards, in-store advertising, point of purchase displays, trade shows or any other form of advertising or marketing (the "Direct Advertising Expenditure").

6.5.3. Where not unreasonable, any advertising or promotional or packaging materials which refer to Licensee's name shall state that Licensee is a licensee of Licensor, the owner of the Trademark.

6.5.4. Licensee shall furnish Licensor, royalty-free, with two of each SKU of each finished Licensed Product in each line. Upon request, Licensee shall furnish Licensor with a reasonable number of additional royalty-free production samples of finished Licensed Products for use in Licensor's showroom, for advertising and for sales presentations, and Licensor shall reimburse Licensee for Licensee's cost for such samples.

7. <u>Payments and Reports.</u>

7.1.     <u>Trademark Royalty and Advertising Royalty.</u> With respect to each Contract Year of the Term of this Agreement, Licensee shall pay to Licensor and account for a royalty (the "Trademark Royalty") in an amount equal to eight (8%) percent of the Licensee's Net Sales of Licensed Products during each Contract Year. With respect to each Contract Year of the term of this Agreement, Licensee shall pay to Licensor as and for a contribution ("Advertising Contribution") to Licensor's advertising fund for the advertising and promotion of the Licensed Products an amount equal to two (2%) percent of the Licensee's actual Net Sales. This Advertising Contribution shall be in addition to the amount specified as Advertising Expenditures in Section 6.5.2. Payment of any advertising royalty shall be made with the payment of the Trademark Royalty as provided in Section 7.4.

7.2.     <u>Advance Payment.</u> At the time of execution of this Agreement, the Licensee will pay to Licensor the sum of thirty-seven thousand, five hundred ($37,500) Dollars as a non-refundable advance payment ("Advance"). The Advance may be credited against any Trademark Royalty due for the Term and no Royalty shall be payable until all such cumulative Royalty due exceeds the total amount of the Advance.

7.3.     <u>Minimum Net Sales and Minimum Royalty.</u> The following are the Minimum Net Sales and Guaranteed Minimum payments (Trademark Royalty and Advertising Contribution) required for each of the periods referred to below:

| Contract Year | Net Sales | Guaranteed Minimum Payments |
|---|---|---|
| **Initial Term** | | |
| Year 1: February 1, 2004-<br>June 30, 2005 (17 months) | $750,000 | $75,000 |
| Year 2: July 1, 2005-<br>June 30, 2006 (12 months) | $1,200,000 | $120,000 |
| Year 3: July 1, 2006-<br>June 30, 2007 (12 months) | $1,500,000 | $150,000 |
| **Renewal Option Period:** | | |
| Year 1: July 1, 2007 -<br>June 30, 2008 | $2,000,000 | $200,000 |
| Year 2: July 1, 2008 -<br>June 30, 2009 | $2,250,000 | $225,000 |
| Year 3: July 1, 2009 -<br>June 30, 2010 | $2,500,000 | $250,000 |

7.4.     Royalty Payments and Reports. Within forty-five (45) days of the end of each calendar quarter during the Term, regardless of whether any Trademark Royalty payment is then due, Licensee shall submit a report of the number, description and invoice price of each Licensed Product sold, the gross sales, returns actually received, trade discounts and allowances granted, the Net Sales of all Licensed Products and any other information that may be required under any other provisions of this Agreement. Each report shall be certified as correct by the Chief Financial Officer of Licensee. Concurrently with delivery of such report, Licensee shall pay Licensor the Trademark Royalty due for that quarter. In addition, for each calendar quarter, to the extent the Trademark Royalty paid by Licensee for the Contract Year through that date does not equal or exceed the Pro Rata Guaranteed Royalty Minimum, Licensee shall pay Licensor the difference between the Trademark Royalty paid through such date and the Pro Rata Guaranteed Minimum Royalty as of such date. As used herein, "Pro Rata Guaranteed Minimum Royalty" means the Guaranteed Royalty Minimum for such Contract Year divided by four and multiplied by the number of quarters which have elapsed during such Contract Year (except that during the Initial Term, for purposes of determining the Pro Rata Guaranteed Minimum Royalty, the amount of the Guaranteed Minimum Royalty for the Initial Term less the Advance, shall be divided by five (5) and payment of the quarterly payments to the extent applicable shall commence on the first day of the second quarter of the Initial Term and shall be made on each of the next succeeding four quarters of the initial term). Once Licensee has paid Licensor an amount equal to the Guaranteed Royalty payable for a Contract Year, Licensee shall only be required to pay the applicable Royalty for the

remainder of such Contract Year to the extent it exceeds the amount payable for the Guaranteed Royalty for that year. Trademark Royalties which exceed the Guaranteed Royalty shall be credited to the succeeding Contract Years or quarter if part of the same Term. All royalties shall be paid in good funds and in U.S. Dollars.

7.5. Calculation of Net Sales and Royalties.

7.5.1. All sales of Licensed Products to any related company or any shareholders, directors, officers or employers of Licensee or a related company shall be calculated at the average invoice price at which such Licensed Products are sold to unrelated customers in arm's-length transactions and Trademark Royalties shall be payable on the price received on account of all such sales.

7.5.2. Licensee will bear all taxes, duties and other governmental charges in the Territory relating to or arising under this Agreement, including without limitation, any income taxes, withholding income taxes and other taxes, any stamp or documentary taxes or duties, turnover, sales or use taxes, value added taxes, excise taxes, customs or exchange control duties or any other charges relating to or on any royalty payable by Licensee to Licensor hereunder; except that Licensor shall be responsible for any tax imposed on Licensor's income by the United States or any state thereof.

7.6. Additional Statements and Reports.

7.6.1. Upon reasonable request, Licensee shall submit invoices, credit memoranda and/or a computer printout confirming any information reflected in its calculations of royalties, in addition to a summary of sales by customer and product code and supporting documentation, if available.

7.6.2. With each Royalty Report as defined in 7.4, Licensee shall submit to Licensor a list containing the names of all its customers and others who have purchased the Licensed Products with product identities, quantities, unit prices, discounts and charge backs to confirm its compliance with this Agreement.

7.6.3. Receipt or acceptance by Licensor of any statement furnished, or of any sums paid by Licensee, shall not preclude Licensor from questioning their correctness at any time within thirty-six (36) months of receipt by the Licensor; provided, however, that reports submitted by Licensee shall be binding and conclusive on Licensee in the event of any termination based on a breach by Licensee arising out any payment or report.

7.6.4. Within ninety (90) days after the end of each Contract Year, Licensee shall furnish Licensor with a summary report of Licensee's sales of Licensed Products during the Contract Year. The summary report shall be certified by the Chief

Financial Officer or an equivalent officer of Licensee. Such summary report shall contain such information as Licensor shall reasonably require, including but not limited to, an aggregate statement showing the number, description and invoice price of all Licensed Products sold during the term, gross sales and all itemized deductions from gross sales.

7.6.5. Sale Date. The Trademark Royalty shall accrue upon the sale of the Licensed Products regardless of the time of collection by Licensee. For purposes of this Agreement, a Licensed Product shall be considered "sold" upon the date of billing, invoicing, shipping, or payment, whichever occurs first.

7.6.6. Interest on Late Payments. If any payment due from Licensee is not received by Licensor within twenty (20) days of the due date, Licensee shall pay to Licensor interest at the rate of ten (10%) percent per annum from the date such payment was due to the date of payment, on all overdue amounts. The parties agree that this interest charge represents a fair and reasonable estimate of the costs that Licensor will incur by reason of its loss of the use of such funds.

8. New York Showroom. The Licensor shall, at its sole discretion, have the right, but not the obligation, to maintain a showroom in New York City, New York. Should the Licensor establish such a showroom the following shall apply:

8.1.    Licensee agrees to pay Licensor a "Showroom Fee" of no less then nine hundred dollars ($900.00) per month, in advance, for the use of such showroom during the entire term of this Agreement. Such payment will be made to the Licensor no later than the 5th of each month. The Showroom Fee shall be increased when and if the Licensor shall have a respective increase in its' cost to operate the New York Showroom.

8.2.    Licensee shall limit the use of the Showroom to the display of the Licensed Products with one of the Licensee's full-time salesperson plus furniture, displays and equipment to a maximum of two hundred and fifty (250) square feet. Actual space location will be at the sole discretion of the Licensor. At no time shall the Licensee exercise any control or engagement of any sort, direct or indirect, of or with any Licensor employee(s).

8.3.    Nothing in this Agreement shall transfer any control of any kind by the Licensor in the use, function or location within New York City, New York to the Licensee.

8.4.    The Licensor, at its sole discretion, may, with thirty (30) days notice to the Licensee, terminate the New York Showroom for any reason. At termination of the New York Showroom, the Licensee's obligation under 7.1 shall also terminate. Licensee agrees to vacate the premises within the ten (10) days of the end of the thirty (30) day notice period.

8.5.     Licensee agrees that in event of use of the Licensor's showroom as defined herein, all communications (i.e. telephone, facsimile and internet) services shall be arranged by and for the account of the Licensee. Licensor shall have no responsibilities to provide such services.

8.6.     Licensee agrees to provide evidence of all reasonable insurance regarding the Licensee's use of the New York showroom as defined herein including, but not limited to, property, liability, worker's compensation and disability insurance.

9.  MAGIC Trade Show. The Licensor shall, at its sole discretion, have the right, but not the obligation, to purchase booth space at a MAGIC trade show (or its' successors). Should the Licensor participate in a MAGIC trade show the following shall apply:

9.1.     Subject to Licensor providing one hundred and twenty day (120) advance written notice prior to the first day of the respective MAGIC Trade Show, of the maximum amount Licensee would have to pay, Licensee, within thirty (30 days of receiving the Licensors' written notice herein, shall notify Licensor whether it will, at its sole discretion, agree to pay to the Licensor, a pro-rata portion of the direct costs related to the MAGIC Trade Show for such expenses as; booth rental, set-up and removal logistics, hospitality during show hours and imagery. The prorate portion will be determined by the percentage of the actual space taken by the Licensee of the booth space and will not exceed the amount stipulated in the Licensor's written notice provided herein. Payment will be made when the payment for the costs is actually due to the third-party provider, including but not limited to, any and all related deposits.

9.2.     Should the Licensee fail to notify the Licensor of its agreement to participate in the respective MAGIC Trade Show as provided in Section 9.1, Licensor shall have no obligation to provide Licensee with any use of any kind of the Licensor's booth at the respective Magic Trade Show.

10. Suspension of Obligations.

10.1.     If Licensee is prevented from performing any of its obligations hereunder by virtue of governmental regulations or order (including environmental regulations), or by strike or war, declared or undeclared, acts of terrorism, riot or civil unrest or other calamities such as fire, earthquake, or similar acts of God, or because of other similar or dissimilar cause beyond the control of Licensee (herein "act of force majeure"), Licensee's obligations shall abate during the period of such conditions. Except as otherwise provided in this Section 10, if such condition continues for a period of more than sixty (60) days, Licensor shall have the right to terminate this Agreement.

10.2.     If an act of force majeure consists of fire, earthquake, flood, hurricane, tornado, war, or acts of terrorism and if the act prevents Licensee from manufacturing and/or delivering the Licensed Products, whether due to an inability to obtain fabric or other

materials, destruction of manufacturing facilities, inability to deliver finished product, or otherwise, Licensee shall have a period of not to exceed sixty (60) days to find alternate sources to enable it to manufacture and deliver the Licensed Products. Licensee shall use due diligence in obtaining such alternate sources and Licensee shall advise Licensor of the progress it has made with regard thereto.

11. Books and Records.

11.1.    Separate Books and Records. Licensee shall maintain its books of account and records in accordance with generally accepted accounting principles. Licensee shall inform Licensor in writing of the location of such books and records, but in no case shall location of such books and records be outside of the United States of America.

11.2.    Unique Product Code Numbers. The Licensed Products shall be assigned product code numbers unique from any products other than the Licensed Products that Licensee may manufacture and/or sell. The product code number assigned to each Licensed Product shall be identical to the product code number utilized to identify that Licensed Product in all Licensee's books and records. All documents evidencing the sale of Licensed Products shall state the product code number of such products.

11.3.    Right to Examine. Until three (3) years after the last sale of Licensed Products by Licensee, Licensor shall have the right, at its sole cost and expense, no more than once each calendar year, on advance notice to Licensee of five (5) business days, to examine and copy all of Licensee's books and records relating directly to the manufacture and sale of Licensed Products. All such examinations shall be at Licensee's principal place of business and during normal business hours. Licensee shall keep all books of account and records available for at least three (3) years after last the year of the Agreement to which they relate.

11.4.    Right to Audit. In addition to its right to inspect, Licensor shall have the right, not more than once during each calendar year, by its own personnel or its agents, on advance written notice to Licensee of at least five (5) business days, to audit all books and records which Licensee is required to maintain pursuant to this Agreement. All such audits shall be conducted at Licensee's principal place of business during normal working hours. In the event an audit discloses that Licensee has understated Net Sales or underpaid royalties for any report period, without prejudice to any of Licensor's rights under this Agreement, Licensee shall pay to Licensor the amount, if any, by which the actual royalties exceed royalties paid within fifteen (15) days of receipt of notice by Licensor to such effect. If such audit reveals that Licensee underpaid royalties by more than Five (5%) percent for any Contract Year, Licensee shall pay Licensor all reasonable costs, fees and expenses incurred by Licensor in conducting such audit, in addition to any interest for late payment provided for in Section 7.6.6 of this Agreement. Any and all information obtained from such audit shall be held in confidence and not be used for any purpose other than enforcement of the Licensor's rights under this Agreement.

12 Insurance.

12.1.    Requirements.    Without limiting Licensee's liability under the indemnity provisions of this Agreement, Licensee shall maintain comprehensive general liability insurance in the amount of at least Two Million ($2,000,000.00) Dollars. The policy shall provide that Licensor shall receive at least thirty (30) days notice of cancellation. The policy shall cover the applicable territory in which Licensee is conducting sales of Licensed Products and shall include coverage against theft and destruction of the Licensed Products. Each policy shall include Licensor as an additional insured, with a vendor's broad form endorsement and shall provide that although Licensor is a named insured, Licensor may recover under the policy for any covered loss caused to Licensor, its agents or employees notwithstanding that such loss may have been caused by the negligence (including active, passive and gross negligence) of Licensee. The insurance shall provide that it is primary coverage with respect to all insureds. The insurance shall contain a waiver of subrogation against Licensor.

12.2.    Approved Carrier/Policy Changes.    All insurance shall be obtained from an insurance company Best's rated A -, or better which is admitted in the state where Licensee is domiciled. Licensee shall give at least thirty (30) days prior written notice to Licensor of the cancellation of, or any modification in, such insurance policy that would affect Licensor's status or benefits there under. As long as it meets all the foregoing criteria, insurance may be obtained by Licensee in conjunction with a policy which covers products other than the Licensed Products.

12.3    Evidence of Coverage    Promptly following execution of this Agreement and upon each renewal of such policy, Licensee shall provide Licensor with evidence, in form and substance satisfactory to Licensor, of the maintenance and renewal of the required insurance including, but not limited to, copies of policies with applicable riders and endorsements, and certificates of insurance.

13. Indemnifications, Representations and Warranties.

13.1.    Indemnifications.    Licensee agrees to indemnify, hold harmless and defend Licensor, its officers, directors, agents and employees from and against any and all claims, suits or demands asserted against Licensor by any third party, including without limitation any and all losses, liabilities, expenses and damages incurred to resolve or satisfy such claims, suits or demands, including costs of suit and attorneys' fees, arising out of:

13.1.1. any alleged defect in any Licensed Product, regardless of whether the action is based upon negligence or strict liability;

13.1.2. any claim that any element of a Licensed Product (other than the Trademark or a design element furnished by Licensor in writing) infringes upon any trademark or rights of any other person; and

13.1.3. the manufacture, labeling, sale, importation, distribution or advertisement of any Licensed Product by Licensee.

13.1.4. as a condition to the indemnity set forth above, Licensor agrees to give Licensee prompt notice of any claim or occurrence, an opportunity to defend or handle such claim or occurrence prior to Licensor incurring fees, expenses or costs or any kind, and Licensor's cooperation with Licensee in the defense or handling of such claim or occurrence.

13.1.5. the use, by the Licensee, of the Licensor's New York showroom as described herein.

13.2    Licensor Indemnification. Licensor agrees to indemnify, hold harmless and defend Licensee, its officers, directors, agents and employees and customers from and against any and all claims, suits or demands asserted against Licensee by any third party, including without limitation any and all losses, liabilities, expenses and damages, including costs of suit and reasonable attorneys' fees, arising out of and resulting from:

13.2.1. any claim that the use of the Trademark in the Territory and in the manner specified in Sections 3.4 and 3.5 of this Agreement infringes upon any trademark or rights of any other person; or

13.2.2. any violation of any warranty, representation or material agreement made by Licensor in this Agreement.

13.2.3. As a condition to the indemnity set forth above, Licensee agrees to give Licensor prompt notice of any claim or occurrence, an opportunity to defend or handle such claim or occurrence prior to Licensee incurring fees, expenses or costs or any kind, and Licensee's cooperation with Licensor in the defense or handling of such claim or occurrence.

13.3.    Defense of Claims. The indemnifying party shall defend the indemnified party with respect to each and every claim for which such party is indemnified under this Agreement. All fees and expenses of legal counsel engaged with respect to such claims shall be paid for by the indemnifying party as incurred. The indemnified party shall provide its reasonable cooperation, at the indemnifying party's request and at the indemnifying party's sole cost and expense, in connection with the defense of all such claims.

13.4.  Notification of Claims and Consumer Complaints.  A party seeking indemnification under this Agreement shall immediately notify the indemnifying party, by telephone and in writing, of the subject matter and parties relating to such claim. Licensee shall promptly take steps promptly to correct, any material complaint by a consumer and/or governmental body related to the Licensed Products or any other matter related to Licensee's performance under this Agreement of which Licensee is made aware.

13.5.  Indemnity Unaffected.  Compliance by Licensee with the insurance provisions of this Agreement shall not relieve Licensee of its duties to indemnify Licensor under this Agreement.

13.6.  Licensor Representations and Warranties.  Licensor represents and warrants to Licensee that:

13.6.1. Licensor is the sole owner of the Trademark and the Trademark does not infringe upon any other trademarks or rights of any other entity or person;

13.6.2. Licensor is a corporation duly incorporated, validly existing and in good standing under the laws of the State of California;

13.6.3. Licensor has full power to grant the license granted and has the full right, power and authority to enter into this Agreement and to perform all of its obligations hereunder;

13.6.4. The person executing this Agreement on the part of Licensor is duly authorized to execute and deliver the Agreement for Licensor and to bind Licensor to the terms hereof; and

13.6.5. Licensor is under no legal impediment which would prevent it from entering into and performing fully its obligations under this Agreement.

13.6.6. SUBJECT ONLY TO THE FOREGOING SUBSECTION, LICENSOR HEREBY SPECIFICALLY DISCLAIMS ANY AND ALL WARRANTIES, EXPRESS OR IMPLIED, INCLUDING WITHOUT LIMITATION THE WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, TITLE AND NON-INFRINGEMENT OF THIRD-PARTY RIGHTS, AND ANY WARRANTIES THAT MAY ARISE DUE TO COURSE OF PERFORMANCE, COURSE OF DEALING OR USAGE OF TRADE, WHETHER RELATED TO THE TRADEMARK OR OTHERWISE.

13.7.  Licensee Representations and Warranties.  Licensee represents and warrants to Licensor that:

13.7.1. Licensee is a corporation duly incorporated, validly existing and in good standing under the laws of the State of New York;

13.7.2. Licensee has the full right, power and authority to enter into this Agreement and to perform all of its obligations hereunder;

13.7.3. The person executing this Agreement on the part of Licensee is duly authorized to execute and deliver the Agreement for Licensee and to bind Licensee to the terms hereof; and

13.7.4. Licensee is under no legal impediment which would prevent it from entering into and performing fully its obligations under this Agreement and Licensee is financially capable of performing all of its obligations under this Agreement.

13.8.    **LIMITATION OF LIABILITIES.**  SUBJECT TO AND EXCEPTING THE INDEMNIFICATION OBLIGATIONS OF LICENSEE OR LICENSOR SET FORTH IN SECTION 13 OF THIS AGREEMENT, IN NO EVENT SHALL EITHER PARTY OR ANY OF ITS AFFILIATES, SUCCESSORS OR PERMITTED ASSIGNS, AND ITS OR THEIR DIRECTORS, OFFICERS, EMPLOYEES, AGENTS, LICENSORS, OR REPRESENTATIVES BE LIABLE FOR ANY INDIRECT, SPECIAL OR CONSEQUENTIAL DAMAGES, OR DAMAGES FOR LOSS OF PROFITS, BUSINESS INTERRUPTION, LOSS OF GOODWILL, ARISING FROM OR RELATING TO THIS AGREEMENT OR THE TRADEMARK, EVEN IF THE OTHER PARTY IS EXPRESSLY ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. The foregoing limitation of liability and exclusion of certain damages shall apply regardless of the failure of essential purpose of any remedies available to either party.

14.  Trade Secrets and Confidentiality.

14.1.    Definition.  "Confidential Information" means all information disclosed by one party ("Discloser") to the other party ("Recipient") (in writing, orally or in any other form) that is designated, at or before the time of disclosure, as confidential, or provided under circumstances reasonably indicating that the information is confidential, including without limitation trade secrets, customer lists, business plans, technical data, product ideas, personnel, and contract and financial information of Discloser or any third person to whom Discloser owes a duty of confidentiality.  Confidential Information does not include information or material that (1) is now, or hereafter becomes, through no act or failure to act on the part of Recipient, generally known or available to the public; (2) is furnished to Recipient by a third person that is not under an obligation or duty of confidentiality to Discloser with respect to such information or material; or (3) is independently developed by Recipient without any breach of this Agreement, as evidenced by the Recipient's contemporaneous tangible (including written or electronic) records.

14.2   <u>Restrictions on Use</u>.  Each party shall take all reasonable measures to protect the confidentiality of the other party's Confidential Information in a manner that is at least protective as the measures it uses to maintain the confidentiality of its own Confidential Information of similar importance. Recipient shall hold Confidential Information in strict confidence and shall not disclose, copy, reproduce, Sell, assign, license, market or otherwise dispose of such information, or give or disclose such information to third persons, or use such information for any purposes whatsoever other than as necessary in order to fulfill its obligations or exercise its rights under this Agreement. Notwithstanding the foregoing, Recipient may disclose the other party's Confidential Information (i) to employees and consultants that have a need to know such information, provided that Recipient shall advise each such employee and consultant of their obligations to keep such information confidential and shall require that each such employee and consultant sign a written nondisclosure agreement consistent with the confidentiality and nondisclosure provisions herein, and (ii) to the extent Recipient is legally compelled under legal process to disclose such Confidential Information, provided that Recipient shall give advance notice of such compelled disclosure to the other party, and shall cooperate with the other party in connection with any efforts to prevent or limit the scope of such disclosure and/or use of the Confidential Information.

15. <u>Termination</u>.

   15.1.1. Other Rights Unaffected.  It is understood and agreed that termination by Licensor on any ground shall be without prejudice to any other rights or remedies which Licensor may have.

   15.1.2. Grounds for Termination. In addition to grounds for termination stated elsewhere in this Agreement, the following are grounds for termination of this Agreement;

   15.1.3. Monetary Breaches of this Agreement. If Licensee fails to pay any sum on the date due and such breach continues for a period of ten (10) days following Licensor's written notice of breach given to Licensee.

   15.1.4. Non-Monetary Breaches. Except as otherwise provided in Section 15.2.3?, if Licensee fails to timely and fully perform or breaches any non-monetary provision of this Agreement, Licensor shall give Licensee notice of breach and, to the extent such breach is capable of being cured, Licensee must cure such breach as soon as practicable and in any event within thirty (30) days except that, if the breach is such that it cannot be cured within thirty (30) days despite commercially reasonable efforts to do so, Licensee shall immediately commence to cure such breach and diligently prosecute such cure to completion. Licensee shall report to Licensor, in writing, no later than ten (10) business days after the notice of breach, and at least once every two weeks after that until the breach is cured, what steps Licensee has taken and will take in order to cure such breach and to ensure that the breach does not occur again.

BM INIT ____ CO INIT ____

-- 22 --

15.1.5. Grounds for Immediate Termination. Licensor may immediately terminate this Agreement:

15.1.5.1.   If a petition for relief under the Bankruptcy Code is filed by or against the Licensee, or if Licensee makes any assignment for the benefit of its creditors or becomes the subject of proceedings under any insolvency, reorganization, or receivership law, with termination to become effective automatically if Licensee fails within sixty days of commencement to discharge the bankruptcy or terminate the assignment or other proceedings. The license and rights granted hereunder are personal to Licensee. No assignee for the benefit of creditors, receiver, debtor in possession, trustee in bankruptcy, sheriff or any other officer or court charged with taking over custody of Licensee's assets or business, shall have any right to continue performance of this Agreement or to exploit or in any way use the Trademark if this Agreement is terminated pursuant to this subsection, except as may by required by law.

15.1.5.2.   Unless consented to by Licensor in writing in advance, such consent not to be unreasonably withheld, if there is any change of control of Licensee, consisting of one or more transfers (other than transfers among the existing shareholders of Licensee) which, in the aggregate, total fifty percent (50%) of the shares of stock of Licensee which are issued and outstanding upon execution of this Agreement, except for transfers to or between existing shareholders or members of their immediate families or trusts for their benefit, all of which shall be permitted.

16. Obligations at Expiration or Termination.

16.1.     Termination of License. The License shall terminate for all purposes and all rights granted to Licensee to use the Trademark hereunder shall forthwith revert to Licensor; Licensee shall refrain from any use whatsoever of any Trademark; and neither Licensee nor its sub-contractors shall manufacture or Sell any Licensed Articles or any other products that may infringe upon the Trademark at any time following termination, subject only to the limited provisions of this Section hereof.

16.2.     Limited Right of Sell-Off. Upon termination or expiration of this Agreement:

16.2.1. Licensee shall immediately provide Licensor with a complete and accurate written list of the current inventory of all units of Licensed Articles and Imported Articles which utilize the Trademark, either in hand as finished goods or which constituted work in process, as of the date of termination; and a complete and accurate written list of and evidence substantiating all uncancellable orders for the manufacture of Licensed Articles as of the date of termination (collectively, "Termination Inventory"). Such written lists shall be certified as complete and accurate by the President or Chief Financial Officer of Licensee.

16.2.2. In the event this Agreement is terminated other than for the material breach; nonpayment, within specified periods, of monies due herein or Bankruptcy of Licensee, then Licensee may, on a nonexclusive basis within the Licensed Territory only and in a manner otherwise consistent with this Agreement, dispose of quantities of the Termination Inventory for a period of six (6) months thereafter ("Sell-Off Period"); provided that (1) all payments then due are immediately reported and paid in full to Licensor or its designated nominee; (2) all statements and payments with respect to the Sell-Off Period are thereafter made in accordance with Sections 7.4 and 7.6 hereof for each of quarterly periods within such Period; (3) all units of Licensed Articles and Imported Articles to be Sold adhere to the quality and other standards provided for in this Agreement; (4) the quantities of units of Licensed Articles and Imported Articles to be Sold during the Sell-Off Period shall not materially exceed the quantities of the corresponding Licensed Articles or Imported Articles Sold by Licensee during the six-month period immediately prior to the termination of this Agreement; (5) no Sales shall occur directly or indirectly outside of the Licensed Territory; and (6) no Sales shall be made at any time directly or indirectly to any affiliate or successor or agent or representative of Licensee or any person related thereto.

16.2.3.  A final certified written statement and payment for the final quarter of the Sell-Off Period shall be made within thirty (30) days after the end of the Period.  Unless otherwise mutually agreed to in writing between the parties hereto, any Termination Inventory remaining after the Sell-Off Period pursuant to the terms hereof shall be destroyed or all reference to the Trademark shall be obliterated and written proof there of supplied to Licensor.

16.2.4. During the Sell-Off Period and for a period of six (6) months thereafter, Licensor or its representatives shall have the right to enter all relevant premises and conduct physical inventories and review all pertinent records in order to confirm that Licensee has complied with the terms of this Section 16. Any such inventories or reviews shall not be binding on Licensor. The foregoing further shall not limit or affect any other rights or remedies of Licensor hereunder or under applicable law, including but not limited to any right of audit or any pending; and shall not prejudice or affect any claim, action or cause of action of Licensor that shall survive the termination of this Agreement.

16.2.5. Notwithstanding the foregoing, in the event that this Agreement is terminated for the material breach; nonpayment, within specified periods, of monies due herein or Bankruptcy of Licensee, then Licensee may no longer Sell any units of the Licensed Articles or Import Articles or use the Trademark in any manner whatsoever, effective as of the date of termination. All units of the Licensed Articles or Import Articles shall be destroyed or all reference to the Trademark shall be obliterated and written proof there of supplied to Licensor.

16.3.    Other Rights and Obligations.  All other rights and obligations of the respective parties hereunder shall cease as of the date of termination, provided however that:

16.3.1. All rights and obligations of the respective parties under this Agreement relating to Royalties and Royalty statements and other payments due and owing, including all rights of audit;

16.3.2. All representations and warranties and disclaimers of the respective parties;

16.3.3. All rights and obligations of the respective parties under Section 2 hereof (Grant of Rights); Section 3 hereof (Limitations of Rights Granted); Section 4 hereof (Term of Agreement); Section 13.3 hereof (Limitation of Liabilities); Section 13 hereof (Indemnification); Section 12 hereof (Insurance); Section 14 hereof (Trade Secrets and Confidentiality); Section 15 hereof (Termination); this Section 16; Section 17.6 hereof (Assignability); Section 17.3 hereof (Equitable Relief); Section 10 (Force Majeure), and Section 17 hereof to the extent necessary or useful in the application or enforcement of the surviving provisions of this Agreement; and

16.3.4. Any claim or action or cause of action for breach or violation of this Agreement existing as of the date of termination;

16.3.4.1.    each shall not terminate and shall survive and remain in full force and effect for the period of the applicable statutes of limitation, until the relevant rights and obligations of the parties have been fully discharged and satisfied.

16.4.    No Liability or Prejudice.  Neither party shall be liable to the other party for damages of any kind solely as a result of terminating this Agreement in accordance with its terms; and any such termination of this Agreement by a party will be without prejudice to any other rights or remedies of such party under this Agreement or applicable law.

17. General Provisions.

17.1.    Governing Law.  This Agreement is to be construed in accordance with and governed by the internal laws of the State of California, United States of America, without giving effect to any choice of law rule that would cause the application of the laws of any jurisdiction other than the internal laws of the State of California to the rights and duties of the parties. All actions or disputes arising under this Agreement shall be brought exclusively in the Superior Court of the State of California for the County of San Francisco or in the Federal Court for the Northern District of California, United States of America, San Francisco Branch; and such courts shall have exclusive jurisdiction over disputes under this Agreement. Each of the parties expressly consents to jurisdiction and venue in such courts for all purposes of this Agreement or any dispute or controversy hereunder

BM CO FINAL
Last printed 2/17/2004 12:42 PM

– 25 –

BM INIT ⟨initials⟩    CO INIT ⟨initials⟩

17.2.    Disputes. Each of the parties irrevocably agrees to submit to the jurisdiction and venue of the United States District Court for the Northern District of California or the California State Supreme Court for resolution of any and all disputes relating to or arising out of this Agreement. Licensee acknowledges and agrees that the Trademark possesses a special, unique and extraordinary character, which makes difficult the assessment of monetary damages which Licensor might sustain by any use of the Trademark or other action of Licensee affecting the Trademark or Licensor's rights therein which is inconsistent with the terms and provisions of this Agreement, including any unauthorized use, and that irreparable injury would be caused to Licensor thereby, such that injunctive relief, specific performance and/or similar relief would be appropriate to prevent and restrain such uses or actions.

17.3.    Equitable Relief. Licensee acknowledges that a breach of its obligations under this Agreement would cause Licensor irreparable damage. Licensee therefore agrees that in the event of such breach or threatened breach, in addition to remedies at law, Licensor shall have the right to injunctive or other equitable relief to prevent Licensee's violations of its obligations hereunder.

17.4.    Attorneys' fees. The prevailing party in any action or proceeding relating to or arising out of this Agreement shall recover its reasonable attorney's fees and costs incurred in connection with such suit or proceeding in addition to its judgment, including fees and expenses incurred in any appellate proceedings.

17.5.    Independent Contractors. Each party is an independent contractor and the personnel of a party are not the employees or agents of the other party for federal, state or other taxes or any other purposes whatsoever, and are not entitled to compensation or benefits of the other party. This Agreement shall not create any relationship of agency or partnership or joint venture or franchise or other business entity between the parties of any kind or nature. No party has the right or authority to enter into any obligation for or to otherwise bind the other party to any extent.

17.6.    Assignability. This license and other rights granted in this Agreement are personal to Licensee, and Licensee may not assign or sublicense any of its rights or delegate any of its duties under, pledge or otherwise affect the license granted in, this Agreement without prior written consent of Licensor, except to an affiliate that agrees to be bound by this Agreement. Any attempted assignment or sublicense in violation of this provision shall be void. Licensor may assign this Agreement to any successor or to any person or entity which acquires the Trademark, subject to Licensor's obligations under this Agreement.

17.7.    Notices. Any notice or communication is effective when personally delivered in writing; or on the date when the notice or communication is telexed or telecopied and provided that any such telex or telecopy is confirmed on the day after the notice by overnight airmail courier (e.g., Federal Express); or upon receipt of a mailing by

BM INIT 25    CO INIT 𝐷𝑅

certified mail, return receipt requested. All notices shall be sent to the parties at the notice addresses listed below, or such other addresses of which they hereafter notify each other in writing under the provisions of this Section.

**To Licensor:**
President
Blue Marlin Corp.
540 Florida Street
San Francisco, California 94410

**To Licensee:**
Concept One
362 Fifth Avenue, 2nd floor
New York, NY 10001

With a copy to:
Steve Gerber
666 Fifth Avenue
26th floor
New York, NY 10103

17.8.     Entire Agreement. This Agreement states the entire agreement between the parties, and supersedes all prior negotiations and agreements between the parties concerning its subject matter. This writing is intended as the final, complete and exclusive statement of the terms of the Agreement between the parties and cannot be changed or terminated orally. Each party to this Agreement acknowledges that no representations, inducements, promises, or agreements, oral or otherwise, have been made by either party, or anyone acting on behalf of either party, which are not embodied herein and no other agreement, statement, or promise not contained in this Agreement shall be valid or binding. Each party further states that such party is not relying upon any promise, representation, inducement or agreement, oral or otherwise, which is not expressly stated in this Agreement.

17.9.     Interpretation and Rules of Construction.     Sections and section headings contained in this Agreement are for reference purposes only, and shall not affect in any manner the meaning of interpretation of this Agreement. Whenever the context requires, references to the singular shall include the plural and the plural the singular and any gender shall include any other gender. The parties acknowledge that each party has reviewed this Agreement, and no provision of this Agreement shall be interpreted for or against any party because such party or its representative drafted such provision.

17.10.     Survival. All obligations of the parties relating to protection of the Licensed Mark and indemnification, and such other provisions are intended to survive the termination or expiration of this Agreement.

BM INIT ____  CO INIT ____

BM CO FINAL
Last printed 2/17/2004 12:42 PM

17.11.    Severability.  If any provision of this Agreement, or the application thereof to any person, place or circumstance, shall be held by a court of competent jurisdiction to be invalid, void or otherwise unenforceable, such provision shall be enforced to the maximum extent possible so as to effect the intent of the parties, or, if incapable of such enforcement, shall be deemed to be deleted from this Agreement, and the remainder of this Agreement and such provisions as applied to other persons, places and circumstances shall remain in full force and effect.

17.12.    Binding Agreement.  This Agreement shall be binding on and inure to the benefit of the parties and their respective successors, agents, affiliates, representatives and permitted assigns.

17.13.    Counterparts.  This Agreement may be executed in any number of counterparts, each of which shall be deemed an original of this Agreement, but all of which together shall constitute on and the same instrument.

IN WITNESS WHEREOF, the parties have executed this Agreement to be effective as of the Effective Date.

LICENSEE:                                          LICENSOR:

By: _____              By: _____
Its' Authorized Officer                              Its' Authorized Officer

BM CO FINAL                          —28—                BM INIT ___  CO INIT ___
Last printed 2/17/2004 12:42 PM

## SCHEDULE A

1.  ### Trademarks, Logos, etc.:

    #### Serial #: 76/370876:

    

    "BLUE MARLIN"

    #### Serial #: 78/152681:

    

    "BLUE MARLIN
    FIVE STAR VINTAGE"

    #### Serial #: 76/325790:
    "BLUE MARLIN
    FIVE STAR VINTAGE"

    #### Serial #: 76/325789:

    

    "FIVE STAR
    VINTAGE"

    #### Serial #: 76/370837:

    "★★★"
    ★★

2.  ### Licensed Products

    (a)   Men's, women's, and young men's Hats including but not limited to Knitted hats.

BM INIT _SC_   CO INIT _DL_

BM CO FINAL
Last printed 2/17/2004 12:42 PM

EXHIBIT B

Yahoo! Mail - randall_riccardo@yahoo.com                                    Page 1 of 3

Yahoo! Mail                                        Search:                    Web Search

Welcome, randall_riccardo                          Mail Home · Me I Tutorials ·Help
[Sign Out, My Account]


55,000 Titles     FREE Delivery to Your Mailbox     BLOCKBUSTER Start FREE T

Mail  ▾     Addresses     Calendar     Notepad     What's New · Mail For Mobile - Upgrades
                                                   Options

| Check Mail | Compose |                          Search Mail   Search the Web

VONAGE: Save up to          Previous | Next | Back to Search Results
50% on phone service        | Delete | Reply ▾ | Forward ▾ | Spam | More... ▾ |

                            This message is not flagged. [ Flag Message - Mark as Unread ]    Printable View
Check Other Mail    [Edit]
                            From:   'Erik Stuebe' <estuebe@bluemarlincorp com>   ☐ View Contact Details
  mail dinnispor                    § Add Mobile Alert

Folders        [Add - Edit]  To:    'randall riccardo' <randall_riccardo@yahoo com>

  Inbox (28)                 Subject: Fw:

  Draft                      Date:   Wed, 29 Mar 2006 13:59:56 -0800

  Sent
                             Randy
  Bulk (1)       [Empty]
  Trash          [Empty]     let's discuss

My Folders      [Hide]       erik
  BM- Erik Stuebe            ----- Original Message -----
  BM--Licensing              From: Sam Hafif
  BM--Marketing              To: Erik Stuebe
  BM--Trademark              Cc: Rick Ashley ; Bernie Hafif ; Steven Gerber ; sam@concept1 com
  BM--Various                Sent: Wednesday, March 29 2006 1:16 PM
  Events
  Job search                 Dear Erik,
  Miscellaneous
  Rebuilding Toge            Randal Ricardo called on your behalf on Monday to advise that
  Various Clients            you were not willing to renegotiate the terms of the license
                             agreement between Concept One and Blue Marlin. My response
Search Shortcuts             was that we would not agree to pay the minimum royalties as
  My Photos                  stated in the contract based on the following:
  My Attachments
                               1)  Breach of exclusivity - For several months after the license
See your                           agreement went into effect Blue Marlin continued to
credit score: $0                   distribute headwear from their inventory into the market

                               2)  Misrepresentation – As our initial meetings with you and
                                   Per, you stated that at peak your headwear business had
                                   achieved $3,000,000 in revenue, and for the year prior to

http://us.f318.mail.yahoo.com/ym/ShowLetter;_ylc=X3oDMTRrMmpwM2puBEFjdGlvbg...   6/14/2006

Netflix-$5.99/mo
No Late Fees!

Find Any
Email Address

Online Degree
Programs

our entering into license with you, it was $700,000. We based our proposals and sales projections on that advice. Subsequent to signing the license we learned that information to be false. Further, account lists that were provided to us as a basis for distribution turned out to be outdated as 75% of the specialty stores on those lists were inactive for a period of time and advised us that they had dropped Blue Marlin and had no interest in buying the brand.

3) Changes to the marks – Prior to our entering into the agreement, Blue Marlin had been using several marks including the Blue Dot mark for many years, shortly after signing the license we were advised that you were not going forward with those marks, and we were prohibited from using them on product, packaging, and displays. You never adopted a permanent mark thereafter, changing your mark every 3-4 months (shields, lions, stars, shields w lions and stars, no stars etc). This diminished the value of the Blue Marlin brand, and did not enable us to develop the business using the mark that was presented to us prior to signing

4) Delay of approvals – This year you held us off for 4 months from developing Fall while you were deciding whether or not to pull the license back in house. This caused us to miss an entire shipping period of merchandise.

For months now, you have aluded that you wish to discontinue the license agreement with Concept One, but have not directly addressed the minimum royalty issue. There is no point in tiptoeing around this issue, so I am stating directly that we will not accept that obligation. If need be we are prepared to defend our position legally

I offer you the following two alternatives

1) Concept One continues to exploit the license to the best of it's ability, and minimum royalties are reduced to actual royalties earned for 04-05, 50k for 05-06, and 75k for 06-07

2) The license is immediately terminated with no obligation to Concept One to pay additional royalties (except for actual sales). Merchandise is either sold to you at landed cost, or to the market during a 90 day sell-off period.

We do not wish to attend your design and sales meetings next

week, unless this issue is resolved prior to. Unless we hear from you, we will not attend.

The intent of this letter is for the purpose of trying to reach a settlement only, and we're reserving all of our rights, and making no admissions.

We look forward to your response.

Best Regards,

Sam Hafif

Delete | Reply | Forward | Spam | Move...

Previous | Next | Search Results                    Save Message Text | Full Headers

Check Mail | Compose                    Search Mail | Search the Web

Copyright © 1994-2006 Yahoo! Inc. All rights reserved. Terms of Service · Copyright/IP Policy · Guidelines · Ad Feedback
NOTICE: We collect personal information on this site.
To learn more about how we use your information, see our Privacy Policy

http://us.f318.mail.yahoo.com/ym/ShowLetter;_yle=X3oDMTRrMmpwM2puBEFjdGh\bg...    6/14/2006

SUM-100

## SUMMONS
### (CITACION JUDICIAL)

| | FOR COURT USE ONLY |
|---|---|
| | (SOLO PARA USO DE LA CORTE) |

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*
USPA Accessories, LLC dba Concept One Accessories

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*
Blue Marlin Corp

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (www.lawhelpcalifornia.org), the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), or by contacting your local court or county bar association.

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no le protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.courtinfo.ca.gov/selfhelp/espanol/), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.courtinfo.ca.gov/selfhelp/espanol/) o poniéndose en contacto con la corte o el colegio de abogados locales.*

| The name and address of the court is: | CASE NUMBER |
|---|---|
| *(El nombre y dirección de la corte es):* | *(Número del Caso):* CGC-06-453170 |

Superior Court of California, County of San Francisco
400 McAllister Street
San Francisco, CA 94102-4514

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
Randall Riccardo
299 Kansas Street, San Francisco, CA 94103

| DATE: | Clerk, by | , Deputy |
|---|---|---|
| *(Fecha)* | *(Secretario)* | *(Adjunto)* |

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citation use el formulario Proof of Service of Summons, (POS-010)).*

**NOTICE TO THE PERSON SERVED:** You are served
1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify)*:

3. ☐ on behalf of *(specify)*:

under: ☑ CCP 416.10 (corporation) ☐ CCP 416.60 (minor)
☐ CCP 416.20 (defunct corporation) ☐ CCP 416.70 (conservatee)
☐ CCP 416.40 (association or partnership) ☐ CCP 416.90 (authorized person)

☐ other *(specify)*:
4. ☐ by personal delivery on *(date)*:

Page 1 of 1

| Form Adopted for Mandatory Use Judicial Council of California SUM-100 [Rev. January 1, 2004] | SUMMONS | Code of Civil Procedure §§ 412.20, 465 |

CM-010

| ATTORNEY OR PARTY WITHOUT ATTORNEY (Name, State Bar number, and address): | FOR COURT USE ONLY |
|---|---|

Randall Riccardo (Bar. no : 224672)
299 Kansas Street, San Francisco, CA 94103
TELEPHONE NO: 415 252 9630    FAX NO:  415 252 9633
ATTORNEY FOR (Name): Blue Marlin Corp.

ENDORSED
F I L E D
San Francisco County Superior Court

SUPERIOR COURT OF CALIFORNIA, COUNTY OF  San Francisco
STREET ADDRESS: 400 McAllister Street
MAILING ADDRESS:
CITY AND ZIP CODE: San Francisco, CA 94107-4515
BRANCH NAME: Civil Centre Courthouse

JUN 1 6 2006

GORDON PARK-LI, Clerk
BY: CRISTINA E. BAUTISTA
                  Deputy Clerk

CASE NAME:
Blue Marlin Corp. v. USPA Accessories, LLC

| CIVIL CASE COVER SHEET | Complex Case Designation | CASE NUMBER: |
|---|---|---|
| [✓] Unlimited   [ ] Limited | [ ] Counter   [ ] Joinder | CGC-06-453170 |
| (Amount demanded exceeds $25,000) | (Amount demanded is $25,000 or less) | Filed with first appearance by defendant (Cal. Rules of Court, rule 1811) |

JUDGE:
DEPT:

*Items 1–5 below must be completed (see instructions on page 2).*

1. Check one box below for the case type that best describes this case:

**Auto Tort**
- [ ] Auto (22)
- [ ] Uninsured motorist (46)

**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
- [ ] Asbestos (04)
- [ ] Product liability (24)
- [ ] Medical malpractice (45)
- [ ] Other PI/PD/WD (23)

**Non-PI/PD/WD (Other) Tort**
- [ ] Business tort/unfair business practice (07)
- [ ] Civil rights (08)
- [ ] Defamation (13)
- [ ] Fraud (16)
- [ ] Intellectual property (19)
- [ ] Professional negligence (25)
- [ ] Other non-PI/PD/WD tort (35)

**Employment**
- [ ] Wrongful termination (36)
- [ ] Other employment (15)

**Contract**
- [✓] Breach of contract/warranty (06)
- [ ] Collections (09)
- [ ] Insurance coverage (18)
- [ ] Other contract (37)

**Real Property**
- [ ] Eminent domain/Inverse condemnation (14)
- [ ] Wrongful eviction (33)
- [ ] Other real property (26)

**Unlawful Detainer**
- [ ] Commercial (31)
- [ ] Residential (32)
- [ ] Drugs (38)

**Judicial Review**
- [ ] Asset forfeiture (05)
- [ ] Petition re: arbitration award (11)
- [ ] Writ of mandate (02)
- [ ] Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 1800–1812)**
- [ ] Antitrust/Trade regulation (03)
- [ ] Construction defect (10)
- [ ] Mass tort (40)
- [ ] Securities litigation (28)
- [ ] Environmental/Toxic tort (30)
- [ ] Insurance coverage claims arising from the above listed provisionally complex case types (41)

**Enforcement of Judgment**
- [ ] Enforcement of judgment (20)

**Miscellaneous Civil Complaint**
- [ ] RICO (27)
- [ ] Other complaint (not specified above) (42)

**Miscellaneous Civil Petition**
- [ ] Partnership and corporate governance (21)
- [ ] Other petition (not specified above) (43)

2. This case [ ] is   [✓] is not    complex under rule 1800 of the California Rules of Court. If the case is complex. mark the factors requiring exceptional judicial management:
   a. [ ] Large number of separately represented parties   d. [ ] Large number of witnesses
   b. [ ] Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve   e. [ ] Coordination with related actions pending in one or more courts in other counties, states. or countries, or in a federal court
   c. [ ] Substantial amount of documentary evidence   f. [ ] Substantial postjudgment judicial supervision
3. Type of remedies sought (check all that apply):
   a. [✓] monetary   b. [ ] nonmonetary; declaratory or injunctive relief   c. [ ] punitive
4. Number of causes of action (specify): 3: Open Account, Account Stated, Breach of Contract
5. This case [ ] is   [✓] is not   a class action suit.
6. If there are any known related cases file and serve a notice of related case. (You may use form CM-015.)
Date:
   Randall Riccardo
   (TYPE OR PRINT NAME)                              (SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code) (Cal. Rules of Court, rule 201.8 ) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule
- If this case is complex under rule 1800 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

| Form Adopted for Mandatory Use Judicial Council of California CM-010 [Rev. January 1, 2006] | **CIVIL CASE COVER SHEET** | Cal. Rules of Court, rules 201.8, 1800–1812; Standards of Judicial Administration, § 19 www.courtinfo.ca.gov |

American LegalNet, Inc.
www.USCourtForms.com