**TAB 16**

1  David M. Bass (State Bar No. 117199)
   Peter M. Cho (State Bar No. 213870)
2  DAVID M. BASS & ASSOCIATES
   2029 Century Park East, 14th Floor
3  Los Angeles, California 90067
   Telephone: (310) 789-1152
4  Facsimile: (310) 789-1149
   E-mail: dbass@basslawla.com
5

6  Attorneys for Defendant and Cross-
   Complainant USPA ACCESSORIES, LLC
7  dba CONCEPT ONE ACCESSORIES

8

9              SUPERIOR COURT OF THE STATE OF CALIFORNIA

10                FOR THE COUNTY OF SAN FRANCISCO

11

12  BLUE MARLIN CORP.,                    Case No. CGC-06-453170

13                 Plaintiff,             [Assigned for case management purposes
                                          to the Hon. Arlene T. Borick, Dept. 212]
14       vs.
                                          CROSS-COMPLAINT OF USPA
15  USPA ACCESSORIES, LLC dba             ACCESSORIES, LLC FOR:
    CONCEPT ONE ACCESSORIES,
16                                        (1) BREACH OF CONTRACT;
                   Defendant.
17                                        (2) BREACH OF THE IMPLIED
                                              COVENANT OF GOOD FAITH AND
18  USPA ACCESSORIES, LLC dba                  FAIR DEALING;
    CONCEPT ONE ACCESSORIES, a New
19  York limited liability company,       (3) NEGLIGENT MISREPRESENTATION;

20                 Cross-Complainant,     (4) FRAUD;

21       vs.                              (5) RELIEF BASED ON RESCISSION; AND

22  BLUE MARLIN CORP., a California       (6) FAILURE TO REGISTER FRANCHISE
    corporation; and ROES 1 to 25, inclusive,   OFFER.
23                 Cross-Defendants.

24                                        Complaint Filed:    June 15, 2006
25

26  ///

27  ///

28  ///

1    Defendant and Cross-Complainant USPA ACCESSORIES, LLC dba CONCEPT ONE

2  ACCESSORIES ("USPA" or "Cross-Complainant"), for its Cross-Complaint herein, alleges as

3  follows:

4

5                                        **THE PARTIES**

6        1.      Cross-Complainant USPA is a New York limited liability company with a

7  principal place of business located in New York, New York.

8        2.      Upon information and belief, Cross-Defendant BLUE MARLIN CORP. ("BLUE

9  MARLIN") is a California corporation with its principal place of business located in San

10  Francisco, California.

11        3.      Cross-Complainant does not know the true names and capacities of Cross-

12  Defendants Roes 1 through 25, inclusive, and Cross-Complainant therefore sues said Cross-

13  Defendants by such fictitious names. Cross-Complainant will seek leave of Court to amend

14  this Cross-Complaint when said true names and capacities have been ascertained. Cross-

15  Complainant alleges, on information and belief, that each of the Cross-Defendants designated

16  as a Roe herein was the agent, employee, and/or alter ego of each of the remaining Cross-

17  Defendants or is in some manner responsible for the events and occurrences herein described,

18  and legally and proximately caused injury and damages to Cross-Complainant as herein

19  alleged.

20

21                          **FACTS COMMON TO ALL CAUSES OF ACTION**

22        4.      USPA and BLUE MARLIN entered into a license agreement ("License

23  Agreement"), effective January 1, 2004, through which USPA was granted an exclusive license

24  to utilize BLUE MARLIN's trademarks on hats which USPA would design, manufacture,

25  market and distribute to retailers. (A true and correct copy of the License Agreement is

26  attached hereto as Exhibit A.) The original term of the License Agreement was not to exceed

27  42 months (from January 1, 2004 to June 30, 2007), with an option for an additional 36 months.

28  / / /

1      5.    Under the License Agreement, BLUE MARLIN agreed to license certain of its

2  trademarks to USPA, which trademarks are specifically set forth in Schedule A attached to the

3  License Agreement. The License Agreement collectively defined the trademarks specifically

4  set forth in Schedule A as the "Trademark." (Exh. A, Recital A.) The Trademarks consisted of

5  five trademarks bearing serial nos. 76370876, 78152681, 76325790, 76325789 and 76370837.

6      6.    USPA's license to the Trademarks was limited to "use . . . on or in connection

7  with the design, merchandising, manufacture, advertising, promotion, distribution and sale of

8  Licensed Products . . . ." (Exh. A, ¶ 2.1.) The License Agreement defined "Licensed Products"

9  as the products listed on Schedule A of the License Agreement, namely, hats. (Exh. A, ¶ 1.6

10  and Schedule A.)

11      7.    During the negotiations leading up to the execution of the License Agreement,

12  BLUE MARLIN represented that it recorded at least $3,000,000 in revenues per year from its

13  headwear business. These representations were made by BLUE MARLIN executive officers

14  Erik Stuebe and Per Gasseholm to USPA executive officer Sam Hafif on October 30, 2003.

15      8.    Based on these representations with respect to BLUE MARLIN's sales, USPA

16  agreed to pay minimum "guaranteed" annual royalties to BLUE MARLIN during the initial 42-

17  month term. (Exh. A, ¶¶ 7.3-7.4.)

18      9.    The License Agreement also required that BLUE MARLIN approve, in its

19  reasonable discretion, all Licensed Products, including any associated promotional, packaging

20  or advertising materials, before USPA could manufacture, use, market or distribute them.

21  (Exh. A, ¶¶ 6.2-6.3.4.)

22      10.    After the parties executed the License Agreement, BLUE MARLIN continued to

23  distribute and sell hats bearing the licensed Trademarks, notwithstanding the exclusive nature

24  of the License Agreement.

25      11.    After the parties executed the License Agreement, USPA discovered that the

26  revenue numbers that BLUE MARLIN claimed to have obtained in prior years were false and

27  inflated.

28  ///

1    12.    In addition, soon after the License Agreement was executed, BLUE MARLIN

2  gave USPA an account list setting forth the identity of retailers of BLUE MARLIN apparel to

3  whom USPA could sell the Licensed Products. USPA discovered that the majority of these

4  retailers were either inactive business entities or uninterested in buying hats bearing BLUE

5  MARLIN trademarks.

6    13.    Further, only a few months after the execution of the License Agreement, BLUE

7  MARLIN informed USPA that it was moving to different trademarks and that USPA should no

8  longer use trademarks that USPA had licensed from BLUE MARLIN. Rather, BLUE MARLIN

9  requested USPA to use trademarks other than those licensed to USPA under the License

10  Agreement. Indeed, one of the trademarks licensed under the License Agreement, serial

11  no. 78152681, was deemed abandoned as of March 10, 2004, shortly after the License

12  Agreement was executed in February 2004.

13    14.    BLUE MARLIN also unreasonably delayed issuing the required approvals for

14  USPA's Fall 2005 product line of hats, resulting in substantial additional costs of

15  manufacturing, marketing and distributing Licensed Products.

16    15.    To date, USPA has incurred losses of at least $500,000 in selling BLUE

17  MARLIN products from February 2004 to date, after deducting the costs of, *inter alia*, apparel

18  design and development, manufacturing, marketing, promotion, advertising, and distribution.

19

20    **FIRST CAUSE OF ACTION**

21    **(Breach of Contract Against Cross-Defendant Blue Marlin)**

22    16.    USPA repeats and realleges the allegations contained in paragraphs 1 through 15

23  of this Cross-Complaint as though fully set forth herein.

24    17.    USPA and BLUE MARLIN are parties to the License Agreement.

25    18.    BLUE MARLIN has materially breached the terms of the License Agreement

26  by, *inter alia*: (a) distributing hats bearing BLUE MARLIN trademarks in competition with

27  USPA during the term of the License Agreement; (b) forbidding USPA from using the

28  trademarks licensed under the License Agreement; and (c) unreasonably delaying in granting

4

1    the requisite approvals that were a condition precedent to USPA's right to distribute Licensed

2    Products.

3        19.    USPA, by contrast, has performed all of its obligations under the License

4    Agreement, except as to those performances that have been excused, waived, or rendered

5    impossible by BLUE MARLIN.

6        20.    As a direct and proximate result of BLUE MARLIN's material breaches of the

7    License Agreement, USPA has suffered compensatory damages in an amount subject to proof,

8    but not less than $500,000.

9

10    ## SECOND CAUSE OF ACTION

11    **(Breach of the Implied Covenant of Good Faith**

12    **and Fair Dealing Against Cross-Defendant Blue Marlin)**

13        21.    USPA repeats and realleges the allegations contained in paragraphs 1 through 20

14    of this Cross-Complaint as though fully set forth herein.

15        22.    USPA entered into the License Agreement with the understanding and

16    expectation that BLUE MARLIN would act in good faith and deal fairly pursuant to the

17    License Agreement.

18        23.    BLUE MARLIN has breached the implied covenant of good faith and fair

19    dealing arising from the License Agreement by, *inter alia*: (a) distributing hats bearing BLUE

20    MARLIN trademarks in competition with USPA during the term of the License Agreement;

21    (b) requiring USPA to use trademarks other than those licensed under the License Agreement;

22    (c) unreasonably delaying in granting the requisite approvals that were a condition precedent to

23    USPA's right to distribute Licensed Products; and (d) misrepresenting the number and identity

24    of retailers who were willing and/or able to distribute Licensed Products.

25        24.    As a direct and proximate result of BLUE MARLIN's breach of the implied

26    covenant of good faith and fair dealing, USPA has suffered compensatory damages in an

27    amount subject to proof, but no less than $500,000.

28    ///

### THIRD CAUSE OF ACTION

**(Negligent Misrepresentation Against Cross-Defendant Blue Marlin)**

25.    USPA repeats and realleges the allegations contained in paragraphs 1 through 24 of this Cross-Complaint as though fully set forth herein.

26.    On October 30, 2003, BLUE MARLIN represented to USPA that BLUE MARLIN realized $3,000,000 per year from its sales of hats bearing BLUE MARLIN trademarks. When BLUE MARLIN made these representations, it had no reasonable ground for believing them to be true in that its revenues from sales of hats bearing BLUE MARLIN trademarks were actually lower, and BLUE MARLIN was in fact ready to move on to using new trademarks.

27.    During the negotiations leading up to the execution of the License Agreement, BLUE MARLIN failed to disclose to USPA that BLUE MARLIN intended to cease marketing and using the trademarks licensed under the License Agreement during the term thereof. When BLUE MARLIN failed to disclose this fact, it had no reasonable ground for failing to do so in that it knew it would move on to using trademarks other than the trademarks licensed under the License Agreement.

28.    During the negotiations leading up to the execution of the License Agreement, BLUE MARLIN failed to disclose to USPA that BLUE MARLIN intended to sell hats bearing BLUE MARLIN trademarks in competition with USPA. When BLUE MARLIN failed to disclose this fact, it had no reasonable ground for failing to do so in that it knew that it still had inventory of hats bearing BLUE MARLIN trademarks that it wished to sell.

29.    Approximately two months after the execution of the License Agreement, BLUE MARLIN submitted an account list to USPA and represented that the entities set forth therein were able and willing retailers of hats bearing BLUE MARLIN trademarks. When BLUE MARLIN made this representation, it had no reasonable ground for believing them to be true in that the majority of these entities were either inactive or had no interest in distributing goods bearing BLUE MARLIN's trademarks.

///

1    30    BLUE MARLIN made the aforementioned representations and omissions with

2  the intention of inducing USPA to act in reliance on these representations and omissions in

3  entering into and performing under the License Agreement, or with the expectation that USPA

4  would so act.

5    31.    As a proximate result of the negligent misrepresentations and omissions of

6  BLUE MARLIN as herein alleged, USPA was induced to enter into and perform under a

7  License Agreement for unprofitable and/or lesser value trademarks, by reason of which USPA

8  has been damaged in an amount subject to proof.

9

10                    **FOURTH CAUSE OF ACTION**

11              **(Fraud Against Cross-Defendant Blue Marlin)**

12    32.    USPA repeats and realleges the allegations contained in paragraphs 1 through 31

13  of this Cross-Complaint as though fully set forth herein.

14    33.    On October 30, 2003, BLUE MARLIN, through its executives Eric Stuebe and

15  Per Gasseholm, orally represented to USPA's Sam Hafif that BLUE MARLIN realized

16  $3,000,000 per year from its sales of hats bearing BLUE MARLIN trademarks. These

17  representations were in fact false. BLUE MARLIN had realized substantially lower sales

18  revenues from hats bearing BLUE MARLIN trademarks than it had represented to USPA.

19    34.    During the negotiations leading up to the execution of the License Agreement,

20  BLUE MARLIN failed to disclose to USPA that BLUE MARLIN would cease marketing and

21  using the trademarks licensed under the License Agreement during the term thereof. BLUE

22  MARLIN had a duty to disclose facts material to the subject of the negotiations and to USPA's

23  decision to enter into the License Agreement.

24    35.    During the negotiations leading up to the execution of the License Agreement,

25  BLUE MARLIN failed to disclose to USPA that BLUE MARLIN would sell hats bearing

26  BLUE MARLIN trademarks in competition with USPA during the term of the License

27  Agreement. BLUE MARLIN had a duty to disclose facts material to the subject of the

28  negotiations and to USPA's decision to enter into the License Agreement.

1    36.    Approximately two months after the execution of the License Agreement, BLUE

2    MARLIN submitted an account list to USPA and represented that the entities set forth therein

3    were able and willing retailers of hats bearing BLUE MARLIN trademarks. This

4    representation was in fact false. Most of the entities on the account list were either inactive or

5    had no interest in distributing goods bearing BLUE MARLIN trademarks.

6    37.    When BLUE MARLIN made these representations and omissions, it knew them

7    to be false or misleading and made these representations and omissions with the intention to

8    deceive and defraud USPA and to induce USPA to act in reliance on these representations and

9    omissions in entering into and performing under the License Agreement, or with the

10   expectation that USPA would so act.

11   38.    USPA, at the time these representations were made by BLUE MARLIN and at

12   the time USPA entered into the License Agreement, was ignorant of the falsity of BLUE

13   MARLIN'S representations and believed them to be true. In reliance on these representations,

14   USPA was induced to and did enter into an unprofitable License Agreement, and performed

15   thereunder. Had USPA known the actual facts, it would not have entered into the License

16   Agreement or performed thereunder. USPA's reliance on BLUE MARLIN's representations

17   was justified because it did not have access to BLUE MARLIN's internal information.

18   39.    As a proximate result of the fraudulent conduct of BLUE MARLIN as herein

19   alleged, USPA has been damaged in an amount subject to proof.

20   40.    The aforementioned conduct of BLUE MARLIN presents an intentional

21   misrepresentation, deceit, or concealment of material facts known to BLUE MARLIN with the

22   intention on the part of BLUE MARLIN of thereby depriving USPA of property or legal rights

23   or otherwise causing injury, and was despicable conduct that subjected USPA to a cruel and

24   unjust hardship in conscious disregard of USPA'S rights, so as to justify an award of exemplary

25   and punitive damages.

26   ///

27   ///

28   ///

## FIFTH CAUSE OF ACTION

### (Relief Based on Rescission Against Cross-Defendant Blue Marlin)

41.    USPA repeats and realleges the allegations contained in paragraphs 1 through 40 of this Cross-Complaint as though fully set forth herein.

42.    USPA will suffer substantial harm and injury under the License Agreement if it were not rescinded in that as a result of BLUE MARLIN's misrepresentations, USPA will continue to be deprived of its bargain and will have a license to use trademarks that are worth substantially less than what USPA bargained and paid for and intended to license.

43.    USPA intends this Cross-Complaint in this action to serve as notice of rescission of the License Agreement, and hereby offers to restore all consideration furnished by BLUE MARLIN under the License Agreement, on the condition that BLUE MARLIN restore to USPA the consideration furnished by USPA, specifically all royalties and other fees paid to BLUE MARLIN, plus USPA's losses incurred in, *inter alia*, promoting and selling the Licensed Products, in an amount to be proven at trial, but which are no less than $500,000.

44.    In performing the acts herein alleged, BLUE MARLIN intentionally misrepresented to or concealed from USPA material facts known to BLUE MARLIN, such as BLUE MARLIN's past sales figures, BLUE MARLIN's impending switch to new trademarks, BLUE MARLIN's competing sales of hats bearing BLUE MARLIN trademarks, and the low number of willing retailers of BLUE MARLIN products, with the intention on the part of BLUE MARLIN of depriving USPA of its money and property, thereby justifying an award of punitive damages against BLUE MARLIN.


## SIXTH CAUSE OF ACTION

### (Failure to Register Franchise Offer Against Cross-Defendant Blue Marlin)

45.    USPA repeats and realleges the allegations contained in paragraphs 1 through 44 of this Cross-Complaint as though fully set forth herein.

46.    Blue Marlin offered and sold to USPA a franchise for Blue Marlin branded apparel, of which Blue Marlin was the franchisor for a fee comprising of minimum annual

1    royalties. By the terms of the franchise agreement (the License Agreement), USPA was given

2    the right to engage in the business of manufacturing and distributing headwear under a

3    marketing plan prescribed in substantial party by Blue Marlin, whereby the operation of

4    USPA's headwear business would be substantially associated with the Trademarks and other

5    trademarks designated by the franchisor Blue Marlin.

6        47.    Blue Marlin failed to register the franchise offer with the Commissioner of

7    Corporations at the time of the offer and sale to USPA, and it has not been registered at any

8    time prior to the filing of this Cross-Complaint.

9

10                              **PRAYER FOR RELIEF**

11    WHEREFORE, USPA prays for judgment against Blue Marlin as follows:

12                      **ON THE FIRST CAUSE OF ACTION**

13    1.    For damages according to proof.

14                     **ON THE SECOND CAUSE OF ACTION**

15    2.    For damages according to proof.

16                      **ON THE THIRD CAUSE OF ACTION**

17    3.    For damages according to proof.

18                     **ON THE FOURTH CAUSE OF ACTION**

19    4.    For damages according to proof.

20    5.    For exemplary damages.

21                      **ON THE FIFTH CAUSE OF ACTION**

22    6.    For an order rescinding the License Agreement.

23    7.    For damages according to proof.

24    8.    For exemplary damages.

25                      **ON THE SIXTH CAUSE OF ACTION**

26    10.    For an order rescinding the License Agreement.

27    11.    For damages according to proof.

28    ///

1

**ON ALL CAUSES OF ACTION**

2          12.    For pre-judgment interest according to proof

3          13.    For costs of suit incurred herein, including attorneys' fees.

4          14.    Such other relief as this Court may deem just and proper.

5

6    Dated: December 13, 2006                      DAVID M. BASS & ASSOCIATES

7

8                                        By: _____

9                                                        David M. Bass
                                            Attorneys for Defendant and Cross-
                                            Complainant USPA ACCESSORIES, LLC
10                                          dba CONCEPT ONE ACCESSORIES

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT A

# EXCLUSIVE LICENSE AGREEMENT

This Exclusive License Agreement (the "Agreement") is made and entered into effective January 1, 2004 (the "Effective Date") by and between Blue Marlin Corp., a California corporation with its principal place of business at 540 Florida Street, San Francisco, California 94110 ("Licensor") and USPA Accessories, LLC dba Concept One Accessories, a New York corporation with its principal place of business at 362 Fifth Ave, 2nd Fl, New York, NY 10001 ("Licensee").

## RECITALS

A.    Licensor is the owner of certain names, labels and trademarks and related rights which Licensor uses in the manufacture and sale of various products, including the name, label and trademark Blue Marlin and related trademark and design rights, depictions and logos and variations and derivations thereof, as more particularly set forth in Schedule A (the "Trademark").

B.    Licensee desires to utilize the Trademark and related rights in the manufacture, distribution, promotion and sale of the products as set forth on Schedule A attached hereto, Products which bear the Trademark are hereinafter referred to as the "Licensed Products".

C.    Licensor's Trademark and related rights, and the goodwill associated therewith, are of great value to Licensor, making adherence to the quality control standards provided in this Agreement essential to maintaining the significant value of Licensor's Trademark and related rights and such associated goodwill.

D.    Licensor is willing to license Licensee to use the Trademark and related rights on Licensed Products, but only under the terms and conditions set forth in this Agreement

NOW, THEREFORE, in consideration of the mutual promises and representations set forth herein, Licensor and Licensee agree as follows:

1.   Definitions.   The following terms shall have the meanings set forth in this Section for purposes of this Agreement:

1.1.    "Affiliates" means any person or entity controlling, controlled by or under common control of any party now or in the future.

1.2.    "Advertising Materials" means all advertising, publicity and promotional programs and materials related to any Licensed Product

BM INIT ___ CO INIT ___

BM CO FINAL
Last printed 2/16/2004 10:00 AM

1.3.    "Channels of Distribution" - Better department stores and specialty stores within the Territory. In addition, non full price stores and such other accounts, with Licensors' prior written approval, for retail sale (excluding Mail order and the Internet) within the Territory. Final sales to off price retailers shall be permitted with an aggregate limit of ten (10) percent of the current quarter's regular Net Sales.

1.4.    "Contract Year" means the period of time from the Effective Date of this Agreement until June 30, 2005 (the "First Contract Year") and each successive one year period during the Term, including, if applicable, extensions of the Term under Section 4.2, except that the first Contract Year shall date from the Effective Date through the 30th day of June, 2005.

1.5.    "Designs" means (a) all designs for the Licensed Products and any and all copyrights and other intangible or intellectual property rights therein and in any package design, label, insert or Marketing or other material displaying the Trademarks; (b) all drawings, sketches and other materials furnished by Licensor; (c) any and all modifications or improvements or derivative works of the foregoing; and (d) any and all copyrights or other intangible or intellectual property rights in the foregoing. For purposes hereof all designs submitted to Licensor for approval shall have been created exclusively for Licensor and shall not have been offered for sale by Licensee or its agents prior to submission to Licensor.

1.6.    "Licensed Product" means the product as listed on Schedule A hereof, either physically bearing the Trademarks or to which the Trademarks are affixed, that are manufactured either by Licensee directly or by a sub-contractor of Licensee.

1.7.    "Net Sales" means Gross Sales of the Licensed Products by Licensee (including its Affiliates and specifically excluding non-final sales transactions between Affiliates of Licensee) less only (i) returns actually received from customers; (ii) actual Trade Discounts and documented discounts given pursuant to retailer programs; (iii) allowances and post invoice credits granted to customers, but only to the extent that Licensee documents that the allowance or post invoice credit relates to its sale of Licensed Products; (iv) product sales to the Licensor as defined in Section 3.4.3; (v) sales taxes, excise taxes and duties or other taxes paid by customers; and (vi) freight charges actually incurred by the Licensee, all calculated as stated in Section 7.5.

1.8.    "Packaging" means all packaging, cartons, containers, hang-tags, interior woven labels, inserts, in-packs, wrapping materials and artwork, copy and literary text incorporated therein for the Licensed Products.

1.9.    "Person" shall mean any individual, firm, company, corporation, limited liability company, unincorporated association, partnership, trust, joint venture, governmental authority or other entity of any kind in any jurisdiction, and shall include any successor (by merger or otherwise) of such entity.

BM INIT ___ CO INIT ___

BM CO FINAL
Last printed 2/16/2004 10:00 AM

9

1.10. "Sell" or "Sale" (or any such derivation of the word "sale") means any and all sales, transfers, distributions or other dispositions of any kind or nature, directly or through third persons, of units of the Licensed Products at any level of wholesale or retail distribution channels, including final Sales to Affiliates of Licensee.

1.11. "Territory" - United States, its territories, possessions and military bases.

1.12. "Trade Discounts" - Reductions in the list wholesale selling price of the Licensed Products by line item or by invoice sub-total, granted by Licensee in writing prior to or after delivery

1.13. "Trade Secrets" - Information including any formula, pattern, compilation, program, device, method, technique, or process, that derives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use and that is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

2. Grants of Rights.

2.1. Trademark and Design Rights. Licensor hereby grants to Licensee the exclusive, non-transferable, non-assignable license to use the Trademark on or in connection with the design, merchandising, manufacture, advertising, promotion, distribution and sale of Licensed Products solely in the Territory to customers in the Channels of Distribution provided, however, that Licensee may utilize the Trademark in connection with the manufacture of the Licensed Products outside the Territory but only for the Sale of such Licensed Products within the Territory.

2.2. Rights Reserved To Licensor. All rights other than those expressly granted to Licensee are reserved to Licensor, including but not limited to the right to use, license and sublicense the manufacture, merchandising, promotion, distribution and sale of (a) products of any and all types and descriptions other than the Licensed Products in the Territory; (b) Licensed Products outside of the Territory, except for the right to manufacture outside the Territory as provided for in Section 2.1; and (c) all products of any and all types and descriptions sold under names, labels and trademarks other than the Trademark

2.3. Efforts. At all times while this Agreement is in effect, Licensee shall use commercially reasonable efforts to exploit the rights herein granted on a commercially reasonable basis throughout the Territory, including but not limited to, endeavoring to sell the maximum quantity of Licensed Products to retail stores in the Channels of Distribution consistent with good business practices and the quality standards set forth in this Agreement; offering Licensed Products for sale such that they may be sold to the

consumer on a timely basis; and maintaining a sales force sufficient to provide effective distribution to the Channels of Distribution throughout the Territory.

2.4.    Conduct of Business. Licensee shall conduct its business at all times in a manner that will reflect positively on the Trademarks. Licensee shall use the Trademarks in a manner that does not derogate Licensor's rights in the Trademarks or the value of the Trademarks, and shall take no action that would interfere with, diminish or tarnish those rights or value of the goodwill of Licensor in such Trademarks.

## 3    Limitations on Rights Granted.

3.1.    Third Parties. The license granted conveys no right to grant any sublicense, concession, right or privilege relating to the Trademark or Licensed Products, and the license granted is not to be deemed transferable by operation of law for any purpose and is indivisible and non-assignable, including, but not limited to, any affiliates and/or business successors of Licensee except with Licensor's prior written consent, which shall not be unreasonably withheld.

3.2.    Licensee shall adopt and utilize reasonable commercial procedures to monitor all persons and entities, including domestic and foreign subcontractors, engaged in the manufacture or sale of Licensed Products to endeavor to confirm that they comply fully with all applicable laws, rules and regulations, including without limitation, all applicable state, federal and local wage and hour, child labor, overtime and other labor laws.

3.3.    In furtherance of the foregoing, and in a timely manner, Licensee shall cooperate with Licensor, and shall provide such information to Licensor, as is reasonably required for Licensor to comply with any and all reasonable or legally enforceable demands or requests by any governing or judicial entity for any information regarding any or all manufacturers and subcontractors who have or are manufacturing components of the Licensed Products. Such information to include all necessary information to clearly identify which Licensed Products and related components such manufacturers and subcontractors have produced or are producing. The Licensor shall maintain all such information under this section in strict confidence and shall not use any such information for its own benefit, commercial or otherwise, or other than in accordance with this Agreement and the purposes contemplated herein. Licensee shall be responsible for keeping such related records in safekeeping for a period not to exceed three (3) years from the expiry of this Agreement.

3.4.    Distribution of Licensed Products. The parties acknowledge that the manner and scope of the distribution of the Licensed Products are critical to the promotion and enhancement of Licensor's image, and to the protection of the Trademark and associated goodwill. Accordingly, Licensee agrees to abide by the following restrictions throughout the Territory:

BM INIT [signature]    CO INIT [signature]

-4-

3.4.1.  Licensee shall use the Trademark solely in connection with the manufacture and wholesale distribution of the Licensed Products.

3.4.2.  Licensee shall sell the Licensed Products only for resale in retail establishments within the Channels of Distribution.

3.4.3.  At the request of the Licensor, Licensee shall sell, at its regular wholesale price, less twenty percent (20%), any Licensed Product, to the Licensor for Licensor's distribution to end user's through Licensor's Internet sales channel. Such sales shall be excluded from the definition of Net Sales in Section 1.5. Licensor shall sell such product at no less then regular retail price.

3.4.4.  No Extraterritorial Sales.  Notwithstanding any contrary provision of this Agreement, Licensee agrees and covenants that it shall Sell the Licensed Products solely within the Licensed Territory; and that Licensee shall not, either directly or indirectly through its affiliates or other third persons, export or Sell any of the Licensed Products to (i) any person outside of the Licensed Territory, or (ii) any person within the Licensed Territory whom Licensee knows or has good reason to know intends or is likely to export or Sell Licensed Articles in any country or region outside of the Licensed Territory, except by specific written approval of Licensor in a specific case granted in its sole discretion.

3.4.5.  Licensee shall, upon request and within thirty (30) days of such written notice but no more than twice annually, advise Licensor, in writing, of its specific marketing plans.

3.5.    Licensee's Use of Other Marks.  Licensee shall not, on any Licensed Products or in conjunction with any use of the Trademark, use or associate the Trademark with any other name, trademark, character or personality, except with prior written consent or as permitted under this Agreement.

3.6.    No Premiums.  In addition to the other limitations hereunder, the rights of Licensee shall not include the right to, and Licensee warrants and represents that neither Licensee nor any of its affiliates will, use the Trademark or the Licensed Products for an endorsement of any other product or service. Licensee shall not use or permit the use of any Licensed Product as a premium except with the prior written consent of Licensor and shall not distribute any Licensed Product to any person which Licensee has good reason to believe would distribute such Licensed Product in contravention of the foregoing. "Premium" shall mean any Licensed Product distributed at no charge or minimal charge for the purpose of increasing the sale of any other article of merchandise or product, or any service, including any distribution or display for publicity, promotional purposes, combination sales, giveaways or in any other similar transaction.

3.7.    Design Non-Infringement. Licensee agrees not to infringe on any of Licensor's past, current or future designs and/or trade dress, including but not limited to, "Vintage

BM CO FINAL                                          - 5 -                        BM INIT       CO INIT
Last printed 2/16/2004 10:00 AM

Sportswear" image(s) or other intellectual property rights belonging to Licensor in any of Licensees' affiliates' and/or subsidiaries' business activities without the express written approval of the Licensor.

4   Term of Agreement

4.1.     **Term.** The "Term" of this Agreement shall commence on the Effective Date and expire on June 30, 2007, unless renewed as provided herein.

4.2.     **Renewal Terms.** Licensee shall have one (1) option ("Renewal Option") to renew the term of this Agreement; the option period shall be for a period of three Contract Years (36 months). The Renewal Option shall be for the period dating from the 1st day of July 2007 through June 30, 2010. Licensee shall exercise its option to renew, if at all, by delivering written notice of renewal to Licensor at any time prior to ninety (90) days prior to the expiration of the then existing Term. As used in this Agreement, the "Term" shall be deemed to consist of the initial term described in Section 4.1. Notwithstanding the foregoing, Licensee shall not have any further rights to renew in the event that, before Licensee's exercise of its' renewal right: (a) Licensee breaches this Agreement and fails to cure such breach within the applicable cure period, if any, specified in Section 16 of this Agreement; as a result of which Licensor elects in writing to terminate this Agreement; (b) Licensee fails to meet ninety (90) percent of any of the sales minimums in paragraph 7.3 during the Term; (c) Licensee breaches any monetary provision (i.e., a provision requiring payment of money by Licensee) of this Agreement and fails to cure such breach within ten (10) days of written notice of such breach as a result of which Licensor elects in writing to terminate this Agreement.

4.3.     Any transaction between the parties following the termination or expiration of this Agreement shall not be construed as a renewal or extension or waiver hereof; but as a separate transaction terminable at will by either party without cause.

5   Ownership and Protection of Intellectual Properties.

5.1     **Ownership.** Licensee acknowledges Licensor's ownership of the Trademark and each and all of the Designs and further acknowledges that all of Licensee's uses of the Trademark and Designs shall inure to the exclusive benefit of Licensor. If not created by Licensor, the Designs shall be deemed "works made for hire" for the Licensor within the meaning of United States Copyright Law or any other applicable industrial or intellectual property law. If the Designs do not so qualify, the Designs and all intangible or intellectual property rights therein will be deemed irrevocably transferred and assigned by Licensee under this Agreement to Licensor on a continuous basis as of the time or creation or development, without the payment of additional consideration. The provision of this Section 5.1 shall survive the expiration or earlier termination of this Agreement.

Licensee also represents that it has not registered and in the future will not attempt to register the Trademark in its own name or for its own benefit in any country or territory in the world. For the purposes of protection of ownership in the Trademark only, all uses of the Trademark made by or on behalf of the Licensee will be deemed to have been made by Licensor. During the term of this Agreement and thereafter, Licensee shall not:

5.1.1. Claim ownership of or attempt to register the Trademarks in any country or state;

5.1.2. Do or commit any act which would adversely affect the validity of the Trademarks in any country;

5.1.3 Infringe the Trademarks anywhere in the world;

5.1.4. Attack the validity of this Agreement;

5.1.5. Display the Trademarks in a manner which might mislead purchasers into believing that Licensee was itself Licensor or an affiliate or subsidiary thereof; and

5.1.6. Engage in any other activity which can reasonably be expected to materially dilute or otherwise materially impair the right, title and interest of Licensor in the Trademark;

5.1.7. provided that before Licensor declares a breach of Section 5.1.6 above, Licensor shall advise Licensee of its claim of breach and afford Licensee a reasonable period of time, not to exceed thirty (30) days, to rectify such breach.

5.2.    Registrations. Licensee shall, at Licensor's expense, cooperate with Licensor in the execution, filing and prosecution of any trademark, copyright or patent application that Licensor may desire to file, and shall supply Licensor with Licensed Products, samples, containers, labels and all uses of the Trademark as may be reasonably requested for use in connection therewith. Licensee shall cooperate with Licensor in making and terminating registered user entries. Licensor shall pay all costs and fees in connection with filing and prosecution of trademarks, copyrights and patents. The obligations under this Section 5.2 shall survive termination of this Agreement.

5.3.    No Implied Licenses. Nothing in this Agreement shall constitute the grant of any implied licenses or rights.

5.4.    Infringements. Licensee shall immediately give notice to Licensor, in writing, of any infringement or misuse of any Trademark by any third party of which Licensee becomes aware. Licensor shall have the option to commence legal action regarding any such misuse at its expense. Upon Licensor's request, Licensee shall cooperate fully and promptly in any infringement action commenced by Licensor (which cooperation shall not require Licensee to initiate legal action against a third party); provided, however, that

BM INIT ____ CO INIT ____

BM CO FINAL
Last printed 2/16/2004 10:00 AM

any and all costs incurred by Licensee in connection with such litigation shall be borne solely by Licensor. If Licensee decides to take any action against an infringement or misuse, Licensee may do so at its own expense (and shall be entitled to keep all of any recovery) provided it obtains the prior written consent of Licensor, in which event Licensee shall indemnify Licensor against all loss, damage, attorneys' fees, judgments and other costs or expenses incurred or suffered by Licensor as a result of such action. Licensee shall not settle any such action without Licensor's prior written approval of the settlement terms and conditions, which approval shall not be withheld unreasonably.

6. Quality Control and Approvals.

6.1.    Quality Standards.  Licensee acknowledges that the maintenance of the high quality of the Licensed Products, and the control by Licensor over the nature, quality and manner of distribution of all Licensed Products are essential elements of the license being granted herein.  Therefore, the quality of the Licensed Products and the quality of all promotional and packaging materials bearing the Trademark shall be at least as high as the best quality of similar products and promotional, advertising and packaging material presently shipped, distributed, manufactured or sold by Licensee in the Territory and shall conform fully with all applicable laws and regulations.

6.2.    Standards for Licensor Approval.  In order to maintain the high quality standard prescribed by Licensor, Licensee may not manufacture, use, offer for sale, advertise, promote, ship or distribute any Licensed Product, promotional or packaging materials or advertising materials bearing the Trademark until approved in writing by Licensor.  All matters in this Agreement requiring approval of Licensor or the exercise of its discretion shall be at the reasonable discretion of Licensor. Any matter not approved, in writing, by Licensor within fifteen (15) days from submission shall be deemed disapproved, unless the Licensee shall submit a second written request within seven (7) days of the fifteenth (15th) day and the Licensor does not provide a written response within seven (7) days of receipt, either approving or disapproving of the request, the second request shall be considered approved. Approval by Licensor does not constitute, nor shall it be construed as, a determination that the approval matter complies with any applicable laws, rules or regulations.

6.3. Approval of Specific Elements.

6.3.1.  Licensee shall submit for Licensor's prior written approval all final designs, specifications, fabrications, color information, Packaging and Advertising.  Licensor shall exercise its best efforts to advise Licensee in writing of its approval or disapproval of any approval request from Licensee within fifteen (15) days of receipt by Licensor, provided that no request shall be deemed approved by Licensor unless such approval is given in writing.

6.3.2.  Prior to the production of each line of Licensed Products, Licensee shall submit to Licensor at least one (1) final sample of each style in the collection. Samples submitted for approval shall be of at least equal quality as the Licensed Products that are produced and distributed. Once a proposed element of a Licensed Product has been approved, Licensee shall not deviate in any material respect from the elements so approved. No disapproved proposed Licensed Product shall be manufactured or sold as a Licensed Product under this Agreement. Licensee may revise any disapproved sample and resubmit it for approval.

6.3.3.  Following commencement of the first of each seasonal production run of the Licensed Products (or, if production of the various styles of the Licensed Product commences at different times, within two weeks after commencement of each style's first production run), Licensee shall deliver to Licensor a finished production sample of each style of Licensed Product solely for the purpose of confirming that the production goods are at least equal in quality as the approved samples. If the production sample is not at least equal in quality to that of the sample previously approved, Licensee shall immediately make all changes necessary to conform fully to the original sample approved by Licensor. Any Licensed Product which is not of at least equal quality may only be sold upon mutual written agreement, except in the event there are minor defects or difference from the sample approved by Licensor, such changes or corrections may be made per a "running change" as soon as reasonably practical.

6.3.4.  To the extent not approved concurrently with a Licensed Product, Licensee shall submit for Licensor's prior written approval, as provided above, at least one sample of all promotional, labeling and packaging materials bearing the Trademark. No disapproved promotional, labeling or packaging materials shall be used in commerce by Licensee in connection with the Trademark.

6.3.5  Licensee shall be solely responsible for taking commercially reasonable action to endeavor to ensure that all Licensed Products comply fully, to the extent applicable, with the Textile Fiber Product Identification Act, the Flammable Fabrics Act and all other applicable consumer product and safety laws, rules and regulations. Licensee will prior to shipment of any Licensed Product for which flammability standards have been issued, amended or continued in effect under the Flammable Fabrics Act, reasonable and representative tests as prescribed by the Consumer Products Safety Commission have been or prior to shipment for sale will be performed, which show that such Licensed Products conform to all applicable flammability standards. Licensee shall promptly investigate and respond to product safety concerns and/or complaints made by consumers who purchase Licensed Products upon Licensee being made aware of the same.

6.3.6.  Licensee shall affix to all Licensed Products such legends, markings and notices as required by laws and regulations in the Territory or reasonably required by

Licensor, including but not limited to, information about the proper care and use of the Licensed Products.

6.3.7. **Anti-Counterfeiting.** Licensee and its sub-contractors at all times shall each comply with all shipment tracking, identification and anti-counterfeiting systems and labels and procedures that Licensor may reasonably establish from time to time, provided not commercially prohibitive. Licensee further shall use commercially reasonable measures to endeavor to ensure that all of its distributors and retailers purchasing Licensed Products each comply with such anti-counterfeiting systems and labels and procedures.

6.3.8. **Use of Sub-contractors.** Licensee shall be entitled to sub-contract directly with third party sub-contractors solely for the manufacturing of the Licensed Products by such firms ("sub-contractors"); provided however that (i) all sub-contracting work shall be limited to manufacturing units of the Licensed Products for the sole account of Licensee and for the sole use or Sale by Licensee under its own name or under the name of Licensor; (ii) all quality standards and specifications provided for in this Section shall be followed at all times by such sub-contractors; (iii) prior to the start of manufacturing Licensee and each sub-contractor shall enter into a legally enforceable written agreement in the English language that (1) prohibits the manufacturing of any Licensed Article for any third person or for its own account; (2) grants Licensor the right to directly enforce such contract as a third party beneficiary; (3) prohibits all Sales or transshipping or grey marketing of any Licensed Products or any other goods incorporating any of the Trademark by such sub-contractor or its affiliates or agents for any purpose; (4) requires compliance by the sub-contractor with Applicable Laws and Applicable Standards (as herein defined) at all times; and (5) otherwise shall contain such terms and conditions and be in the form reasonably approved in advance by Licensor in each case. Licensee shall be directly liable to and shall fully indemnify Licensor for any breach by any sub-contractor.

6.3.9. **Applicable Laws.** Licensee will and Licensee will endeavor to cause its sub-contractors to comply with all applicable laws, rules, regulations, ordinances, treaties, governmental orders and employment standards in connection with the manufacturing, assembly, labeling, packaging, Sale, promotion or marketing of the Licensed Products or the Packaging or Advertising Materials or any components; including but not limited to laws concerning import, export, customs, certificate licenses, quota allocations, country or origin, safety, public health, employment standards, wages and benefits, child or involuntary labor, working hours and employee health and safety (collectively "Applicable Laws"). Licensee shall obtain at its own expense all approvals of all governmental authorities as may be necessary in connection with its performance under this Agreement.

6.3.10. **Applicable Standards.** Licensee will and Licensee will endeavor to cause its sub-contractors to comply with all established industry standards and good

BM CO FINAL
Last printed 2/16/2004 10:00 AM

BM INIT CO INIT

manufacturing and storage practices related to the Licensed Products or the Packaging; and shall maintain a commercially reasonable quality control and safety assurance program with the respect to the Licensed Products and the Packaging (collectively "Applicable Standards"). Where no such standards and practices are established, the Licensed Products and the Packaging shall meet the higher of (i) the level of quality used for similar products of Licensee, or (ii) the level of quality comparable to the quality standards and practices generally accepted for other leading brands of the same type of product in similar markets.

6.3.11. Material Breach. Licensee agrees and acknowledges that its compliance with each of the foregoing standards and requirements shall be deemed material to this Agreement.

6.4    Uses of the Trademark. Licensee agrees that the Trademark will appear on each Licensed Product and its packaging, if any. Licensee shall use only those promotional and packaging materials which have been approved in writing by Licensor. Licensee shall have the right to place its corporate designation on any packaging, the form of which shall have the prior written approval of the Licensor as specified above. No other combination of third party logos, marks, trade names or characters shall be used with the Trademark unless specifically approved by Licensor as specified above

6.5. Advertising and Promotion.

6.5.1. All advertising and promotion of the Licensed Products undertaken or approved by Licensee must be consistent with the quality, image and standards of Licensor. All advertising copy and art work and any other advertising materials (including without limitation any proposed advertising to be submitted or provided to retailers or customers of Licensee for any use by them) and all display and merchandising materials and merchandising aids which will be provided or approved by Licensee for use in retail stores or showrooms shall be submitted to Licensor in writing for its prior approval; any such item which is not approved by Licensor within fifteen (15) days shall be deemed disapproved. Licensee shall comply with all Licensor decisions in such matters. If Licensor provides Licensee with written guidelines regarding use of the Trademarks in retail advertising, Licensee shall promptly provide such guidelines to its customers.

6.5.2. Advertising Expenditures. Licensee shall expend the minimum of two percent (2%) of the Net Sale Proceeds for each respective period as defined in Schedule A for advertising Licensed Articles via television, print media, radio, billboards, in-store advertising, point of purchase displays, trade shows or any other form of advertising or marketing (the "Direct Advertising Expenditure").

BM INIT Ξ∑ CO INIT 𝕏𝕝

6.5.3.  Where not unreasonable, any advertising or promotional or packaging materials which refer to Licensee's name shall state that Licensee is a licensee of Licensor, the owner of the Trademark.

6.5.4.  Licensee shall furnish Licensor, royalty-free, with two of each SKU of each finished Licensed Product in each line.  Upon request, Licensee shall furnish Licensor with a reasonable number of additional royalty-free production samples of finished Licensed Products for use in Licensor's showroom, for advertising and for sales presentations, and Licensor shall reimburse Licensee for Licensee's cost for such samples

7.  Payments and Reports.

7.1.      Trademark Royalty and Advertising Royalty.  With respect to each Contract Year of the Term of this Agreement, Licensee shall pay to Licensor and account for a royalty (the "Trademark Royalty") in an amount equal to eight (8%) percent of the Licensee's Net Sales of Licensed Products during each Contract Year.  With respect to each Contract Year of the term of this Agreement, Licensee shall pay to Licensor as and for a contribution ("Advertising Contribution") to Licensor's advertising fund for the advertising and promotion of the Licensed Products an amount equal to two (2%) percent of the Licensee's actual Net Sales. This Advertising Contribution shall be in addition to the amount specified as Advertising Expenditures in Section 6.5.2. Payment of any advertising royalty shall be made with the payment of the Trademark Royalty as provided in Section 7.4.

7.2.      Advance Payment.  At the time of execution of this Agreement, the Licensee will pay to Licensor the sum of thirty-seven thousand, five hundred ($37,500) Dollars as a non-refundable advance payment ("Advance").  The Advance may be credited against any Trademark Royalty due for the Term and no Royalty shall be payable until all such cumulative Royalty due exceeds the total amount of the Advance.

7.3.      Minimum Net Sales and Minimum Royalty.  The following are the Minimum Net Sales and Guaranteed Minimum payments (Trademark Royalty and Advertising Contribution) required for each of the periods referred to below:

BM INIT ЕЅ   CO INIT ᴮᴶ

BM CO FINAL
Last printed 2/16/2004 10:00 AM

| Contract Year | Net Sales | Guaranteed Minimum Payments |
|---|---|---|
| **Initial Term** | | |
| Year 1: February 1, 2004-<br>June 30, 2005 (17 months) | $750,000 | $75,000 |
| Year 2: July 1, 2005-<br>June 30, 2006 (12 months) | $1,200,000 | $120,000 |
| Year 3: July 1, 2006-<br>June 30, 2007 (12 months) | $1,500,000 | $150,000 |
| **Renewal Option Period:** | | |
| Year 1: July 1, 2007 -<br>June 30, 2008 | $2,000,000 | $200,000 |
| Year 2: July 1, 2008 -<br>June 30, 2009 | $2,250,000 | $225,000 |
| Year 3: July 1, 2009 -<br>June 30, 2010 | $2,500,000 | $250,000 |

7.4.    Royalty Payments and Reports   Within forty-five (45) days of the end of each calendar quarter during the Term, regardless of whether any Trademark Royalty payment is then due, Licensee shall submit a report of the number, description and invoice price of each Licensed Product sold, the gross sales, returns actually received, trade discounts and allowances granted, the Net Sales of all Licensed Products and any other information that may be required under any other provisions of this Agreement. Each report shall be certified as correct by the Chief Financial Officer of Licensee. Concurrently with delivery of such report, Licensee shall pay Licensor the Trademark Royalty due for that quarter. In addition, for each calendar quarter, to the extent the Trademark Royalty paid by Licensee for the Contract Year through that date does not equal or exceed the Pro Rata Guaranteed Royalty Minimum, Licensee shall pay Licensor the difference between the Trademark Royalty paid through such date and the Pro Rata Guaranteed Minimum Royalty as of such date   As used herein, "Pro Rata Guaranteed Minimum Royalty" means the Guaranteed Royalty Minimum for such Contract Year divided by four and multiplied by the number of quarters which have elapsed during such Contract Year (except that during the Initial Term, for purposes of determining the Pro Rata Guaranteed Minimum Royalty, the amount of the Guaranteed Minimum Royalty for the Initial Term less the Advance, shall be divided by five (5) and payment of the quarterly payments to the extent applicable shall commence on the first day of the second quarter of the Initial Term and shall be made on each of the next succeeding four quarters of the initial term). Once Licensee has paid Licensor an amount equal to the Guaranteed Royalty payable for a Contract Year, Licensee shall only be required to pay the applicable Royalty for the

-13-

BM INIT ☒ CO INIT ☒

remainder of such Contract Year to the extent it exceeds the amount payable for the Guaranteed Royalty for that year. Trademark Royalties which exceed the Guaranteed Royalty shall be credited to the succeeding Contract Years or quarter if part of the same Term. All royalties shall be paid in good funds and in U.S. Dollars.

7.5. Calculation of Net Sales and Royalties.

7.5.1. All sales of Licensed Products to any related company or any shareholders, directors, officers or employers of Licensee or a related company shall be calculated at the average invoice price at which such Licensed Products are sold to unrelated customers in arm's-length transactions and Trademark Royalties shall be payable on the price received on account of all such sales.

7.5.2. Licensee will bear all taxes, duties and other governmental charges in the Territory relating to or arising under this Agreement, including without limitation, any income taxes, withholding income taxes and other taxes, any stamp or documentary taxes or duties, turnover, sales or use taxes, value added taxes, excise taxes, customs or exchange control duties or any other charges relating to or on any royalty payable by Licensee to Licensor hereunder, except that Licensor shall be responsible for any tax imposed on Licensor's income by the United States or any state thereof.

7.6. Additional Statements and Reports.

7.6.1. Upon reasonable request, Licensee shall submit invoices, credit memoranda and/or a computer printout confirming any information reflected in its calculations of royalties, in addition to a summary of sales by customer and product code and supporting documentation, if available.

7.6.2. With each Royalty Report as defined in 7.4, Licensee shall submit to Licensor a list containing the names of all its customers and others who have purchased the Licensed Products with product identities, quantities, unit prices, discounts and charge backs to confirm its compliance with this Agreement.

7.6.3. Receipt or acceptance by Licensor of any statement furnished, or of any sums paid by Licensee, shall not preclude Licensor from questioning their correctness at any time within thirty-six (36) months of receipt by the Licensor; provided, however, that reports submitted by Licensee shall be binding and conclusive on Licensee in the event of any termination based on a breach by Licensee arising out any payment or report.

7.6.4. Within ninety (90) days after the end of each Contract Year, Licensee shall furnish Licensor with a summary report of Licensee's sales of Licensed Products during the Contract Year. The summary report shall be certified by the Chief

BM INIT __ CO INIT __

Financial Officer or an equivalent officer of Licensee. Such summary report shall contain such information as Licensor shall reasonably require, including but not limited to, an aggregate statement showing the number, description and invoice price of all Licensed Products sold during the term, gross sales and all itemized deductions from gross sales.

7.6.5. <u>Sale Date</u>. The Trademark Royalty shall accrue upon the sale of the Licensed Products regardless of the time of collection by Licensee. For purposes of this Agreement, a Licensed Product shall be considered "sold" upon the date of billing, invoicing, shipping, or payment, whichever occurs first.

7.6.6. <u>Interest on Late Payments</u>. If any payment due from Licensee is not received by Licensor within twenty (20) days of the due date, Licensee shall pay to Licensor interest at the rate of ten (10%) percent per annum from the date such payment was due to the date of payment, on all overdue amounts. The parties agree that this interest charge represents a fair and reasonable estimate of the costs that Licensor will incur by reason of its loss of the use of such funds.

8. <u>New York Showroom</u>. The Licensor shall, at its sole discretion, have the right, but not the obligation, to maintain a showroom in New York City, New York. Should the Licensor establish such a showroom the following shall apply:

8.1.   Licensee agrees to pay Licensor a "Showroom Fee" of no less then nine hundred dollars ($900.00) per month, in advance, for the use of such showroom during the entire term of this Agreement. Such payment will be made to the Licensor no later than the 5th of each month. The Showroom Fee shall be increased when and if the Licensor shall have a respective increase in its' cost to operate the New York Showroom.

8.2.   Licensee shall limit the use of the Showroom to the display of the Licensed Products with one of the Licensee's full-time salesperson plus furniture, displays and equipment to a maximum of two hundred and fifty (250) square feet. Actual space location will be at the sole discretion of the Licensor. At no time shall the Licensee exercise any control or engagement of any sort, direct or indirect, of or with any Licensor employee(s).

8.3.   Nothing in this Agreement shall transfer any control of any kind by the Licensor in the use, function or location within New York City, New York to the Licensee.

8.4.   The Licensor, at its sole discretion, may, with thirty (30) days notice to the Licensee, terminate the New York Showroom for any reason. At termination of the New York Showroom, the Licensee's obligation under 7.1 shall also terminate. Licensee agrees to vacate the premises within the ten (10) days of the end of the thirty (30) day notice period.

BM INIT SS   CO INIT

8.5    Licensee agrees that in event of use of the Licensor's showroom as defined herein, all communications (i.e. telephone, facsimile and internet) services shall be arranged by and for the account of the Licensee. Licensor shall have no responsibilities to provide such services.

8.6.    Licensee agrees to provide evidence of all reasonable insurance regarding the Licensee's use of the New York showroom as defined herein including, but not limited to, property, liability, worker's compensation and disability insurance.

9    MAGIC Trade Show. The Licensor shall, at its sole discretion, have the right, but not the obligation, to purchase booth space at a MAGIC trade show (or its' successors). Should the Licensor participate in a MAGIC trade show the following shall apply:

9.1.    Subject to Licensor providing one-hundred and twenty day (120) advance written notice prior to the first day of the respective MAGIC Trade Show, of the maximum amount Licensee would have to pay, Licensee, within thirty (30 days of receiving the Licensors' written notice herein, shall notify Licensor whether it will, at its sole discretion, agree to pay to the Licensor, a pro rata portion of the direct costs related to the MAGIC Trade Show for such expenses as; booth rental, set-up and removal logistics, hospitality during show hours and imagery. The prorate portion will be determined by the percentage of the actual space taken by the Licensee of the booth space and will not exceed the amount stipulated in the Licensor's written notice provided herein. Payment will be made when the payment for the costs is actually due to the third-party provider, including but not limited to, any and all related deposits.

9.2.    Should the Licensee fail to notify the Licensor of its agreement to participate in the respective MAGIC Trade Show as provided in Section 9.1, Licensor shall have no obligation to provide Licensee with any use of any kind of the Licensor's booth at the respective Magic Trade Show

10. Suspension of Obligations.

10.1.    If Licensee is prevented from performing any of its obligations hereunder by virtue of governmental regulations or order (including environmental regulations), or by strike or war, declared or undeclared, acts of terrorism, riot or civil unrest or other calamities such as fire, earthquake, or similar acts of God, or because of other similar or dissimilar cause beyond the control of Licensee (herein "act of force majeure"), Licensee's obligations shall abate during the period of such conditions. Except as otherwise provided in this Section 10, if such condition continues for a period of more than sixty (60) days, Licensor shall have the right to terminate this Agreement.

10.2.    If an act of force majeure consists of fire, earthquake, flood, hurricane, tornado, war, or acts of terrorism and if the act prevents Licensee from manufacturing and/or delivering the Licensed Products, whether due to an inability to obtain fabric or other

BM INIT ___   CO INIT ___

materials, destruction of manufacturing facilities, inability to deliver finished product, or otherwise, Licensee shall have a period of not to exceed sixty (60) days to find alternate sources to enable it to manufacture and deliver the Licensed Products. Licensee shall use due diligence in obtaining such alternate sources and Licensee shall advise Licensor of the progress it has made with regard thereto.

11. Books and Records.

11.1.   Separate Books and Records.   Licensee shall maintain its books of account and records in accordance with generally accepted accounting principles. Licensee shall inform Licensor in writing of the location of such books and records, but in no case shall location of such books and records be outside of the United States of America.

11.2.   Unique Product Code Numbers.   The Licensed Products shall be assigned product code numbers unique from any products other than the Licensed Products that Licensee may manufacture and/or sell. The product code number assigned to each Licensed Product shall be identical to the product code number utilized to identify that Licensed Product in all Licensee's books and records. All documents evidencing the sale of Licensed Products shall state the product code number of such products.

11.3.   Right to Examine.   Until three (3) years after the last sale of Licensed Products by Licensee, Licensor shall have the right, at its sole cost and expense, no more than once each calendar year, on advance notice to Licensee of five (5) business days, to examine and copy all of Licensee's books and records relating directly to the manufacture and sale of Licensed Products. All such examinations shall be at Licensee's principal place of business and during normal business hours. Licensee shall keep all books of account and records available for at least three (3) years after last the year of the Agreement to which they relate.

11.4.   Right to Audit.   In addition to its right to inspect, Licensor shall have the right, not more than once during each calendar year, by its own personnel or its agents, on advance written notice to Licensee of at least five (5) business days, to audit all books and records which Licensee is required to maintain pursuant to this Agreement. All such audits shall be conducted at Licensee's principal place of business during normal working hours. In the event an audit discloses that Licensee has understated Net Sales or underpaid royalties for any report period, without prejudice to any of Licensor's rights under this Agreement, Licensee shall pay to Licensor the amount, if any, by which the actual royalties exceed royalties paid within fifteen (15) days of receipt of notice by Licensor to such effect. If such audit reveals that Licensee underpaid royalties by more than Five (5%) percent for any Contract Year, Licensee shall pay Licensor all reasonable costs, fees and expenses incurred by Licensor in conducting such audit, in addition to any interest for late payment provided for in Section 7.6.6 of this Agreement. Any and all information obtained from such audit shall be held in confidence and not be used for any purpose other than enforcement of the Licensor's rights under this Agreement.

12 Insurance.

12.1.    Requirements.    Without limiting Licensee's liability under the indemnity provisions of this Agreement, Licensee shall maintain comprehensive general liability insurance in the amount of at least Two Million ($2,000,000.00) Dollars.  The policy shall provide that Licensor shall receive at least thirty (30) days notice of cancellation.  The policy shall cover the applicable territory in which Licensee is conducting sales of Licensed Products and shall include coverage against theft and destruction of the Licensed Products.  Each policy shall include Licensor as an additional insured, with a vendor's broad form endorsement and shall provide that although Licensor is a named insured, Licensor may recover under the policy for any covered loss caused to Licensor, its agents or employees notwithstanding that such loss may have been caused by the negligence (including active, passive and gross negligence) of Licensee.  The insurance shall provide that it is primary coverage with respect to all insureds.  The insurance shall contain a waiver of subrogation against Licensor.

12.2.    Approved Carrier/Policy Changes.    All insurance shall be obtained from an insurance company Best's rated A   , or better which is admitted in the state where Licensee is domiciled.  Licensee shall give at least thirty (30) days prior written notice to Licensor of the cancellation of, or any modification in, such insurance policy that would affect Licensor's status or benefits there under.  As long as it meets all the foregoing criteria, insurance may be obtained by Licensee in conjunction with a policy which covers products other than the Licensed Products.

12.3.    Evidence of Coverage    Promptly following execution of this Agreement and upon each renewal of such policy, Licensee shall provide Licensor with evidence, in form and substance satisfactory to Licensor, of the maintenance and renewal of the required insurance including, but not limited to, copies of policies with applicable riders and endorsements, and certificates of insurance.

13. Indemnifications, Representations and Warranties.

13.1.    Indemnifications.    Licensee agrees to indemnify, hold harmless and defend Licensor, its officers, directors, agents and employees from and against any and all claims, suits or demands asserted against Licensor by any third party, including without limitation any and all losses, liabilities, expenses and damages incurred to resolve or satisfy such claims, suits or demands, including costs of suit and attorneys' fees, arising out of:

13.1.1. any alleged defect in any Licensed Product, regardless of whether the action is based upon negligence or strict liability;

13.1.2. any claim that any element of a Licensed Product (other than the Trademark or a design element furnished by Licensor in writing) infringes upon any trademark or rights of any other person; and

13.1.3. the manufacture, labeling, sale, importation, distribution or advertisement of any Licensed Product by Licensee.

13.1.4. as a condition to the indemnity set forth above, Licensor agrees to give Licensee prompt notice of any claim or occurrence, an opportunity to defend or handle such claim or occurrence prior to Licensor incurring fees, expenses or costs or any kind, and Licensor's cooperation with Licensee in the defense or handling of such claim or occurrence.

13.1.5. the use, by the Licensee, of the Licensor's New York showroom as described herein.

13.2    Licensor Indemnification.  Licensor agrees to indemnify, hold harmless and defend Licensee, its officers, directors, agents and employees and customers from and against any and all claims, suits or demands asserted against Licensee by any third party, including without limitation any and all losses, liabilities, expenses and damages, including costs of suit and reasonable attorneys' fees, arising out of and resulting from:

13.2.1. any claim that the use of the Trademark in the Territory and in the manner specified in Sections 3.4 and 3.5 of this Agreement infringes upon any trademark or rights of any other person; or

13.2.2. any violation of any warranty, representation or material agreement made by Licensor in this Agreement.

13.2.3. As a condition to the indemnity set forth above, Licensee agrees to give Licensor prompt notice of any claim or occurrence, an opportunity to defend or handle such claim or occurrence prior to Licensee incurring fees, expenses or costs or any kind, and Licensee's cooperation with Licensor in the defense or handling of such claim or occurrence.

13.3.    Defense of Claims.  The indemnifying party shall defend the indemnified party with respect to each and every claim for which such party is indemnified under this Agreement. All fees and expenses of legal counsel engaged with respect to such claims shall be paid for by the indemnifying party as incurred. The indemnified party shall provide its reasonable cooperation, at the indemnifying party's request and at the indemnifying party's sole cost and expense, in connection with the defense of all such claims.

13.4.    Notification of Claims and Consumer Complaints.    A party seeking indemnification under this Agreement shall immediately notify the indemnifying party, by telephone and in writing, of the subject matter and parties relating to such claim Licensee shall promptly take steps promptly to correct, any material complaint by a consumer and/or governmental body related to the Licensed Products or any other matter related to Licensee's performance under this Agreement of which Licensee is made aware.

13.5.    Indemnity Unaffected.  Compliance by Licensee with the insurance provisions of this Agreement shall not relieve Licensee of its duties to indemnify Licensor under this Agreement.

13.6.    Licensor Representations and Warranties.  Licensor represents and warrants to Licensee that:

13.6.1. Licensor is the sole owner of the Trademark and the Trademark does not infringe upon any other trademarks or rights of any other entity or person;

13.6.2. Licensor is a corporation duly incorporated, validly existing and in good standing under the laws of the State of California;

13.6.3 Licensor has full power to grant the license granted and has the full right, power and authority to enter into this Agreement and to perform all of its obligations hereunder;

13.6.4. The person executing this Agreement on the part of Licensor is duly authorized to execute and deliver the Agreement for Licensor and to bind Licensor to the terms hereof; and

13.6.5. Licensor is under no legal impediment which would prevent it from entering into and performing fully its obligations under this Agreement.

13.6.6. SUBJECT ONLY TO THE FOREGOING SUBSECTION, LICENSOR HEREBY SPECIFICALLY DISCLAIMS ANY AND ALL WARRANTIES, EXPRESS OR IMPLIED, INCLUDING WITHOUT LIMITATION THE WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, TITLE AND NON-INFRINGEMENT OF THIRD-PARTY RIGHTS, AND ANY WARRANTIES THAT MAY ARISE DUE TO COURSE OF PERFORMANCE, COURSE OF DEALING OR USAGE OF TRADE, WHETHER RELATED TO THE TRADEMARK OR OTHERWISE.

13.7.    Licensee Representations and Warranties.  Licensee represents and warrants to Licensor that:

13.7.1. Licensee is a corporation duly incorporated, validly existing and in good standing under the laws of the State of New York;

13.7.2. Licensee has the full right, power and authority to enter into this Agreement and to perform all of its obligations hereunder;

13.7.3. The person executing this Agreement on the part of Licensee is duly authorized to execute and deliver the Agreement for Licensee and to bind Licensee to the terms hereof; and

13.7.4. Licensee is under no legal impediment which would prevent it from entering into and performing fully its obligations under this Agreement and Licensee is financially capable of performing all of its obligations under this Agreement.

13.8.    **LIMITATION OF LIABILITIES.** SUBJECT TO AND EXCEPTING THE INDEMNIFICATION OBLIGATIONS OF LICENSEE OR LICENSOR SET FORTH IN SECTION 13 OF THIS AGREEMENT, IN NO EVENT SHALL EITHER PARTY OR ANY OF ITS AFFILIATES, SUCCESSORS OR PERMITTED ASSIGNS, AND ITS OR THEIR DIRECTORS, OFFICERS, EMPLOYEES, AGENTS, LICENSORS, OR REPRESENTATIVES BE LIABLE FOR ANY INDIRECT, SPECIAL OR CONSEQUENTIAL DAMAGES, OR DAMAGES FOR LOSS OF PROFITS, BUSINESS INTERRUPTION, LOSS OF GOODWILL, ARISING FROM OR RELATING TO THIS AGREEMENT OR THE TRADEMARK, EVEN IF THE OTHER PARTY IS EXPRESSLY ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. The foregoing limitation of liability and exclusion of certain damages shall apply regardless of the failure of essential purpose of any remedies available to either party.

14. Trade Secrets and Confidentiality.

14.1    Definition. "Confidential Information" means all information disclosed by one party ("Discloser") to the other party ("Recipient") (in writing, orally or in any other form) that is designated, at or before the time of disclosure, as confidential, or provided under circumstances reasonably indicating that the information is confidential, including without limitation trade secrets, customer lists, business plans, technical data, product ideas, personnel, and contract and financial information of Discloser or any third person to whom Discloser owes a duty of confidentiality. Confidential Information does not include information or material that (1) is now, or hereafter becomes, through no act or failure to act on the part of Recipient, generally known or available to the public; (2) is furnished to Recipient by a third person that is not under an obligation or duty of confidentiality to Discloser with respect to such information or material; or (3) is independently developed by Recipient without any breach of this Agreement, as evidenced by the Recipient's contemporaneous tangible (including written or electronic) records.

14.2    Restrictions on Use. Each party shall take all reasonable measures to protect the confidentiality of the other party's Confidential Information in a manner that is at least protective as the measures it uses to maintain the confidentiality of its own Confidential Information of similar importance. Recipient shall hold Confidential Information in strict confidence and shall not disclose, copy, reproduce, Sell, assign, license, market or otherwise dispose of such information, or give or disclose such information to third persons, or use such information for any purposes whatsoever other than as necessary in order to fulfill its obligations or exercise its rights under this Agreement. Notwithstanding the foregoing, Recipient may disclose the other party's Confidential Information (i) to employees and consultants that have a need to know such information, provided that Recipient shall advise each such employee and consultant of their obligations to keep such information confidential and shall require that each such employee and consultant sign a written nondisclosure agreement consistent with the confidentiality and nondisclosure provisions herein, and (ii) to the extent Recipient is legally compelled under legal process to disclose such Confidential Information, provided that Recipient shall give advance notice of such compelled disclosure to the other party, and shall cooperate with the other party in connection with any efforts to prevent or limit the scope of such disclosure and/or use of the Confidential Information.

15. Termination.

15.1.1. Other Rights Unaffected. It is understood and agreed that termination by Licensor on any ground shall be without prejudice to any other rights or remedies which Licensor may have.

15.1.2. Grounds for Termination. In addition to grounds for termination stated elsewhere in this Agreement, the following are grounds for termination of this Agreement;

15.1.3. Monetary Breaches of this Agreement. If Licensee fails to pay any sum on the date due and such breach continues for a period of ten (10) days following Licensor's written notice of breach given to Licensee.

15.1.4. Non-Monetary Breaches. Except as otherwise provided in Section 15.2.37, if Licensee fails to timely and fully perform or breaches any non-monetary provision of this Agreement, Licensor shall give Licensee notice of breach and, to the extent such breach is capable of being cured, Licensee must cure such breach as soon as practicable and in any event within thirty (30) days except that, if the breach is such that it cannot be cured within thirty (30) days despite commercially reasonable efforts to do so, Licensee shall immediately commence to cure such breach and diligently prosecute such cure to completion. Licensee shall report to Licensor, in writing, no later than ten (10) business days after the notice of breach, and at least once every two weeks after that until the breach is cured, what steps Licensee has taken and will take in order to cure such breach and to ensure that the breach does not occur again.

BM INIT ᏚᏚ  CO INIT ___

15.1.5. **Grounds for Immediate Termination.** Licensor may immediately terminate this Agreement:

15.1.5.1. If a petition for relief under the Bankruptcy Code is filed by or against the Licensee, or if Licensee makes any assignment for the benefit of its creditors or becomes the subject of proceedings under any insolvency, reorganization, or receivership law, with termination to become effective automatically if Licensee fails within sixty days of commencement to discharge the bankruptcy or terminate the assignment or other proceedings. The license and rights granted hereunder are personal to Licensee. No assignee for the benefit of creditors, receiver, debtor in possession, trustee in bankruptcy, sheriff or any other officer or court charged with taking over custody of Licensee's assets or business, shall have any right to continue performance of this Agreement or to exploit or in any way use the Trademark if this Agreement is terminated pursuant to this subsection, except as may by required by law.

15.1.5.2. Unless consented to by Licensor in writing in advance, such consent not to be unreasonably withheld, if there is any change of control of Licensee, consisting of one or more transfers (other than transfers among the existing shareholders of Licensee) which, in the aggregate, total fifty percent (50%) of the shares of stock of Licensee which are issued and outstanding upon execution of this Agreement, except for transfers to or between existing shareholders or members of their immediate families or trusts for their benefit, all of which shall be permitted.

16 **Obligations at Expiration or Termination.**

16.1.     **Termination of License.** The License shall terminate for all purposes and all rights granted to Licensee to use the Trademark hereunder shall forthwith revert to Licensor; Licensee shall refrain from any use whatsoever of any Trademark; and neither Licensee nor its sub-contractors shall manufacture or Sell any Licensed Articles or any other products that may infringe upon the Trademark at any time following termination, subject only to the limited provisions of this Section hereof.

16.2.     **Limited Right of Sell-Off.** Upon termination or expiration of this Agreement:

16.2.1. Licensee shall immediately provide Licensor with a complete and accurate written list of the current inventory of all units of Licensed Articles and Imported Articles which utilize the Trademark, either in hand as finished goods or which constituted work in process, as of the date of termination; and a complete and accurate written list of and evidence substantiating all uncancellable orders for the manufacture of Licensed Articles as of the date of termination (collectively, "Termination Inventory"). Such written lists shall be certified as complete and accurate by the President or Chief Financial Officer of Licensee.

BM CO FINAL
Last printed 2/17/2004 12:42 PM

BM INIT____    CO INIT____

16.2.2 In the event this Agreement is terminated other than for the material breach; nonpayment, within specified periods, of monies due herein or Bankruptcy of Licensee, then Licensee may, on a nonexclusive basis within the Licensed Territory only and in a manner otherwise consistent with this Agreement, dispose of quantities of the Termination Inventory for a period of six (6) months thereafter ("Sell-Off Period"); provided that (1) all payments then due are immediately reported and paid in full to Licensor or its designated nominee; (2) all statements and payments with respect to the Sell-Off Period are thereafter made in accordance with Sections 7.4 and 7.6 hereof for each of quarterly periods within such Period; (3) all units of Licensed Articles and Imported Articles to be Sold adhere to the quality and other standards provided for in this Agreement; (4) the quantities of units of Licensed Articles and Imported Articles to be Sold during the Sell-Off Period shall not materially exceed the quantities of the corresponding Licensed Articles or Imported Articles Sold by Licensee during the six-month period immediately prior to the termination of this Agreement; (5) no Sales shall occur directly or indirectly outside of the Licensed Territory; and (6) no Sales shall be made at any time directly or indirectly to any affiliate or successor or agent or representative of Licensee or any person related thereto.

16.2.3. A final certified written statement and payment for the final quarter of the Sell-Off Period shall be made within thirty (30) days after the end of the Period. Unless otherwise mutually agreed to in writing between the parties hereto, any Termination Inventory remaining after the Sell-Off Period pursuant to the terms hereof shall be destroyed or all reference to the Trademark shall be obliterated and written proof there of supplied to Licensor.

16.2.4. During the Sell-Off Period and for a period of six (6) months thereafter, Licensor or its representatives shall have the right to enter all relevant premises and conduct physical inventories and review all pertinent records in order to confirm that Licensee has complied with the terms of this Section 16. Any such inventories or reviews shall not be binding on Licensor. The foregoing further shall not limit or affect any other rights or remedies of Licensor hereunder or under applicable law, including but not limited to any right of audit or any pending; and shall not prejudice or affect any claim, action or cause of action of Licensor that shall survive the termination of this Agreement.

16.2.5. Notwithstanding the foregoing, in the event that this Agreement is terminated for the material breach; nonpayment, within specified periods, of monies due herein or Bankruptcy of Licensee, then Licensee may no longer Sell any units of the Licensed Articles or Import Articles or use the Trademark in any manner whatsoever, effective as of the date of termination. All units of the Licensed Articles or Import Articles shall be destroyed or all reference to the Trademark shall be obliterated and written proof there of supplied to Licensor.

16.3    Other Rights and Obligations.  All other rights and obligations of the respective parties hereunder shall cease as of the date of termination, provided however that:

16.3.1. All rights and obligations of the respective parties under this Agreement relating to Royalties and Royalty statements and other payments due and owing, including all rights of audit;

16.3.2. All representations and warranties and disclaimers of the respective parties;

16.3.3  All rights and obligations of the respective parties under Section 2 hereof (Grant of Rights); Section 3 hereof (Limitations of Rights Granted); Section 4 hereof (Term of Agreement); Section 13.3 hereof (Limitation of Liabilities); Section 13 hereof (Indemnification); Section 12 hereof (Insurance); Section 14 hereof (Trade Secrets and Confidentiality); Section 15 hereof (Termination); this Section 16; Section 17.6 hereof (Assignability); Section 17.3 hereof (Equitable Relief); Section 10 (Force Majeure), and  Section 17 hereof to the extent necessary or useful in the application or enforcement of the surviving provisions of this Agreement; and

16.3.4. Any claim or action or cause of action for breach or violation of this Agreement existing as of the date of termination;

16.3.4.1.  each shall not terminate and shall survive and remain in full force and effect for the period of the applicable statutes of limitation, until the relevant rights and obligations of the parties have been fully discharged and satisfied.

16.4.    No Liability or Prejudice.  Neither party shall be liable to the other party for damages of any kind solely as a result of terminating this Agreement in accordance with its terms; and any such termination of this Agreement by a party will be without prejudice to any other rights or remedies of such party under this Agreement or applicable law.

17. General Provisions.

17.1.    Governing Law.  This Agreement is to be construed in accordance with and governed by the internal laws of the State of California, United States of America, without giving effect to any choice of law rule that would cause the application of the laws of any jurisdiction other than the internal laws of the State of California to the rights and duties of the parties. All actions or disputes arising under this Agreement shall be brought exclusively in the Superior Court of the State of California for the County of San Francisco or in the Federal Court for the Northern District of California, United States of America, San Francisco Branch; and such courts shall have exclusive jurisdiction over disputes under this Agreement. Each of the parties expressly consents to jurisdiction and venue in such courts for all purposes of this Agreement or any dispute or controversy hereunder;

17.2.     Disputes. Each of the parties irrevocably agrees to submit to the jurisdiction and venue of the United States District Court for the Northern District of California or the California State Supreme Court for resolution of any and all disputes relating to or arising out of this Agreement. Licensee acknowledges and agrees that the Trademark possesses a special, unique and extraordinary character, which makes difficult the assessment of monetary damages which Licensor might sustain by any use of the Trademark or other action of Licensee affecting the Trademark or Licensor's rights therein which is inconsistent with the terms and provisions of this Agreement, including any unauthorized use, and that irreparable injury would be caused to Licensor thereby, such that injunctive relief, specific performance and/or similar relief would be appropriate to prevent and restrain such uses or actions.

17.3.     Equitable Relief. Licensee acknowledges that a breach of its obligations under this Agreement would cause Licensor irreparable damage. Licensee therefore agrees that in the event of such breach or threatened breach, in addition to remedies at law, Licensor shall have the right to injunctive or other equitable relief to prevent Licensee's violations of its obligations hereunder.

17.4.     Attorneys' fees. The prevailing party in any action or proceeding relating to or arising out of this Agreement shall recover its reasonable attorney's fees and costs incurred in connection with such suit or proceeding in addition to its judgment, including fees and expenses incurred in any appellate proceedings.

17.5.     Independent Contractors. Each party is an independent contractor and the personnel of a party are not the employees or agents of the other party for federal, state or other taxes or any other purposes whatsoever, and are not entitled to compensation or benefits of the other party. This Agreement shall not create any relationship of agency or partnership or joint venture or franchise or other business entity between the parties of any kind or nature. No party has the right or authority to enter into any obligation for or to otherwise bind the other party to any extent.

17.6.     Assignability. This license and other rights granted in this Agreement are personal to Licensee, and Licensee may not assign or sublicense any of its rights or delegate any of its duties under, pledge or otherwise affect the license granted in, this Agreement without prior written consent of Licensor, except to an affiliate that agrees to be bound by this Agreement. Any attempted assignment or sublicense in violation of this provision shall be void. Licensor may assign this Agreement to any successor or to any person or entity which acquires the Trademark, subject to Licensor's obligations under this Agreement.

17.7.     Notices. Any notice or communication is effective when personally delivered in writing; or on the date when the notice or communication is telexed or telecopied and provided that any such telex or telecopy is confirmed on the day after the notice by overnight airmail courier (e.g., Federal Express); or upon receipt of a mailing by

BM CO FINAL
Last printed 2/17/2004 12:42 PM

-26-

BM INIT 25   CO INIT _BL_

33

certified mail, return receipt requested. All notices shall be sent to the parties at the notice addresses listed below, or such other addresses of which they hereafter notify each other in writing under the provisions of this Section.

To Licensor:
President
Blue Marlin Corp.
540 Florida Street
San Francisco, California 94410

To Licensee:
Concept One
362 Fifth Avenue, 2nd floor
New York, NY 10001

With a copy to:
Steve Gerber
666 Fifth Avenue
26th floor
New York, NY 10103

17.8.    Entire Agreement. This Agreement states the entire agreement between the parties, and supersedes all prior negotiations and agreements between the parties concerning its subject matter. This writing is intended as the final, complete and exclusive statement of the terms of the Agreement between the parties and cannot be changed or terminated orally. Each party to this Agreement acknowledges that no representations, inducements, promises, or agreements, oral or otherwise, have been made by either party, or anyone acting on behalf of either party, which are not embodied herein and no other agreement, statement, or promise not contained in this Agreement shall be valid or binding. Each party further states that such party is not relying upon any promise, representation, inducement or agreement, oral or otherwise, which is not expressly stated in this Agreement.

17.9.    Interpretation and Rules of Construction. Sections and section headings contained in this Agreement are for reference purposes only, and shall not affect in any manner the meaning of interpretation of this Agreement. Whenever the context requires, references to the singular shall include the plural and the plural the singular and any gender shall include any other gender. The parties acknowledge that each party has reviewed this Agreement, and no provision of this Agreement shall be interpreted for or against any party because such party or its representative drafted such provision.

17.10    Survival. All obligations of the parties relating to protection of the Licensed Mark and indemnification, and such other provisions are intended to survive the termination or expiration of this Agreement.

17.11    Severability. If any provision of this Agreement, or the application thereof to any person, place or circumstance, shall be held by a court of competent jurisdiction to be invalid, void or otherwise unenforceable, such provision shall be enforced to the maximum extent possible so as to effect the intent of the parties, or, if incapable of such enforcement, shall be deemed to be deleted from this Agreement, and the remainder of this Agreement and such provisions as applied to other persons, places and circumstances shall remain in full force and effect.

17.12.    Binding Agreement. This Agreement shall be binding on and inure to the benefit of the parties and their respective successors, agents, affiliates, representatives and permitted assigns.

17.13.    Counterparts. This Agreement may be executed in any number of counterparts, each of which shall be deemed an original of this Agreement, but all of which together shall constitute on and the same instrument.

IN WITNESS WHEREOF, the parties have executed this Agreement to be effective as of the Effective Date.

LICENSEE:                                            LICENSOR:

By:_____            By:_____
Its' Authorized Officer                              Its' Authorized Officer