TAB 20

12-21-06 13:45 FROM- T-621 P 001/001 F-323

David M Bass (State Bar No. 117199)
Peter M. Cho (State Bar No. 213870)
DAVID M. BASS & ASSOCIATES
2029 Century Park East, 14th Floor
Los Angeles, California 90067
Telephone: (310) 789-1152
Facsimile: (310) 789-1149
E-mail: dbass@basslawla.com

ENDORSED
FILED
San Francisco County Superior Court

DEC 21 2006

GORDON PARK-LI, Clerk
BY TAKU MOROHOSHI
Deputy Clerk

Attorneys for Defendant USPA ACCESSORIES, LLC dba CONCEPT ONE ACCESSORIES

FAXED COPY

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF SAN FRANCISCO

BLUE MARLIN CORP.,

Plaintiff,

vs.

USPA ACCESSORIES, LLC dba CONCEPT ONE ACCESSORIES,

Defendant

USPA ACCESSORIES, LLC dba CONCEPT ONE ACCESSORIES, a New York limited liability company,

Cross-Complainant,

vs

BLUE MARLIN CORP., a California corporation; and ROES 1 to 25, inclusive,

Cross-Defendants

Case No. CGC-06-453170

Hon Ronald E. Quidachay
Law & Motion Department 302

**OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION; DECLARATIONS OF SAM HAFIF, DEBRA MEDLEY AND JENNIFER RODRIGUEZ**

Date: January 3, 2006
Time: 9:00 a.m.
Place: Department 302

Complaint Filed: June 15, 2006

///

///

///

///

///

# TABLE OF CONTENTS

Page

I. INTRODUCTION ..... 1

II. STATEMENT OF MATERIAL FACTS ..... 3

III. THE REQUIREMENTS OF INJUNCTIVE RELIEF ARE NOT MET HERE ..... 5

A. The Requirements for Injunctive Relief ..... 5

B. Blue Marlin Has an Adequate Legal Remedy in the Form of Monetary Damages; There is No Irreparable Harm to Blue Marlin ..... 6

C. Blue Marlin is Not Likely to Succeed on the Merits of its Claims ..... 7

1. Blue Marlin Committed Breaches of Contract ..... 7

2. Blue Marlin Committed Fraud/Negligent Misrepresentation ..... 8

3. Blue Marlin Violated the Franchise Laws ..... 8

a. The Franchise Laws Protect Franchisees such as USPA ..... 8

b. The Agreement Effectuated a Franchise Sale ..... 9

c. Blue Marlin Violated The Franchise Laws ..... 10

D. The Balance of the Hardships Weighs in USPA's Favor ..... 10

IV. CONCLUSION ..... 11

# TABLE OF AUTHORITIES

Page

CASES

*Butt v. State of California*, 4 Cal. 4th 668 (1992) ... 5

*Cohen v. Board of Supervisors*, 40 Cal. 3d 277 (1985) ... 5

*Duvall v. White*, 46 Cal. App. 305 (1920) ... 6

*Fenn v. Pickwick Corp.*, 117 Cal. App. 236 (1931) ... 7

*Loder v. Glendale*, 216 Cal. App. 3d 777 (1989) ... 5

*Mad River Lumber Sales v. Willburn*, 205 Cal. App. 2d 321 (1962) ... 7

*Morrison v. Land*, 169 Cal. 580, 586 (1915) ... 6

*Neptune Society Corp. v. Longanecker*, 194 Cal. App. 3d 1233 (1987) ... 9

*Pacific Design Sciences Corp. v. Superior Court*, 121 Cal. App. 4th 1100 (2004) ... 5, 6

*People v. Kline*, 110 Cal. App. 3d 587 (1980) ... 9

*San Francisco Newspaper Printing Co. v. Superior Court*, 170 Cal. App. 3d 438 (1985) ... 5

*Schwartz v. Arata*, 45 Cal. App. 596 (1920) ... 7

*Thayer Plymouth Center, Inc. v. Chrysler Motors*, 255 Cal. App. 2d 300 (1967) ... 6

*Vesper v. Forest Lawn Cemetery Assn.*, 20 Cal. App. 2d 157 (1937) ... 7

*Wilke v. Coinway, Inc.*, 257 Cal. App. 2d 126 (1967) ... 8

///

///

///

**STATUTES**

Code of Civil Procedure § 526 .... 5
Corporations Code § 31000 .... 8
Corporations Code § 31001 .... 9
Corporations Code § 31005(a) .... 9
Corporations Code § 31111(a) .... 9
Corporations Code § 31200 .... 9
Corporations Code § 31300 .... 9
Corporations Code §§ 31100 .... 9
Corporations Code §§ 31410-31411 .... 9

**OTHER AUTHORITIES**

Commissioner of Corporations Release No 3-F .... 9

## I. INTRODUCTION.

This action concerns claims by Plaintiff and Cross-Defendant Blue Marlin Corporation ("Blue Marlin") for amounts supposedly due under the terms of an exclusive license agreement (the "Agreement"). The Agreement granted Defendant and Cross-Complainant USPA Accessories, LLC, d/b/a Concept One Accessories ("USPA") the use of five specific design trademarks for use on headwear that USPA planned on manufacturing and selling to retail stores. The Motion for Preliminary Injunction (the "Motion") seeks to enjoin any further sales of headwear products by USPA based on a claim that USPA has failed to pay in full all fees due under the Agreement.

The Motion does not provide this Court with sufficient factual or legal support to issue any equitable relief of any kind. This action and USPA's Cross-Complaint addresses disputed claims over the effect, value and quality of the marks covered by the Agreement. The record on this Motion shows that USPA has substantial claims and offsets that defeat Blue Marlin's theories of recovery. Specifically, USPA entered into the Agreement based on the representations of executives of Blue Marlin that Blue Marlin's headwear lines produced over $3 million per year.[1] With this assurance on the track record and viability of the Blue Marlin marks, USPA licensed five *specific* trademarks from Blue Marlin for use on headwear products.

Immediately after USPA began utilizing the five marks in the Agreement, Blue Marlin breached the Agreement by instructing USPA to accept different marks to replace the original five marks covered by the Agreement. Blue Marlin's actions also constituted an abandonment of one of the trademarks licensed under the Agreement by the United States Patent and Trademark Office. The post-Agreement switch of marks by Blue Marlin amounted to an admission that the original marks covered by the Agreement – which induced the Agreement in the first place – were not performing, and could not perform, as initially promised by Blue Marlin, pursuant to the Agreement.

///

[1] These claims are covered in the Cross-Complaint (¶¶ 16-47) and the attached Declarations of Sam Hafif, Debra Medley and Jennifer Rodriguez.

Further, after concluding the Agreement, and attempting to incorporate the original designs covered by the Agreement into headwear products (*i.e.*, the original marks that were then withdrawn and replaced by Blue Marlin), USPA learned that the Blue Marlin's representations concerning its prior headwear line sales (supplied to USPA to show the "success" of the Blue Marlin headwear prior to entering into the Agreement) materially misstated the prior sales of Blue Marlin headwear.

To further diminish the value of the exclusive license covered by the Agreement – and in express violation of the exclusive rights granted USPA under the terms of the Agreement – Blue Marlin continued to sell headwear *after* the effective date of the Agreement *in express violation of the exclusivity provision of the Agreement*. To divert attention from this violation of the exclusivity provision of the Agreement, Blue Marlin insisted that USPA accept unproven, replacement marks, but then failed to issue timely approvals to allow USPA to develop, promote and distribute headwear with the replacement marks. These failings changed the assumptions under the Agreement, diminished the volume of sales, delayed the production of headwear (and, thus, deferred any sales by USPA) and changed the entire economic expectation and value of the Agreement to USPA.

Blue Marlin is not entitled to a preliminary injunction for the following reasons.

First, Blue Marlin is not likely to succeed on the merits of its claims because of its failure to follow the terms of the Agreement and its misrepresentations about the prior sales and success of the marks covered by the Agreement. Further, the Agreement effectuated a franchise sale, and Blue Marlin failed to register an offer of franchise with the Commissioner of Corporations as mandated by California statutory law. Failure to do so is a basis for rescission and an affirmative defense in this action.

Second, Blue Marlin has an adequate legal remedy in the form of monetary damages – indeed, Blue Marlin's Complaint asserts *only* a claim for money damages under the theories of breach of contract, open account and account stated. In the event Blue Marlin succeeds on its claims, the payment of money is Blue Marlin's full and adequate remedy for purported fees due under the Agreement. The dispute in this action (as framed by the Complaint and the Cross-

Complaint) *covers the injuries suffered by USPA* because the marks delivered by Blue Marlin were late and of lesser quality than required under the Agreement USPA will demonstrate through discovery and trial that Blue Marlin has already received full payment under the Agreement, given the conduct of Blue Marlin and its failures under the Agreement

Third, the balance of hardships substantially favors USPA USPA has sustained over $500,000 in damages by purchasing the diminished Blue Marlin franchise under the terms of the Agreement To grant Blue Marlin's Motion would cause undue hardship on USPA, who would be forced to undertake the costly endeavor of recalling all of its Blue Marlin product from the market, which USPA is obliged to sell as part of its duty to mitigate damages.

Accordingly, Blue Marlin has not met the requirements for obtaining injunctive relief pending trial The Court should deny the Motion

## II. STATEMENT OF MATERIAL FACTS.

In or about October 2003, USPA and Blue Marlin commenced negotiations concerning an agreement under which USPA would license five of Blue Marlin's trademarks to use on its headwear products (Declaration of Sam Hafif ["Hafif Decl "], ¶ 2.) During these negotiations, Blue Marlin's officers, Erik Stuebe and Per Gasseholm, represented to USPA officer Sam Hafif that Blue Marlin was receiving at least $3,000,000 in revenues per year from its headwear business (Hafif Decl , ¶ 2 )

Based on these representations, USPA and Blue Marlin entered into an exclusive license contract (the "Agreement"), effective January 1, 2004, through which USPA was granted an exclusive license to utilize five of Blue Marlin's trademarks on headwear, to be designed and manufactured by USPA (Exh A, ¶¶ 1 6, 2 1; Hafif Decl., ¶ 3 ) The five trademarks licensed to USPA under the Agreement are denoted by serial nos 76370876, 78152681, 76325790, 76325789 and 76370837 (Exh A., Schedule A ) Also based on these representations, USPA agreed to pay minimum royalties to Blue Marlin based on actual and projected sales (Hafif Decl., ¶ 3; Exh A, ¶¶ 7.3-7.4 ) Blue Marlin never registered this franchise offer with the Commissioner of Corporations. (Hafif Decl , ¶ 3.)

Under the Agreement, as an absolute condition to USPA's right to manufacture, use, market or distribute headwear under the Agreement, Blue Marlin had the right to approve all proposed USPA headwear, including their design, fabric and associated promotional, packaging and advertising materials (Exh A, ¶¶ 6 2-6 3 4 )

During the course of its efforts to develop and distribute Blue Marlin headwear under the Agreement, USPA discovered through its retailers that the revenues presented by Blue Marlin to induce the Agreement were not supported by the marketplace. (Hafif Decl., ¶ 4 ) Retailers reported that Blue Marlin goods did not generate sufficient interest or sales to support Blue Marlin's claims (Hafif Decl , ¶ 4 ) In addition, USPA discovered that the majority of the retailers that Blue Marlin had identified as <u>active retailers</u> willing to buy Blue Marlin headwear with the licensed marks were either inactive business entities, or uninterested in buying hats bearing Blue Marlin trademarks. (Declaration of Jennifer Rodriguez, ¶¶ 2-3 )

Furthermore, Blue Marlin required USPA to switch to new, different trademarks other than the trademarks licensed under the Agreement (Medley Decl., ¶ 2 ) Indeed, one of the trademarks licensed under the Agreement, denoted by serial no 78152681, was deemed abandoned as of March 10, 2004, shortly after the Agreement was executed (Hafif Decl , ¶ 5 and Exh B.) By way of example, in May 2005, Blue Marlin informed USPA by e-mail that Blue Marlin was moving to "all new labels with an updated logo " (Medley Decl , ¶ 2 and Exh. C.) The attachment to the e-mail shows that these "new" labels are significantly different to the trademarks under the Agreement (*Compare* Exh C and Exh A, Schedule A ) Also, in September 2005, a USPA e-mail shows that Blue Marlin had informed USPA that it had abandoned the "five stars alone" mark licensed under the Agreement (Medley Decl , ¶ 3 and Exh D )

In certain instances, Blue Marlin unreasonably delayed issuing the required approvals of products and marketing materials, causing USPA to incur substantial additional costs, even missing shipping periods (Medley Decl., ¶ 4 and Exh E.) Blue Marlin itself – and in direct violation of the exclusivity provision of the Agreement – also continued to sell headwear bearing the licensed trademarks during the term of the Agreement. (Hafif Decl, ¶ 6.)

To date, USPA has incurred losses of at least $500,000 in selling Blue Marlin products from February 2004 to date. (Hafif Decl., ¶ 7.) Accordingly, on December 14, 2006, USPA filed a Cross-Complaint for rescission and damages against Blue Marlin. It would be prohibitively expensive for USPA to recall all of its Blue Marlin product from the market. (Hafif Decl., ¶ 8.)

The parties necessarily will engage in substantial discovery on all of the above factual issues. Over the next several months, the parties will exchange documents and other information in response to written discovery requests. USPA will also notice depositions of the key party and third party witnesses to address these critical factual disputes.

## III. THE REQUIREMENTS OF INJUNCTIVE RELIEF ARE NOT MET HERE.

### A. The Requirements for Injunctive Relief.

The courts will not grant injunctive relief where there is an adequate legal remedy, *i.e.*, money damages are available. Code of Civil Procedure § 526(a)(4)-(5); *Pacific Design Sciences Corp. v. Superior Court*, 121 Cal. App. 4th 1100, 1110 (2004). Further, there must be a showing of irreparable harm. Code of Civil Procedure § 526(a)(2); *Loder v. Glendale*, 216 Cal. App. 3d 777, 782 (1989) (plaintiff must present evidence of irreparable injury).

Assuming that there is no adequate legal remedy and irreparable harm, a court must weigh two "interrelated" factors: (1) the likelihood that the moving party will ultimately prevail on the merits; and (2) the relative interim harm to the parties from issuance (or non-issuance) of the injunction. *Butt v. State of California*, 4 Cal. 4th 668, 678 (1992). A court may not grant a preliminary injunction, regardless of the balance of interim harm, if there is no possibility that the plaintiff will ultimately prevail on the merits. *Butt*, 4 Cal. 4th at 678; *San Francisco Newspaper Printing Co. v. Superior Court*, 170 Cal. App. 3d 438, 442 (1985) (if plaintiff has failed to demonstrate a reasonable probability of success on the merits, a preliminary injunction should be denied). If a plaintiff fails to satisfy either or both of these two prerequisites (interim harm and likelihood of success on the merits), a judge's denial of the request for a preliminary judgment will be upheld. *Cohen v. Board of Supervisors*, 40 Cal. 3d 277, 287 (1985).

As discussed below, these requirements are not met here

B. **Blue Marlin Has an Adequate Legal Remedy in the Form of Monetary Damages; There is No Irreparable Harm to Blue Marlin.**

The courts do not issue injunctions where a suit for damages provides a clear, monetary remedy. *See Thayer Plymouth Center, Inc. v. Chrysler Motors*, 255 Cal App 2d 300, 306-307 (1967) (no injunction lies where movant could reasonably estimate its lost profits and recover them as damages) Thus, where damages afford an adequate remedy for breach of contract, the courts refuse to grant injunctive relief *Id* at 306 To obtain injunctive relief, "it must appear that monetary relief would not afford adequate relief or that it would be extremely difficult to ascertain the amount of damages." *Pacific Design*, 121 Cal. App 4th at 1110 (damages on breach of contract claim were fixed and ascertainable); *Duvall v. White*, 46 Cal App 305, 308 (1920) (complaint showed amount of loss)

Here, Blue Marlin's Complaint seeks a specific sum of $234,139.23 on its claims of an open book account, account stated and breach of contract (Complaint, ¶ 19.) The Complaint does not seek injunctive relief and does not assert claims for trademark infringement Any damages are quantifiable and ascertainable in the form of royalties, as set forth in the Agreement The adequacy of Blue Marlin's legal remedy thus prohibits injunctive relief. *See also Morrison v. Land*, 169 Cal. 580, 586 (1915) (where law affords remedy of damages for breach of contract, "a proper exercise of the equitable jurisdiction will not give equitable relief in any case where the legal remedy is full and adequate and does complete justice").

This is a contract action, not an infringement action. This case appertains only to a claim for unpaid royalties by Blue Marlin and the offsets of USPA, which offsets may well exceed Blue Marlin's claim The Complaint establishes that Blue Marlin is concerned only with the recovery of a percentage of royalties, not with the protection of its brand. USPA's sales do not threaten the stability of Blue Marlin's business or its ability to enforce its intellectual property rights, but relates only to Blue Marlin's exploitation of its purported intellectual property rights Blue Marlin's Motion is a misguided attempt to expand this action into what it is not.

For these very same reasons, Blue Marlin has not suffered, nor is about to suffer, irreparable harm. Indeed, a plaintiff's delay in asking for injunctive relief while the defendant expends efforts and money, or incurs substantial obligations, shows lack of irreparable harm and is thus a strong reason for denying an injunction. *See Schwartz v. Arata*, 45 Cal. App. 596, 602 (1920) (delay in seeking injunction and fact that defendant was solvent warranted finding of no irreparable harm and denial of injunctive relief); *see also Vesper v. Forest Lawn Cemetery Assn.*, 20 Cal. App. 2d 157, 165 (1937). In the present action, Blue Marlin waited nearly six months after it filed its Complaint to bring this Motion. Blue Marlin has framed this action as, and this action is, a dispute concerning payment under the Agreement, not a dispute affecting the very livelihood of its business. Also during this time, as did the defendant in *Schwartz*, USPA has expended considerable efforts and money in marketing and distributing the headwear in an attempt to mitigate its damages. Under these circumstances, there is no irreparable harm and the Motion should be denied on this separate and independent ground.

**C. Blue Marlin is Not Likely to Succeed on the Merits of its Claims.**

**1. Blue Marlin Committed Breaches of Contract.**

Blue Marlin breached the Agreement by replacing the trademarks licensed under the Agreement (including abandoning one of the trademarks) with new ones, selling headwear bearing the licensed trademarks in competition with USPA, and delaying issuance of approvals that were a prerequisite to USPA's right to market and sell the headwear. These breaches also bar Blue Marlin from succeeding on its claims. *Fenn v. Pickwick Corp.*, 117 Cal. App. 236, 243 (1931).

Further, such breaches vitiate Blue Marlin's purported right to terminate the Agreement. A conditional right to terminate for breach may be lost by wrongful conduct of the injured party. *Mad River Lumber Sales v. Willburn*, 205 Cal. App. 2d 321, 324 (1962) (defendant prevented remedy of breach and thereby lost the right to terminate the contract). USPA is attempting to perform under the Agreement and maintain its offsets against Blue Marlin's claim for unpaid monetary funds. The Agreement is not terminated and Blue Marlin has forfeited any right to do so by its own breaches.

2. **Blue Marlin Committed Fraud/Negligent Misrepresentation.**

Blue Marlin's misrepresentations and omissions also independently support findings of fraud or negligent misrepresentation A false representation as to income or profits from a business provides a basis for rescission *Wilke v. Coinway, Inc.*, 257 Cal. App. 2d 126, 139 (1967). Where the facts underlying such representations are peculiarly within the knowledge of the seller, the buyer is entitled to rely on such statements and is not bound to make an independent investigation *Id* Blue Marlin misrepresented its income from the licensed trademarks and attempted to replace the trademarks as soon as possible with ones that it hoped would live up to its representations of high revenues. Blue Marlin misrepresented the willingness of the retail market to accept and sell its headwear USPA was entitled to rely on these representations in entering into and in performing under the Agreement. This fraud also separately and independently precludes Blue Marlin from prevailing on its contract and account claims

3. **Blue Marlin Violated the Franchise Laws.**

There is no question that Blue Marlin failed to register its franchise offer with the Commissioner of Corporations as mandated by California law This failure is a basis for rescinding the Agreement and constitutes an affirmative defense to Blue Marlin's claims. Accordingly, Blue Marlin will not succeed on the merits of its claims on this ground alone

a. **The Franchise Laws Protect Franchisees such as USPA.**

The Agreement effectuated a franchise sale between USPA and Blue Marlin. Franchise sales and relationships are highly regulated by both state and federal law. The purpose of the franchise laws is to provide each prospective franchisee, such as USPA, with the information necessary to make an intelligent decision regarding the franchises being offered. Corporations Code § 31000 The franchise laws are also designed to prohibit the sale of a franchise if it would lead to fraud or a likelihood that the franchisor's promises would not be fulfilled, and to

///

protect the franchisor and franchisee by providing a better understanding of the business relationship between them. *Id* § 31001

Accordingly, a franchisor must register an offer to sell a franchise with the Commissioner of Corporations. *Id* §§ 31100, 31111(a). It is unlawful to offer or sell a franchise by means of any oral or written communication which is misrepresents or omits a material fact. *Id* § 31200. A person who offers or sells a franchise in violation of any provision of the franchise laws is liable for damages or the franchise may be rescinded. *Id* § 31300; *Neptune Society Corp. v. Longanecker*, 194 Cal. App. 3d 1233, 1244-45 (1987).[2]

b. **The Agreement Effectuated a Franchise Sale.**

A "franchise" is any contract to which the following apply:

1. the franchisee is granted the right to engage in the business of offering, selling or distributing goods or services under a marketing plan or system prescribed in substantial part by the franchisor;
2. the operation of the business is substantially associated with the franchisor's trademarks, trade names, logos, advertising or other commercial symbol designating the franchisor; and
3. the franchisee is required to pay, directly or indirectly, a franchise fee

Corporations Code § 31005(a); *see* Commissioner of Corporations Release No. 3-F. The Agreement constitutes a franchise as defined by California law.

The presence of a marketing plan is suggested by certain elements, whether alone or together, such as, but not limited to, approval of advertising and products, providing for uniformity of appearance, and/or giving detailed directions and advice with respect to advertising and products. Commissioner of Corporations Release No. 3-F. A fully prescribed, detailed, realized marketing plan is not necessary to establish the presence of a marketing plan sufficient to find a franchise. *See People v. Kline*, 110 Cal. App. 3d 587, 594-595 (1980). Under the Agreement, Blue Marlin had full control over the appearance of the packaging,

[2] Indeed, willful violations of the franchise laws may be prosecuted as criminal felonies. Corporations Code §§ 31410-31411.

advertising and appearance of the product Blue Marlin gave detailed directions and advice in this respect The first prong of the franchise definition is thus met.

The other two prongs are also easily established The Agreement granted a license to use certain trademarks of Blue Marlin, and over the course of the term of the Agreement, Blue Marlin also granted implied-in-fact licenses to use other of its trademarks by its instructions to USPA. Blue Marlin, in essence, treated USPA as its in-house headwear operation. Also, the Agreement imposed royalty obligations on USPA. Therefore, the Agreement constitutes a franchise under California law.

c. **Blue Marlin Violated The Franchise Laws.**

Here, there are no registrations of franchise offers filed with the California Commissioner of Corporations. Blue Marlin further misrepresented, *inter alia*, its past revenues from its headwear business, the trademarks it intended to use during the term of the Agreement (including its intent to abandon one of the trademarks licensed under the Agreement), and the number and identity of retailers willing and able to sell Blue Marlin headwear Blue Marlin also did not attempt to terminate the franchise in accordance with franchise law. USPA will thus likely succeed on its franchise claims against Blue Marlin.

D. **The Balance of the Hardships Weighs in USPA's Favor.**

Given that Blue Marlin is not likely to succeed on the merits of its claims, that it has an adequate legal remedy and will not suffer irreparable harm, and that it would be prohibitively difficult for USPA to recall product from retailers, the balance of the hardships weighs in USPA's favor Again, this case does not implicate the very livelihood of Blue Marlin's business Rather, Blue Marlin only seeks recovery of what it contends it is contractually entitled to, while USPA claims that Blue Marlin, by its franchise violations, breaches and fraud, is entitled to offsets against such recovery. Granting the Motion would only cause severe hardship to USPA in that it would add to the already substantial losses that USPA has incurred and is seeking to offset against Blue Marlin's potential recovery, if any. Therefore, this factor warrants denial of the Motion

///

12-21-06 13:45 FROM- T-621 P 001/001 F-323

## IV. CONCLUSION

For the foregoing reasons, the Court should deny the Motion.

Dated: December 21, 2006

DAVID M BASS & ASSOCIATES

By: ____________________
David M Bass
Attorneys for Defendant USPA ACCESSORIES, d.b.a. CONCEPT ONE ACCESSORIES

11

OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION; DECLARATIONS OF SAM HAFIF, DEBRA MEDLEY AND JENNIFER RODRIGUEZ

**DECLARATION OF SAM HAFIF**

I, Sam Hafif, hereby declare as follows:

1. I am President of USPA Accessories, LLC, dba Concept One Accessories ("USPA"), Defendant and Cross-Complainant in this action. I have personal knowledge of the facts set forth herein, unless otherwise stated, and if called as a witness, I could and would testify competently to such facts under oath.

*Agreement with Blue Marlin*

2. In or about October 2003, USPA and Plaintiff and Cross-Defendant Blue Marlin Corporation ("Blue Marlin") commenced negotiations concerning an agreement under which USPA would license five of Blue Marlin's trademarks to use on its headwear products During these negotiations, Blue Marlin's officers, Erik Stuebe and Per Gasseholm, represented to me that Blue Marlin was receiving at least $3,000,000 in revenues per year from its headwear business.

3 Based on these representations concerning the volume of sales of these specific trademarks that USPA would license, USPA and Blue Marlin entered into an exclusive license agreement, effective January 1, 2004 (the "Agreement") (A true and correct copy of the Agreement is attached hereto as Exhibit A.) Under the Agreement, USPA agreed to pay minimum royalties to Blue Marlin based on actual and projected sales. According to the Commissioner of Corporations' website, Blue Marlin never registered this franchise offer.

*Blue Marlin's Misrepresentations and Breaches of the Agreement*

4 During the course of our efforts to develop and distribute Blue Marlin headwear under the Agreement, USPA discovered that the revenue numbers that Blue Marlin claimed to have obtained in prior years were false and inflated Once we started to work on exploiting the trademarks under the Agreement, it became apparent that the successful sales figures for prior years by Blue Marlin were not supported by the marketplace. Several retailers, such as Bloomingdales, advised me and my representatives that Blue Marlin goods were not generating sufficient interest or sales to support the figures that Blue Marlin provided to us during negotiations.

12-21-06 13:45 FROM- T-621 P.001/001 F-323
12/21/2006 03:21 912128682597 CONCEPT ONE PAGE 01
Dec 21, 2006 11:20AM David Bass & Associates No. 3512 P. 2

5. One of the trademarks licensed under the Agreement, denoted by serial no. 78152681, was deemed abandoned as of March 10, 2004, shortly after the Agreement was executed in February 2004. A true and correct copy of the status report concerning this trademark, obtained and printed from the Trademark Electronic Search System of the United States Patent and Trademark Office, is attached hereto as Exhibit B.

6. As President, one of my primary responsibilities is to supervise the employees and independent contractors of USPA. During the course of my supervision, I received reports from these employees and independent contractors, including Marty Salerno, that Blue Marlin was still attempting to sell headwear bearing the trademarks under the Agreement in direct competition with USPA, notwithstanding the exclusivity provision of the Agreement.

7. To date, USPA has incurred losses of at least $500,000 in selling Blue Marlin products from February 2004 to date.

8. It would be prohibitively expensive for USPA to cease mitigating its damages by attempting to recall all of its Blue Marlin product from the market.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed on this 21st day of December, 2006 at New York, New York.

Sam Hafif

13
OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION; DECLARATIONS OF SAM HAFIF, DEBRA MEDLEY AND JENNIFER RODRIGUEZ

## DECLARATION OF DEBRA MEDLEY

I, Debra Medley, hereby declare as follows:

1 I am Vice President of Merchandising of USPA Accessories, LLC, dba Concept One Accessories ("USPA"), Defendant and Cross-Complainant in this action. I have personal knowledge of the facts set forth herein, unless otherwise stated, and if called as a witness, I could and would testify competently to such facts under oath.

***Blue Marlin Attempts to Replace the Licensed Trademarks***

2. Plaintiff and Cross-Defendant Blue Marlin Corporation ("Blue Marlin") repeatedly instructed USPA to use new or different marks other than the five trademarks licensed under their agreement ("Agreement"). For example, in May 2005, Blue Marlin informed USPA by e-mail that Blue Marlin was moving to "all new labels with an updated logo." A true and correct copy of this e-mail chain dated May 25, 2005, on which I was copied, is attached hereto as Exhibit C The attachment to this e-mail chain shows that these "new" labels are distinct from the trademarks under the Agreement.

3 Also, in September 2005, a USPA e-mail shows that Blue Marlin had abandoned the "five stars alone" mark licensed under the Agreement. A true and correct copy of this e-mail dated September 30, 2005, on which I was copied, is attached hereto as Exhibit D

***Delay of Necessary Approvals***

4. In certain instances, Blue Marlin unreasonably delayed issuing the required approvals of products and marketing materials, causing USPA to incur substantial additional costs, even missing shipping periods An example of this occurred in March 2006, when Joshua Lorr, USPA's Design Director, sent an e-mail dated March 2, 2006 to Blue Marlin representatives attempting to resolve Blue Marlin's last minute changes, comments and other impediments to approval because "[t]ime is short for [the] holiday[s]." A true and correct copy of this e-mail dated March 2, 2006, on which I was copied, is attached hereto as Exhibit E

///

///

///

12-21-06 13:45 FROM- T-621 P 001/001 F-323

12/21/2006 02:57 9121286825597 CONCEPT ONE PAGE 08

Dec 21 06 12:08p Ken/Debra Medley 609 730-0499 p.1
12/21/2006 00:44 9121286825597 CONCEPT ONE PAGE 02

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed on this 21 day of December, 2006 at New York, New York.

Debra Medley

15

OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION; DECLARATIONS OF SAM HAFIF, DEBRA MEDLEY AND JENNIFER RODRIGUEZ

12-21-06 13:45 FROM- T-621 P.001/001 F-323

12/21/2006 02:57 9121286832597 CONCEPT ONE PAGE 18

**DECLARATION OF JENNIFER RODRIGUEZ**

I, Jennifer Rodriguez, hereby declare:

1. I am an Account Executive of USPA Accessories, LLC, dba Concept One Accessories ("USPA"), Defendant and Cross-Complainant in this action. I have personal knowledge of the facts set forth herein, unless otherwise stated, and if called as a witness, I could and would testify competently to such facts under oath.

2. In mid-2004, Plaintiff and Cross-Defendant Blue Marlin Corporation ("Blue Marlin") gave me a list of retailers that it claimed were active retailers who were willing to buy Blue Marlin headwear to sell to consumers.

3. As part of my duties as an Account Executive, I attempted to contact each retailer on this list to discuss their potential acquisition and distribution of Blue Marlin headwear from USPA. My attempts revealed that the majority of the retailers on Blue Marlin's list were either inactive business entities, or uninterested in buying Blue Marlin headwear.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed on this 21 day of December, 2006 at New York, New York.

Jennifer Rodriguez

16

OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION; DECLARATIONS OF SAM HAFIF, DEBRA MEDLEY AND JENNIFER RODRIGUEZ

EXHIBIT A

EXCLUSIVE LICENSE AGREEMENT

This Exclusive License Agreement (the "Agreement") is made and entered into effective January 1, 2004 (the "Effective Date") by and between Blue Marlin Corp., a California corporation with its principal place of business at 540 Florida Street, San Francisco, California 94110 ("Licensor") and USPA Accessories, LLC dba Concept One Accessories, a New York corporation with its principal place of business at 362 Fifth Ave, 2nd Fl, New York, NY 10001 ("Licensee").

RECITALS

A. Licensor is the owner of certain names, labels and trademarks and related rights which Licensor uses in the manufacture and sale of various products, including the name, label and trademark Blue Marlin and related trademark and design rights, depictions and logos and variations and derivations thereof, as more particularly set forth in Schedule A (the "Trademark");

B. Licensee desires to utilize the Trademark and related rights in the manufacture, distribution, promotion and sale of the products as set forth on Schedule A attached hereto. Products which bear the Trademark are hereinafter referred to as the "Licensed Products".

C. Licensor's Trademark and related rights, and the goodwill associated therewith, are of great value to Licensor, making adherence to the quality control standards provided in this Agreement essential to maintaining the significant value of Licensor's Trademark and related rights and such associated goodwill.

D. Licensor is willing to license Licensee to use the Trademark and related rights on Licensed Products, but only under the terms and conditions set forth in this Agreement

NOW, THEREFORE, in consideration of the mutual promises and representations set forth herein, Licensor and Licensee agree as follows:

1. Definitions. The following terms shall have the meanings set forth in this Section for purposes of this Agreement:

1.1. "Affiliates" means any person or entity controlling, controlled by or under common control of any party now or in the future.

1.2. "Advertising Materials" means all advertising, publicity and promotional programs and materials related to any Licensed Product.

BM INIT ___ CO INIT ___

1.3 "Channels of Distribution": Better department stores and specialty stores within the Territory. In addition, non full price stores and such other accounts, with Licensors' prior written approval, for retail sale (excluding Mail order and the Internet) within the Territory. Final sales to off price retailers shall be permitted with an aggregate limit of ten (10) percent of the current quarter's regular Net Sales.

1.4 "Contract Year" means the period of time from the Effective Date of this Agreement until June 30, 2005 (the "First Contract Year") and each successive one year period during the Term, including, if applicable, extensions of the Term under Section 4.2, except that the first Contract Year shall date from the Effective Date through the 30th day of June, 2005.

1.5 "Designs" means (a) all designs for the Licensed Products and any and all copyrights and other intangible or intellectual property rights therein and in any package design, label, insert or Marketing or other material displaying the Trademarks; (b) all drawings, sketches and other materials furnished by Licensor; (c) any and all modifications or improvements or derivative works of the foregoing; and (d) any and all copyrights or other intangible or intellectual property rights in the foregoing. For purposes hereof all designs submitted to Licensor for approval shall have been created exclusively for Licensor and shall not have been offered for sale by Licensee or its agents prior to submission to Licensor.

1.6 "Licensed Product" means the product as listed on Schedule A hereof, either physically bearing the Trademarks or to which the Trademarks are affixed, that are manufactured either by Licensee directly or by a sub contractor of Licensee.

1.7 "Net Sales" means Gross Sales of the Licensed Products by Licensee (including its Affiliates and specifically excluding non-final sales transactions between Affiliates of Licensee) less only (i) returns actually received from customers; (ii) actual Trade Discounts and documented discounts given pursuant to retailer programs; (iii) allowances and post invoice credits granted to customers, but only to the extent that Licensee documents that the allowance or post invoice credit relates to its sale of Licensed Products; (iv) product sales to the Licensor as defined in Section 3.4.3; (v) sales taxes, excise taxes and duties or other taxes paid by customers; and (vi) freight charges actually incurred by the Licensee, all calculated as stated in Section 7.5.

1.8 "Packaging" means all packaging, cartons, containers, hang-tags, interior woven labels, inserts, in-packs, wrapping materials and artwork, copy and literary text incorporated therein for the Licensed Products.

1.9 "Person" shall mean any individual, firm, company, corporation, limited liability company, unincorporated association, partnership, trust, joint venture, governmental authority or other entity of any kind in any jurisdiction, and shall include any successor (by merger or otherwise) of such entity.

BM INIT ____ CO INIT ____

1.10 "Sell" or "Sale" (or any such derivation of the word "sale") means any and all sales, transfers, distributions or other dispositions of any kind or nature, directly or through third persons, of units of the Licensed Products at any level of wholesale or retail distribution channels, including final Sales to Affiliates of Licensee.

1.11. "Territory" - United States, its territories, possessions and military bases.

1.12. "Trade Discounts" - Reductions in the list wholesale selling price of the Licensed Products by line item or by invoice sub total, granted by Licensee in writing prior to or after delivery

1.13 "Trade Secrets" - Information including any formula, pattern, compilation, program, device, method, technique, or process, that derives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use and that is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

2 Grants of Rights.

2.1. Trademark and Design Rights. Licensor hereby grants to Licensee the exclusive, non-transferable, non-assignable license to use the Trademark on or in connection with the design, merchandising, manufacture, advertising, promotion, distribution and sale of Licensed Products solely in the Territory to customers in the Channels of Distribution provided, however, that Licensee may utilize the Trademark in connection with the manufacture of the Licensed Products outside the Territory but only for the Sale of such Licensed Products within the Territory.

2.2. Rights Reserved To Licensor. All rights other than those expressly granted to Licensee are reserved to Licensor, including but not limited to the right to use, license and sublicense the manufacture, merchandising, promotion, distribution and sale of (a) products of any and all types and descriptions other than the Licensed Products in the Territory; (b) Licensed Products outside of the Territory, except for the right to manufacture outside the Territory as provided for in Section 2.1; and (c) all products of any and all types and descriptions sold under names, labels and trademarks other than the Trademark

2.3 Efforts. At all times while this Agreement is in effect, Licensee shall use commercially reasonable efforts to exploit the rights herein granted on a commercially reasonable basis throughout the Territory, including but not limited to, endeavoring to sell the maximum quantity of Licensed Products to retail stores in the Channels of Distribution consistent with good business practices and the quality standards set forth in this Agreement; offering Licensed Products for sale such that they may be sold to the

BM INIT SS CO INIT GR

consumer on a timely basis; and maintaining a sales force sufficient to provide effective distribution to the Channels of Distribution throughout the Territory.

2.4. Conduct of Business. Licensee shall conduct its business at all times in a manner that will reflect positively on the Trademarks. Licensee shall use the Trademarks in a manner that does not derogate Licensor's rights in the Trademarks or the value of the Trademarks, and shall take no action that would interfere with, diminish or tarnish those rights or value of the goodwill of Licensor in such Trademarks.

3 Limitations on Rights Granted.

3.1 Third Parties. The license granted conveys no right to grant any sublicense, concession, right or privilege relating to the Trademark or Licensed Products, and the license granted is not to be deemed transferable by operation of law for any purpose and is indivisible and non-assignable, including, but not limited to, any affiliates and/or business successors of Licensee except with Licensor's prior written consent, which shall not be unreasonably withheld.

3.2. Licensee shall adopt and utilize reasonable commercial procedures to monitor all persons and entities, including domestic and foreign subcontractors, engaged in the manufacture or sale of Licensed Products to endeavor to confirm that they comply fully with all applicable laws, rules and regulations, including without limitation, all applicable state, federal and local wage and hour, child labor, overtime and other labor laws.

3.3. In furtherance of the foregoing, and in a timely manner, Licensee shall cooperate with Licensor, and shall provide such information to Licensor, as is reasonably required for Licensor to comply with any and all reasonable or legally enforceable demands or requests by any governing or judicial entity for any information regarding any or all manufacturers and subcontractors who have or are manufacturing components of the Licensed Products. Such information to include all necessary information to clearly identify which Licensed Products and related components such manufacturers and subcontractors have produced or are producing. The Licensor shall maintain all such information under this section in strict confidence and shall not use any such information for its own benefit, commercial or otherwise, or other than in accordance with this Agreement and the purposes contemplated herein. Licensee shall be responsible for keeping such related records in safekeeping for a period not to exceed three (3) years from the expiry of this Agreement.

3.4. Distribution of Licensed Products. The parties acknowledge that the manner and scope of the distribution of the Licensed Products are critical to the promotion and enhancement of Licensor's image, and to the protection of the Trademark and associated goodwill. Accordingly, Licensee agrees to abide by the following restrictions throughout the Territory:

3.4.1 Licensee shall use the Trademark solely in connection with the manufacture and wholesale distribution of the Licensed Products.

3.4.2. Licensee shall sell the Licensed Products only for resale in retail establishments within the Channels of Distribution.

3.4.3. At the request of the Licensor, Licensee shall sell, at its regular wholesale price, less twenty percent (20%), any Licensed Product, to the Licensor for Licensor's distribution to end user's through Licensor's Internet sales channel. Such sales shall be excluded from the definition of Net Sales in Section 1.5, Licensor shall sell such product at no less then regular retail price

3.4.4. No Extraterritorial Sales. Notwithstanding any contrary provision of this Agreement, Licensee agrees and covenants that it shall Sell the Licensed Products solely within the Licensed Territory; and that Licensee shall not, either directly or indirectly through its affiliates or other third persons, export or Sell any of the Licensed Products to (i) any person outside of the Licensed Territory, or (ii) any person within the Licensed Territory whom Licensee knows or has good reason to know intends or is likely to export or Sell Licensed Articles in any country or region outside of the Licensed Territory, except by specific written approval of Licensor in a specific case granted in its sole discretion.

3.4.5. Licensee shall, upon request and within thirty (30) days of such written notice but no more than twice annually, advise Licensor, in writing, of its specific marketing plans.

3.5 Licensee's Use of Other Marks. Licensee shall not, on any Licensed Products or in conjunction with any use of the Trademark, use or associate the Trademark with any other name, trademark, character or personality, except with prior written consent or as permitted under this Agreement

3.6. No Premiums. In addition to the other limitations hereunder, the rights of Licensee shall not include the right to, and Licensee warrants and represents that neither Licensee nor any of its affiliates will, use the Trademark or the Licensed Products for an endorsement of any other product or service. Licensee shall not use or permit the use of any Licensed Product as a premium except with the prior written consent of Licensor and shall not distribute any Licensed Product to any person which Licensee has good reason to believe would distribute such Licensed Product in contravention of the foregoing. "Premium" shall mean any Licensed Product distributed at no charge or minimal charge for the purpose of increasing the sale of any other article of merchandise or product, or any service, including any distribution or display for publicity, promotional purposes, combination sales, giveaways or in any other similar transaction.

3.7. Design Non-Infringement. Licensee agrees not to infringe on any of Licensor's past, current or future designs and/or trade dress, including but not limited to, "Vintage

Sportswear" image(s) or other intellectual property rights belonging to Licensor in any of Licensees' affiliates' and/or subsidiaries' business activities without the express written approval of the Licensor

4 Term of Agreement

4.1. Term. The "Term" of this Agreement shall commence on the Effective Date and expire on June 30, 2007, unless renewed as provided herein.

4.2. Renewal Terms. Licensee shall have one (1) option ("Renewal Option") to renew the term of this Agreement; the option period shall be for a period of three Contract Years (36 months). The Renewal Option shall be for the period dating from the 1st day of July 2007 through June 30, 2010. Licensee shall exercise its option to renew, if at all, by delivering written notice of renewal to Licensor at any time prior to ninety (90) days prior to the expiration of the then existing Term. As used in this Agreement, the "Term" shall be deemed to consist of the initial term described in Section 4.1. Notwithstanding the foregoing, Licensee shall not have any further rights to renew in the event that, before Licensee's exercise of its' renewal right: (a) Licensee breaches this Agreement and fails to cure such breach within the applicable cure period, if any, specified in Section 16 of this Agreement; as a result of which Licensor elects in writing to terminate this Agreement; (b) Licensee fails to meet ninety (90) percent of any of the sales minimums in paragraph 7.3 during the Term; (c) Licensee breaches any monetary provision (i.e., a provision requiring payment of money by Licensee) of this Agreement and fails to cure such breach within ten (10) days of written notice of such breach as a result of which Licensor elects in writing to terminate this Agreement.

4.3. Any transaction between the parties following the termination or expiration of this Agreement shall not be construed as a renewal or extension or waiver hereof, but as a separate transaction terminable at will by either party without cause

5 Ownership and Protection of Intellectual Properties.

5.1 Ownership. Licensee acknowledges Licensor's ownership of the Trademark and each and all of the Designs and further acknowledges that all of Licensee's uses of the Trademark and Designs shall inure to the exclusive benefit of Licensor. If not created by Licensor, the Designs shall be deemed "works made for hire" for the Licensor within the meaning of United States Copyright Law or any other applicable industrial or intellectual property law. If the Designs do not so qualify, the Designs and all intangible or intellectual property rights therein will be deemed irrevocably transferred and assigned by Licensee under this Agreement to Licensor on a continuous basis as of the time of creation or development, without the payment of additional consideration. The provision of this Section 5.1 shall survive the expiration or earlier termination of this Agreement.

BM INIT [initials] CO INIT [initials]

Licensee also represents that it has not registered and in the future will not attempt to register the Trademark in its own name or for its own benefit in any country or territory in the world. For the purposes of protection of ownership in the Trademark only, all uses of the Trademark made by or on behalf of the Licensee will be deemed to have been made by Licensor. During the term of this Agreement and thereafter, Licensee shall not:

5.1.1. Claim ownership of or attempt to register the Trademarks in any country or state;

5.1.2. Do or commit any act which would adversely affect the validity of the Trademarks in any country;

5.1.3. Infringe the Trademarks anywhere in the world;

5.1.4. Attack the validity of this Agreement;

5.1.5. Display the Trademarks in a manner which might mislead purchasers into believing that Licensee was itself Licensor or an affiliate or subsidiary thereof; and

5.1.6. Engage in any other activity which can reasonably be expected to materially dilute or otherwise materially impair the right, title and interest of Licensor in the Trademark;

5.1.7. provided that before Licensor declares a breach of Section 5.1.6 above, Licensor shall advise Licensee of its claim of breach and afford Licensee a reasonable period of time, not to exceed thirty (30) days, to rectify such breach.

5.2. Registrations. Licensee shall, at Licensor's expense, cooperate with Licensor in the execution, filing and prosecution of any trademark, copyright or patent application that Licensor may desire to file, and shall supply Licensor with Licensed Products, samples, containers, labels and all uses of the Trademark as may be reasonably requested for use in connection therewith. Licensee shall cooperate with Licensor in making and terminating registered user entries. Licensor shall pay all costs and fees in connection with filing and prosecution of trademarks, copyrights and patents. The obligations under this Section 5.2 shall survive termination of this Agreement.

5.3. No Implied Licenses. Nothing in this Agreement shall constitute the grant of any implied licenses or rights.

5.4. Infringements. Licensee shall immediately give notice to Licensor, in writing, of any infringement or misuse of any Trademark by any third party of which Licensee becomes aware. Licensor shall have the option to commence legal action regarding any such misuse at its expense. Upon Licensor's request, Licensee shall cooperate fully and promptly in any infringement action commenced by Licensor (which cooperation shall not require Licensee to initiate legal action against a third party); provided, however, that

BM INIT [initials] CO INIT [initials]

any and all costs incurred by Licensee in connection with such litigation shall be borne solely by Licensor. If Licensee decides to take any action against an infringement or misuse, Licensee may do so at its own expense (and shall be entitled to keep all of any recovery) provided it obtains the prior written consent of Licensor, in which event Licensee shall indemnify Licensor against all loss, damage, attorneys' fees, judgments and other costs or expenses incurred or suffered by Licensor as a result of such action. Licensee shall not settle any such action without Licensor's prior written approval of the settlement terms and conditions, which approval shall not be withheld unreasonably.

6. Quality Control and Approvals.

6.1 Quality Standards. Licensee acknowledges that the maintenance of the high quality of the Licensed Products, and the control by Licensor over the nature, quality and manner of distribution of all Licensed Products are essential elements of the license being granted herein. Therefore, the quality of the Licensed Products and the quality of all promotional and packaging materials bearing the Trademark shall be at least as high as the best quality of similar products and promotional, advertising and packaging material presently shipped, distributed, manufactured or sold by Licensee in the Territory and shall conform fully with all applicable laws and regulations.

6.2 Standards for Licensor Approval. In order to maintain the high quality standard prescribed by Licensor, Licensee may not manufacture, use, offer for sale, advertise, promote, ship or distribute any Licensed Product, promotional or packaging materials or advertising materials bearing the Trademark until approved in writing by Licensor. All matters in this Agreement requiring approval of Licensor or the exercise of its discretion shall be at the reasonable discretion of Licensor. Any matter not approved, in writing, by Licensor within fifteen (15) days from submission shall be deemed disapproved, unless the Licensee shall submit a second written request within seven (7) days of the fifteenth (15th) day and the Licensor does not provide a written response within seven (7) days of receipt, either approving or disapproving of the request, the second request shall be considered approved. Approval by Licensor does not constitute, nor shall it be construed as, a determination that the approval matter complies with any applicable laws, rules or regulations.

6.3. Approval of Specific Elements.

6.3.1. Licensee shall submit for Licensor's prior written approval all final designs, specifications, fabrications, color information, Packaging and Advertising. Licensor shall exercise its best efforts to advise Licensee in writing of its approval or disapproval of any approval request from Licensee within fifteen (15) days of receipt by Licensor, provided that no request shall be deemed approved by Licensor unless such approval is given in writing.

6.3.2. Prior to the production of each line of Licensed Products, Licensee shall submit to Licensor at least one (1) final sample of each style in the collection. Samples submitted for approval shall be of at least equal quality as the Licensed Products that are produced and distributed. Once a proposed element of a Licensed Product has been approved, Licensee shall not deviate in any material respect from the elements so approved. No disapproved proposed Licensed Product shall be manufactured or sold as a Licensed Product under this Agreement. Licensee may revise any disapproved sample and resubmit it for approval.

6.3.3. Following commencement of the first of each seasonal production run of the Licensed Products (or, if production of the various styles of the Licensed Product commences at different times, within two weeks after commencement of each style's first production run), Licensee shall deliver to Licensor a finished production sample of each style of Licensed Product solely for the purpose of confirming that the production goods are at least equal in quality as the approved samples. If the production sample is not at least equal in quality to that of the sample previously approved, Licensee shall immediately make all changes necessary to conform fully to the original sample approved by Licensor. Any Licensed Product which is not of at least equal quality may only be sold upon mutual written agreement, except in the event there are minor defects or difference from the sample approved by Licensor, such changes or corrections may be made per a "running change" as soon as reasonably practical.

6.3.4. To the extent not approved concurrently with a Licensed Product, Licensee shall submit for Licensor's prior written approval, as provided above, at least one sample of all promotional, labeling and packaging materials bearing the Trademark. No disapproved promotional, labeling or packaging materials shall be used in commerce by Licensee in connection with the Trademark.

6.3.5. Licensee shall be solely responsible for taking commercially reasonable action to endeavor to ensure that all Licensed Products comply fully, to the extent applicable, with the Textile Fiber Product Identification Act, the Flammable Fabrics Act and all other applicable consumer product and safety laws, rules and regulations. Licensee will prior to shipment of any Licensed Product for which flammability standards have been issued, amended or continued in effect under the Flammable Fabrics Act, reasonable and representative tests as prescribed by the Consumer Products Safety Commission have been or prior to shipment for sale will be performed, which show that such Licensed Products conform to all applicable flammability standards. Licensee shall promptly investigate and respond to product safety concerns and/or complaints made by consumers who purchase Licensed Products upon Licensee being made aware of the same.

6.3.6. Licensee shall affix to all Licensed Products such legends, markings and notices as required by laws and regulations in the Territory or reasonably required by

BM INIT [initials] CO INIT [initials]

Licensor, including but not limited to, information about the proper care and use of the Licensed Products.

6.3.7. Anti-Counterfeiting. Licensee and its sub-contractors at all times shall each comply with all shipment tracking, identification and anti-counterfeiting systems and labels and procedures that Licensor may reasonably establish from time to time, provided not commercially prohibitive. Licensee further shall use commercially reasonable measures to endeavor to ensure that all of its distributors and retailers purchasing Licensed Products each comply with such anti-counterfeiting systems and labels and procedures.

6.3.8. Use of Sub-contractors. Licensee shall be entitled to sub-contract directly with third party sub-contractors solely for the manufacturing of the Licensed Products by such firms ("sub-contractors"); provided however that (i) all sub-contracting work shall be limited to manufacturing units of the Licensed Products for the sole account of Licensee and for the sole use or Sale by Licensee under its own name or under the name of Licensor; (ii) all quality standards and specifications provided for in this Section shall be followed at all times by such sub-contractors; (iii) prior to the start of manufacturing Licensee and each sub-contractor shall enter into a legally enforceable written agreement in the English language that (1) prohibits the manufacturing of any Licensed Article for any third person or for its own account; (2) grants Licensor the right to directly enforce such contract as a third party beneficiary; (3) prohibits all Sales or transshipping or grey marketing of any Licensed Products or any other goods incorporating any of the Trademark by such sub-contractor or its affiliates or agents for any purpose; (4) requires compliance by the sub-contractor with Applicable Laws and Applicable Standards (as herein defined) at all times; and (5) otherwise shall contain such terms and conditions and be in the form reasonably approved in advance by Licensor in each case. Licensee shall be directly liable to and shall fully indemnify Licensor for any breach by any sub-contractor.

6.3.9. Applicable Laws. Licensee will and Licensee will endeavor to cause its sub-contractors to comply with all applicable laws, rules, regulations, ordinances, treaties, governmental orders and employment standards in connection with the manufacturing, assembly, labeling, packaging, Sale, promotion or marketing of the Licensed Products or the Packaging or Advertising Materials or any components; including but not limited to laws concerning import, export, customs, certificate licenses, quota allocations, country or origin, safety, public health, employment standards, wages and benefits, child or involuntary labor, working hours and employee health and safety (collectively "Applicable Laws"). Licensee shall obtain at its own expense all approvals of all governmental authorities as may be necessary in connection with its performance under this Agreement.

6.3.10. Applicable Standards. Licensee will and Licensee will endeavor to cause its sub-contractors to comply with all established industry standards and good

BM INIT ___ CO INIT ___

manufacturing and storage practices related to the Licensed Products or the Packaging; and shall maintain a commercially reasonable quality control and safety assurance program with the respect to the Licensed Products and the Packaging (collectively "Applicable Standards"). Where no such standards and practices are established, the Licensed Products and the Packaging shall meet the higher of (i) the level of quality used for similar products of Licensee, or (ii) the level of quality comparable to the quality standards and practices generally accepted for other leading brands of the same type of product in similar markets.

6.3.11 Material Breach. Licensee agrees and acknowledges that its compliance with each of the foregoing standards and requirements shall be deemed material to this Agreement.

6.4 Uses of the Trademark. Licensee agrees that the Trademark will appear on each Licensed Product and its packaging, if any. Licensee shall use only those promotional and packaging materials which have been approved in writing by Licensor. Licensee shall have the right to place its corporate designation on any packaging, the form of which shall have the prior written approval of the Licensor as specified above. No other combination of third party logos, marks, trade names or characters shall be used with the Trademark unless specifically approved by Licensor as specified above.

6.5 Advertising and Promotion.

6.5.1. All advertising and promotion of the Licensed Products undertaken or approved by Licensee must be consistent with the quality, image and standards of Licensor. All advertising copy and art work and any other advertising materials (including without limitation any proposed advertising to be submitted or provided to retailers or customers of Licensee for any use by them) and all display and merchandising materials and merchandising aids which will be provided or approved by Licensee for use in retail stores or showrooms shall be submitted to Licensor in writing for its prior approval; any such item which is not approved by Licensor within fifteen (15) days shall be deemed disapproved. Licensee shall comply with all Licensor decisions in such matters. If Licensor provides Licensee with written guidelines regarding use of the Trademarks in retail advertising, Licensee shall promptly provide such guidelines to its customers.

6.5.2 Advertising Expenditures. Licensee shall expend the minimum of two percent (2%) of the Net Sale Proceeds for each respective period as defined in Schedule A for advertising Licensed Articles via television, print media, radio, billboards, in-store advertising, point of purchase displays, trade shows or any other form of advertising or marketing (the "Direct Advertising Expenditure").

BM INIT ES CO INIT

6.5.3. Where not unreasonable, any advertising or promotional or packaging materials which refer to Licensee's name shall state that Licensee is a licensee of Licensor, the owner of the Trademark.

6.5.4. Licensee shall furnish Licensor, royalty-free, with two of each SKU of each finished Licensed Product in each line. Upon request, Licensee shall furnish Licensor with a reasonable number of additional royalty-free production samples of finished Licensed Products for use in Licensor's showroom, for advertising and for sales presentations, and Licensor shall reimburse Licensee for Licensee's cost for such samples

7. Payments and Reports.

7.1. Trademark Royalty and Advertising Royalty. With respect to each Contract Year of the Term of this Agreement, Licensee shall pay to Licensor and account for a royalty (the "Trademark Royalty") in an amount equal to eight (8%) percent of the Licensee's Net Sales of Licensed Products during each Contract Year. With respect to each Contract Year of the term of this Agreement, Licensee shall pay to Licensor as and for a contribution ("Advertising Contribution") to Licensor's advertising fund for the advertising and promotion of the Licensed Products an amount equal to two (2%) percent of the Licensee's actual Net Sales. This Advertising Contribution shall be in addition to the amount specified as Advertising Expenditures in Section 6.5.2. Payment of any advertising royalty shall be made with the payment of the Trademark Royalty as provided in Section 7.4.

7.2 Advance Payment. At the time of execution of this Agreement, the Licensee will pay to Licensor the sum of thirty-seven thousand, five hundred ($37,500) Dollars as a non-refundable advance payment ("Advance"). The Advance may be credited against any Trademark Royalty due for the Term and no Royalty shall be payable until all such cumulative Royalty due exceeds the total amount of the Advance.

7.3. Minimum Net Sales and Minimum Royalty. The following are the Minimum Net Sales and Guaranteed Minimum payments (Trademark Royalty and Advertising Contribution) required for each of the periods referred to below:

| Contract Year | Net Sales | Guaranteed Minimum Payments |
|---|---|---|
| **Initial Term** | | |
| Year 1: February 1, 2004-June 30, 2005 (17 months) | $750,000 | $75,000 |
| Year 2: July 1, 2005-June 30, 2006 (12 months) | $1,200,000 | $120,000 |
| Year 3: July 1, 2006-June 30, 2007 (12 months) | $1,500,000 | $150,000 |
| **Renewal Option Period:** | | |
| Year 1: July 1, 2007-June 30, 2008 | $2,000,000 | $200,000 |
| Year 2: July 1, 2008-June 30, 2009 | $2,250,000 | $225,000 |
| Year 3: July 1, 2009-June 30, 2010 | $2,500,000 | $250,000 |

7.4. Royalty Payments and Reports. Within forty-five (45) days of the end of each calendar quarter during the Term, regardless of whether any Trademark Royalty payment is then due, Licensee shall submit a report of the number, description and invoice price of each Licensed Product sold, the gross sales, returns actually received, trade discounts and allowances granted, the Net Sales of all Licensed Products and any other information that may be required under any other provisions of this Agreement. Each report shall be certified as correct by the Chief Financial Officer of Licensee. Concurrently with delivery of such report, Licensee shall pay Licensor the Trademark Royalty due for that quarter. In addition, for each calendar quarter, to the extent the Trademark Royalty paid by Licensee for the Contract Year through that date does not equal or exceed the Pro Rata Guaranteed Royalty Minimum, Licensee shall pay Licensor the difference between the Trademark Royalty paid through such date and the Pro Rata Guaranteed Minimum Royalty as of such date. As used herein, "Pro Rata Guaranteed Minimum Royalty" means the Guaranteed Royalty Minimum for such Contract Year divided by four and multiplied by the number of quarters which have elapsed during such Contract Year (except that during the Initial Term, for purposes of determining the Pro Rata Guaranteed Minimum Royalty, the amount of the Guaranteed Minimum Royalty for the Initial Term less the Advance, shall be divided by five (5) and payment of the quarterly payments to the extent applicable shall commence on the first day of the second quarter of the Initial Term and shall be made on each of the next succeeding four quarters of the initial term). Once Licensee has paid Licensor an amount equal to the Guaranteed Royalty payable for a Contract Year, Licensee shall only be required to pay the applicable Royalty for the

BM INIT ES CO INIT [illegible]