remainder of such Contract Year to the extent it exceeds the amount payable for the Guaranteed Royalty for that year. Trademark Royalties which exceed the Guaranteed Royalty shall be credited to the succeeding Contract Years or quarter if part of the same Term. All royalties shall be paid in good funds and in U.S. Dollars.

7.5. Calculation of Net Sales and Royalties.

7.5.1. All sales of Licensed Products to any related company or any shareholders, directors, officers or employers of Licensee or a related company shall be calculated at the average invoice price at which such Licensed Products are sold to unrelated customers in arm's-length transactions and Trademark Royalties shall be payable on the price received on account of all such sales.

7.5.2. Licensee will bear all taxes, duties and other governmental charges in the Territory relating to or arising under this Agreement, including without limitation, any income taxes; withholding income taxes and other taxes, any stamp or documentary taxes or duties, turnover, sales or use taxes, value added taxes, excise taxes, customs or exchange control duties or any other charges relating to or on any royalty payable by Licensee to Licensor hereunder, except that Licensor shall be responsible for any tax imposed on Licensor's income by the United States or any state thereof.

7.6   Additional Statements and Reports

7.6.1 Upon reasonable request, Licensee shall submit invoices, credit memoranda and/or a computer printout confirming any information reflected in its calculations of royalties, in addition to a summary of sales by customer and product code and supporting documentation, if available.

7.6.2. With each Royalty Report as defined in 7.4, Licensee shall submit to Licensor a list containing the names of all its customers and others who have purchased the Licensed Products with product identities, quantities, unit prices, discounts and charge backs to confirm its compliance with this Agreement.

7.6.3. Receipt or acceptance by Licensor of any statement furnished, or of any sums paid by Licensee, shall not preclude Licensor from questioning their correctness at any time within thirty-six (36) months of receipt by the Licensor; provided, however, that reports submitted by Licensee shall be binding and conclusive on Licensee in the event of any termination based on a breach by Licensee arising out any payment or report.

7.6.4. Within ninety (90) days after the end of each Contract Year, Licensee shall furnish Licensor with a summary report of Licensee's sales of Licensed Products during the Contract Year. The summary report shall be certified by the Chief

– 14–

BM INIT _____ CO INIT _____

Financial Officer or an equivalent officer of Licensee. Such summary report shall contain such information as Licensor shall reasonably require, including but not limited to, an aggregate statement showing the number, description and invoice price of all Licensed Products sold during the term, gross sales and all itemized deductions from gross sales.

7.6.5. Sale Data. The Trademark Royalty shall accrue upon the sale of the Licensed Products regardless of the time of collection by Licensee. For purposes of this Agreement, a Licensed Product shall be considered "sold" upon the date of billing, invoicing, shipping, or payment, whichever occurs first.

7.6.6. Interest on Late Payments. If any payment due from Licensee is not received by Licensor within twenty (20) days of the due date, Licensee shall pay to Licensor interest at the rate of ten (10%) percent per annum from the date such payment was due to the date of payment, on all overdue amounts. The parties agree that this interest charge represents a fair and reasonable estimate of the costs that Licensor will incur by reason of its loss of the use of such funds.

8    New York Showroom. The Licensor shall, at its sole discretion, have the right, but not the obligation, to maintain a showroom in New York City, New York. Should the Licensor establish such a showroom the following shall apply:

8.1.    Licensee agrees to pay Licensor a "Showroom Fee" of no less than nine hundred dollars ($900.00) per month, in advance, for the use of such showroom during the entire term of this Agreement. Such payment will be made to the Licensor no later than the 5th of each month. The Showroom Fee shall be increased when and if the Licensor shall have a respective increase in its' cost to operate the New York Showroom

8.2.    Licensee shall limit the use of the Showroom to the display of the Licensed Products with one of the Licensee's full-time salesperson plus furniture, displays and equipment to a maximum of two hundred and fifty (250) square feet. Actual space location will be at the sole discretion of the Licensor. At no time shall the Licensee exercise any control or engagement of any sort, direct or indirect, of or with any Licensor employee(s).

8.3    Nothing in this Agreement shall transfer any control of any kind by the Licensor in the use, function or location within New York City, New York to the Licensee

8.4.    The Licensor, at its sole discretion, may, with thirty (30) days notice to the Licensee, terminate the New York Showroom for any reason. At termination of the New York Showroom, the Licensee's obligation under 7.1 shall also terminate. Licensee agrees to vacate the premises within the ten (10) days of the end of the thirty (30) day notice period.

8.5    Licensee agrees that in event of use of the Licensor's showroom as defined herein, all communications (i.e. telephone, facsimile and internet) services shall be arranged by and for the account of the Licensee. Licensor shall have no responsibilities to provide such services.

8.6    Licensee agrees to provide evidence of all reasonable insurance regarding the Licensee's use of the New York showroom as defined herein including, but not limited to, property, liability, worker's compensation and disability insurance.

9    MAGIC Trade Show. The Licensor shall, at its sole discretion, have the right, but not the obligation, to purchase booth space at a MAGIC trade show (or its' successors). Should the Licensor participate in a MAGIC trade show the following shall apply:

9.1    Subject to Licensor providing one hundred and twenty day (120) advance written notice prior to the first day of the respective MAGIC Trade Show, of the maximum amount Licensee would have to pay, Licensee, within thirty (30 days of receiving the Licensors' written notice herein, shall notify Licensor whether it will, at its sole discretion, agree to pay to the Licensor, a pro rata portion of the direct costs related to the MAGIC Trade Show for such expenses, as; booth rental, set-up and removal logistics, hospitality during show hours and imagery. The prorata portion will be determined by the percentage of the actual space taken by the Licensee of the booth space and will not exceed the amount stipulated in the Licensor's written notice provided herein. Payment will be made when the payment for the costs is actually due to the third-party provider, including but not limited to, any and all related deposits.

9.2    Should the Licensee fail to notify the Licensor of its agreement to participate in the respective MAGIC Trade Show as provided in Section 9.1, Licensor shall have no obligation to provide Licensee with any use of any kind of the Licensor's booth at the respective Magic Trade Show.

10. Suspension of Obligations.

10.1    If Licensee is prevented from performing any of its obligations hereunder by virtue of governmental regulations or order (including environmental regulations), or by strike or war, declared or undeclared, acts of terrorism, riot or civil unrest or other calamities such as fire, earthquake, or similar acts of God, or because of other similar or dissimilar cause beyond the control of Licensee (herein "act of force majeure"), Licensee's obligations shall abate during the period of such conditions. Except as otherwise provided in this Section 10, if such condition continues for a period of more than sixty (50) days, Licensor shall have the right to terminate this Agreement.

10.2    If an act of force majeure consists of fire, earthquake, flood, hurricane, tornado, war, or acts of terrorism and if the act prevents Licensee from manufacturing and/or delivering the Licensed Products, whether due to an inability to obtain fabric or other

BM INIT 𝓔𝓢  CO INIT ⏷

materials, destruction of manufacturing facilities, inability to deliver finished product, or otherwise, Licensee shall have a period of not to exceed sixty (60) days to find alternate sources to enable it to manufacture and deliver the Licensed Products. Licensee shall use due diligence in obtaining such alternate sources and Licensee shall advise Licensor of the progress it has made with regard thereto.

11. Books and Records.

   11.1.    Separate Books and Records. Licensee shall maintain its books of account and records in accordance with generally accepted accounting principles. Licensee shall inform Licensor in writing of the location of such books and records, but in no case shall location of such books and records be outside of the United States of America.

   11.2.    Unique Product Code Numbers. The Licensed Products shall be assigned product code numbers unique from any products other than the Licensed Products that Licensee may manufacture and/or sell. The product code number assigned to each Licensed Product shall be identical to the product code number utilized to identify that Licensed Product in all Licensee's books and records. All documents evidencing the sale of Licensed Products shall state the product code number of such products.

   11.3.    Right to Examine; Until three (3) years after the last sale of Licensed Products by Licensee, Licensor shall have the right, at its sole cost and expense, no more than once each calendar year, on advance notice to Licensee of five (5) business days, to examine and copy all of Licensee's books and records relating directly to the manufacture and sale of Licensed Products. All such examinations shall be at Licensee's principal place of business and during normal business hours. Licensee shall keep all books of account and records available for at least three (3) years after last the year of the Agreement to which they relate.

   11.4.    Right to Audit. In addition to its right to inspect, Licensor shall have the right, not more than once during each calendar year, by its own personnel or its agents, on advance written notice to Licensee of at least five (5) business days, to audit all books and records which Licensee is required to maintain pursuant to this Agreement. All such audits shall be conducted at Licensee's principal place of business during normal working hours. In the event an audit discloses that Licensee has understated Net Sales or underpaid royalties for any report period, without prejudice to any of Licensor's rights under this Agreement, Licensee shall pay to Licensor the amount, if any, by which the actual royalties exceed royalties paid within fifteen (15) days of receipt of notice by Licensor to such effect. If such audit reveals that Licensee underpaid royalties by more than Five (5%) percent for any Contract Year, Licensee shall pay Licensor all reasonable costs, fees and expenses incurred by Licensor in conducting such audit, in addition to any interest for late payment provided for in Section 7.6.6 of this Agreement. Any and all information obtained from such audit shall be held in confidence and not be used for any purpose other than enforcement of the Licensor's rights under this Agreement.

BM CO PINAL
Last printed 2/16/2004 10:00 AM

BM INITZ    CO INIT

12-21-06    13:45    FROM-    T-621  P 001/001  F-323

12 Insurance.

12.1.    Requirements.   Without limiting Licensee's liability under the indemnity provisions of this Agreement, Licensee shall maintain comprehensive general liability insurance in the amount of at least Two Million ($2,000,000.00) Dollars. The policy shall provide that Licensor shall receive at least thirty (30) days notice of cancellation. The policy shall cover the applicable territory in which Licensee is conducting sales of Licensed Products and shall include coverage against theft and destruction of the Licensed Products. Each policy shall include Licensor as an additional insured, with a vendor's broad form endorsement and shall provide that although Licensor is a named insured, Licensor may recover under the policy for any covered loss caused to Licensor, its agents or employees notwithstanding that such loss may have been caused by the negligence (including active, passive and gross negligence) of Licensee. The insurance shall provide that it is primary coverage with respect to all insureds. The insurance shall contain a waiver of subrogation against Licensor.

12.2.    Approved Carrier/Policy Changes.   All insurance shall be obtained from an insurance company Best's rated A , or better which is admitted in the state where Licensee is domiciled. Licensee shall give at least thirty (30) days prior written notice to Licensor of the cancellation of, or any modification in, such insurance policy that would affect Licensor's status or benefits there under. As long as it meets all the foregoing criteria, insurance may be obtained by Licensee in conjunction with a policy which covers products other than the Licensed Products.

12.3.    Evidence of Coverage.   Promptly following execution of this Agreement and upon each renewal of such policy, Licensee shall provide Licensor with evidence, in form and substance satisfactory to Licensor, of the maintenance and renewal of the required insurance including, but not limited to, copies of policies with applicable riders and endorsements, and certificates of insurance.

13. Indemnifications, Representations and Warranties.

13.1.    Indemnifications.   Licensee agrees to indemnify, hold harmless and defend Licensor, its officers, directors, agents and employees from and against any and all claims, suits or demands asserted against Licensor by any third party, including without limitation any and all losses, liabilities, expenses and damages incurred to resolve or satisfy such claims, suits or demands, including costs of suit and attorneys' fees, arising out of:

13.1.1. any alleged defect in any Licensed Product, regardless of whether the action is based upon negligence or strict liability;

13.1.2. any claim that any element of a Licensed Product (other than the Trademark or a design element furnished by Licensor in writing) infringes upon any trademark or rights of any other person; and

13.1.3. the manufacture, labeling, sale, importation, distribution or advertisement of any Licensed Product by Licensee.

13.1.4. as a condition to the indemnity set forth above, Licensor agrees to give Licensee prompt notice of any claim or occurrence, an opportunity to defend or handle such claim or occurrence prior to Licensor incurring fees, expenses or costs or any kind, and Licensor's cooperation with Licensee in the defense or handling of such claim or occurrence

13.1.5. the use, by the Licensee, of the Licensor's New York showroom as described herein.

13.2.     Licensor Indemnification.    Licensor agrees to indemnify, hold harmless and defend Licensee, its officers, directors, agents and employees and customers from and against any and all claims, suits or demands asserted against Licensee by any third party, including without limitation any and all losses, liabilities, expenses and damages, including costs of suit and reasonable attorneys' fees, arising out of and resulting from:

13.2.1. any claim that the use of the Trademark in the Territory and in the manner specified in Sections 3.4 and 3.5 of this Agreement infringes upon any trademark or rights of any other person; or

13.2.2. any violation of any warranty, representation or material agreement made by Licensor in this Agreement.

13.2.3. As a condition to the indemnity set forth above, Licensee agrees to give Licensor prompt notice of any claim or occurrence, an opportunity to defend or handle such claim or occurrence prior to Licensee incurring fees, expenses or costs or any kind, and Licensee's cooperation with Licensor in the defense or handling of such claim or occurrence.

13.3.     Defense of Claims.    The indemnifying party shall defend the indemnified party with respect to each and every claim for which such party is indemnified under this Agreement. All fees and expenses of legal counsel engaged with respect to such claims shall be paid for by the indemnifying party as incurred. The indemnified party shall provide its reasonable cooperation, at the indemnifying party's request and at the indemnifying party's sole cost and expense, in connection with the defense of all such claims.

13.4.    Notification of Claims and Consumer Complaints.    A party seeking indemnification under this Agreement shall immediately notify the indemnifying party, by telephone and in writing, of the subject matter and parties relating to such claim. Licensee shall promptly take steps promptly to correct, any material complaint by a consumer and/or governmental body related to the Licensed Products or any other matter related to Licensee's performance under this Agreement of which Licensee is made aware.

13.5.    Indemnity Unaffected.  Compliance by Licensee with the insurance provisions of this Agreement shall not relieve Licensee of its duties to indemnify Licensor under this Agreement

13.6.    Licensor Representations and Warranties    Licensor represents and warrants to Licensee that:

13.6.1. Licensor is the sole owner of the Trademark and the Trademark does not infringe upon any other trademarks or rights of any other entity or person;

13.6.2 Licensor is a corporation duly incorporated, validly existing and in good standing under the laws of the State of California;

13.6.3 Licensor has full power to grant the license granted and has the full right, power and authority to enter into this Agreement and to perform all of its obligations hereunder;

13.6.4. The person executing this Agreement on the part of Licensor is duly authorized to execute and deliver the Agreement for Licensor and to bind Licensor to the terms hereof; and

13.6.5 Licensor is under no legal impediment which would prevent it from entering into and performing fully its obligations under this Agreement.

13.6.6. SUBJECT ONLY TO THE FOREGOING SUBSECTION, LICENSOR HEREBY SPECIFICALLY DISCLAIMS ANY AND ALL WARRANTIES, EXPRESS OR IMPLIED; INCLUDING WITHOUT LIMITATION THE WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, TITLE AND NON-INFRINGEMENT OF THIRD-PARTY RIGHTS, AND ANY WARRANTIES THAT MAY ARISE DUE TO COURSE OF PERFORMANCE, COURSE OF DEALING OR USAGE OF TRADE, WHETHER RELATED TO THE TRADEMARK OR OTHERWISE

13.7.    Licensee Representations and Warranties.  Licensee represents and warrants to Licensor that:

13.7.1. Licensee is a corporation duly incorporated, validly existing and in good standing under the laws of the State of New York;

13.7.2. Licensee has the full right, power and authority to enter into this Agreement and to perform all of its obligations hereunder;

13.7.3. The person executing this Agreement on the part of Licensee is duly authorized to execute and deliver the Agreement for Licensee and to bind Licensee to the terms hereof; and

13.7.4. Licensee is under no legal impediment which would prevent it from entering into and performing fully its obligations under this Agreement and Licensee is financially capable of performing all of its obligations under this Agreement.

13.8.    LIMITATION OF LIABILITIES.  SUBJECT TO AND EXCEPTING THE INDEMNIFICATION OBLIGATIONS OF LICENSEE OR LICENSOR SET FORTH IN SECTION 13 OF THIS AGREEMENT, IN NO EVENT SHALL EITHER PARTY OR ANY OF ITS AFFILIATES, SUCCESSORS OR PERMITTED ASSIGNS, AND ITS OR THEIR DIRECTORS, OFFICERS, EMPLOYEES, AGENTS, LICENSORS, OR REPRESENTATIVES BE LIABLE FOR ANY INDIRECT, SPECIAL OR CONSEQUENTIAL DAMAGES, OR DAMAGES FOR LOSS OF PROFITS, BUSINESS INTERRUPTION, LOSS OF GOODWILL, ARISING FROM OR RELATING TO THIS AGREEMENT OR THE TRADEMARK, EVEN IF THE OTHER PARTY IS EXPRESSLY ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. The foregoing limitation of liability and exclusion of certain damages shall apply regardless of the failure of essential purpose of any remedies available to either party.

14  Trade Secrets and Confidentiality.

14.1    Definition.  "Confidential Information" means all information disclosed by one party ("Discloser") to the other party ("Recipient") (in writing, orally or in any other form) that is designated, at or before the time of disclosure, as confidential, or provided under circumstances reasonably indicating that the information is confidential, including without limitation trade secrets, customer lists, business plans, technical data, product ideas, personnel, and contract and financial information of Discloser or any third person to whom Discloser owes a duty of confidentiality.  Confidential Information does not include information or material that (1) is now, or hereafter becomes, through no act or failure to act on the part of Recipient, generally known or available to the public; (2) is furnished to Recipient by a third person that is not under an obligation or duty of confidentiality to Discloser with respect to such information or material; or (3) is independently developed by Recipient without any breach of this Agreement, as evidenced by the Recipient's contemporaneous tangible (including written or electronic) records.

BM CO FINAL
Last printed 2/16/2004 10:00 AM

-21-

BM INT ___ CO INT ___

14.2    Restrictions on Use. Each party shall take all reasonable measures to protect the confidentiality of the other party's Confidential Information in a manner that is at least protective as the measures it uses to maintain the confidentiality of its own Confidential Information of similar importance. Recipient shall hold Confidential Information in strict confidence and shall not disclose, copy, reproduce, Sell, assign, license, market or otherwise dispose of such information, or give or disclose such information to third persons, or use such information for any purposes whatsoever other than as necessary in order to fulfill its obligations or exercise its rights under this Agreement. Notwithstanding the foregoing, Recipient may disclose the other party's Confidential Information (i) to employees and consultants that have a need to know such information, provided that Recipient shall advise each such employee and consultant of their obligations to keep such information confidential and shall require that each such employee and consultant sign a written nondisclosure agreement consistent with the confidentiality and nondisclosure provisions herein, and (ii) to the extent Recipient is legally compelled under legal process to disclose such Confidential Information, provided that Recipient shall give advance notice of such compelled disclosure to the other party, and shall cooperate with the other party in connection with any efforts to prevent or limit the scope of such disclosure and/or use of the Confidential Information.

15  Termination.

15.1.1. Other Rights Unaffected.  It is understood and agreed that termination by Licensor on any ground shall be without prejudice to any other rights or remedies which Licensor may have.

15.1.2. Grounds for Termination. In addition to grounds for termination stated elsewhere in this Agreement, the following are grounds for termination of this Agreement:

15.1.3. Monetary Breaches of this Agreement.  If Licensee fails to pay any sum on the date due and such breach continues for a period of ten (10) days following Licensor's written notice of breach given to Licensee.

15.1.4. Non-Monetary Breaches. Except as otherwise provided in Section 15.2.37, if Licensee fails to timely and fully perform or breaches any non-monetary provision of this Agreement, Licensor shall give Licensee notice of breach and, to the extent such breach is capable of being cured, Licensee must cure such breach as soon as practicable and in any event within thirty (30) days except that, if the breach is such that it cannot be cured within thirty (30) days despite commercially reasonable efforts to do so, Licensee shall immediately commence to cure such breach and diligently prosecute such cure to completion. Licensee shall report to Licensor, in writing, no later than ten (10) business days after the notice of breach, and at least once every two weeks after that until the breach is cured, what steps Licensee has taken and will take in order to cure such breach and to ensure that the breach does not occur again.

BM INIT ⅀ CO INIT AF

22.

15 1.5. Grounds for Immediate Termination. Licensor may immediately terminate this Agreement:

15.1.5.1. If a petition for relief under the Bankruptcy Code is filed by or against the Licensee, or if Licensee makes any assignment for the benefit of its creditors or becomes the subject of proceedings under any insolvency, reorganization, or receivership law, with termination to become effective automatically if Licensee fails within sixty days of commencement to discharge the bankruptcy or terminate the assignment or other proceedings. The license and rights granted hereunder are personal to Licensee. No assignee for the benefit of creditors, receiver, debtor in possession, trustee in bankruptcy, sheriff or any other officer or court charged with taking over custody of Licensee's assets or business, shall have any right to continue performance of this Agreement or to exploit or in any way use the Trademark if this Agreement is terminated pursuant to this subsection, except as may by required by law.

15.1.5.2. Unless consented to by Licensor in writing in advance, such consent not to be unreasonably withheld, if there is any change of control of Licensee, consisting of one or more transfers (other than transfers among the existing shareholders of Licensee) which, in the aggregate, total fifty percent (50%) of the shares of stock of Licensee which are issued and outstanding upon execution of this Agreement, except for transfers to, or between existing shareholders or members of their immediate families or trusts for their benefit, all of which shall be permitted

16. Obligations at Expiration or Termination.

16.1. Termination of License. The License shall terminate for all purposes and all rights granted to Licensee to use the Trademark hereunder shall forthwith revert to Licensor; Licensee shall refrain from any use whatsoever of any Trademark, and neither Licensee nor its sub-contractors shall manufacture or Sell any Licensed Articles or any other products that may infringe upon the Trademark at any time following termination, subject only to the limited provisions of this Section hereof.

16.2. Limited Right of Sell-Off. Upon termination or expiration of this Agreement:

16.2 1. Licensee shall immediately provide Licensor with a complete and accurate written list of the current inventory of all units of Licensed Articles and Imported Articles which utilize the Trademark, either in hand as finished goods or which constituted work in process, as of the date of termination; and a complete and accurate written list of and evidence substantiating all uncancelable orders for the manufacture of Licensed Articles as of the date of termination (collectively, "Termination Inventory"). Such written lists shall be certified as complete and accurate by the President or Chief Financial Officer of Licensee.

BM CO FINAL
Last printed 2/17/2004 12:42 PM

BM INIT⎍ ⎍ CO INIT⎍

16.2.2  In the event this Agreement is terminated other than for the material breach; nonpayment, within specified periods, of monies due herein or Bankruptcy of Licensee, then Licensee may, on a nonexclusive basis within the Licensed Territory only and in a manner otherwise consistent with this Agreement, dispose of quantities of the Termination Inventory for a period of six (6) months thereafter ("Sell-Off Period"); provided that (1) all payments then due are immediately reported and paid in full to Licensor or its designated nominee; (2) all statements and payments with respect to the Sell Off Period are thereafter made in accordance with Sections 7.4 and  7.6 hereof for each of quarterly periods within such Period; (3) all units of Licensed Articles and Imported Articles to be Sold adhere to the quality and other standards provided for in this Agreement; (4) the quantities of units of Licensed Articles and Imported Articles to be Sold during the Sell-Off Period shall not materially exceed the quantities of the corresponding Licensed Articles or Imported Articles Sold by Licensee during the six-month period immediately prior to the termination of this Agreement; (5) no Sales shall occur directly or indirectly outside of the Licensed Territory; and (6) no Sales shall be made at any time directly or indirectly to any affiliate or successor or agent or representative of Licensee or any person related thereto.

16.2.3.  A final certified written statement and payment for the final quarter of the Sell-Off Period shall be made within thirty (30) days after the end of the Period.  Unless otherwise mutually agreed to in writing between the parties hereto, any Termination Inventory remaining after the Sell-Off Period pursuant to the terms hereof shall be destroyed or all reference to the Trademark shall be obliterated and written proof there of supplied to Licensor.

16.2.4.  During the Sell-Off Period and for a period of six (6) months thereafter, Licensor or its representatives shall have the right to enter all relevant premises and conduct physical inventories and review all pertinent records in order to confirm that Licensee has complied with the terms of this Section 16.  Any such inventories or reviews shall not be binding on Licensor. The foregoing further shall not limit or affect any other rights or remedies of Licensor hereunder or under applicable law, including but not limited to any right of audit or any pending; and shall not prejudice or affect any claim, action or cause of action of Licensor that shall survive the termination of this Agreement.

16.2.5. Notwithstanding the foregoing, in the event that this Agreement is terminated for the material breach; nonpayment, within specified periods, of monies due herein or Bankruptcy of Licensee, then Licensee may no longer Sell any units of the Licensed Articles or Import Articles or use the Trademark in any manner whatsoever, effective as of the date of termination.  All units of the Licensed Articles or Import Articles shall be destroyed or all reference to the Trademark shall be obliterated and written proof there of supplied to Licensor.

24

BM INIT ℬℬ   CO INIT ᵦᵣ

16.3     Other Rights and Obligations.  All other rights and obligations of the respective parties hereunder shall cease as of the date of termination, provided however that:

    16.3.1. All rights and obligations of the respective parties under this Agreement relating to Royalties and Royalty statements and other payments due and owing, including all rights of audit;

    16.3.2. All representations and warranties and disclaimers of the respective parties;

    16.3.3. All rights and obligations of the respective parties under Section 2 hereof (Grant of Rights); Section 3 hereof (Limitations of Rights Granted); Section 4 hereof (Term of Agreement); Section 13.3 hereof (Limitation of Liabilities); Section 13 hereof (Indemnification); Section 12 hereof (Insurance); Section 14 hereof (Trade Secrets and Confidentiality); Section 15 hereof (Termination); this Section 16; Section 17.6 hereof (Assignability); Section 17.3 hereof (Equitable Relief); Section 10 (Force Majeure), and Section 17 hereof to the extent necessary or useful in the application or enforcement of the surviving provisions of this Agreement; and

    16.3.4. Any claim or action or cause of action for breach or violation of this Agreement existing as of the date of termination;

        16.3.4.1.  each shall not terminate and shall survive and remain in full force and effect for the period of the applicable statutes of limitation, until the relevant rights and obligations of the parties have been fully discharged and satisfied.

16.4.     No Liability or Prejudice.  Neither party shall be liable to the other party for damages of any kind solely as a result of terminating this Agreement in accordance with its terms; and any such termination of this Agreement by a party will be without prejudice to any other rights or remedies of such party under this Agreement or applicable law.

17. General Provisions.

17.1.     Governing Law.  This Agreement is to be construed in accordance with and governed by the internal laws of the State of California, United States of America, without giving effect to any choice of law rule that would cause the application of the laws of any jurisdiction other than the internal laws of the State of California to the rights and duties of the parties. All actions or disputes arising under this Agreement shall be brought exclusively in the Superior Court of the State of California for the County of San Francisco or in the Federal Court for the Northern District of California, United States of America, San Francisco Branch; and such courts shall have exclusive jurisdiction over disputes under this Agreement. Each of the parties expressly consents to jurisdiction and venue in such courts for all purposes of this Agreement or any dispute or controversy hereunder.

17.2. Disputes. Each of the parties irrevocably agrees to submit to the jurisdiction and venue of the United States District Court for the Northern District of California or the California State Supreme Court for resolution of any and all disputes relating to or arising out of this Agreement. Licensee acknowledges and agrees that the Trademark possesses a special, unique and extraordinary character, which makes difficult the assessment of monetary damages which Licensor might sustain by any use of the Trademark or other action of Licensee affecting the Trademark or Licensor's rights therein which is inconsistent with the terms and provisions of this Agreement, including any unauthorized use, and that irreparable injury would be caused to Licensor thereby, such that injunctive relief, specific performance and/or similar relief would be appropriate to prevent and restrain such uses or actions.

17.3. Equitable Relief. Licensee acknowledges that a breach of its obligations under this Agreement would cause Licensor irreparable damage. Licensee therefore agrees that in the event of such breach or threatened breach, in addition to remedies at law, Licensor shall have the right to injunctive or other equitable relief to prevent Licensee's violations of its obligations hereunder.

17.4. Attorneys' fees. The prevailing party in any action or proceeding relating to or arising out of this Agreement shall recover its reasonable attorney's fees and costs incurred in connection with such suit or proceeding in addition to its judgment, including fees and expenses incurred in any appellate proceedings.

17.5. Independent Contractors. Each party is an independent contractor and the personnel of a party are not the employees or agents of the other party for federal, state or other taxes or any other purposes whatsoever, and are not entitled to compensation or benefits of the other party. This Agreement shall not create any relationship of agency or partnership or joint venture or franchise or other business entity between the parties of any kind or nature. No party has the right or authority to enter into any obligation for or to otherwise bind the other party to any extent.

17.6. Assignability. This license and other rights granted in this Agreement are personal to Licensee, and Licensee may not assign or sublicense any of its rights or delegate any of its duties under, pledge or otherwise affect the license granted in, this Agreement without prior written consent of Licensor, except to an affiliate that agrees to be bound by this Agreement. Any attempted assignment or sublicense in violation of this provision shall be void. Licensor may assign this Agreement to any successor or to any person or entity which acquires the Trademark, subject to Licensor's obligations under this Agreement.

17.7. Notices. Any notice or communication is effective when personally delivered in writing or on the date when the notice or communication is telexed or telecopied and provided that any such telex or telecopy is confirmed on the day after the notice by overnight airmail courier (e.g. Federal Express); or upon receipt of a mailing by

BM CO FINAL                          -26-                          BM INIT 25  CO INIT OF
Last printed 2/17/2004 12:42 PM

certified mail, return receipt requested. All notices shall be sent to the parties at the notice addresses listed below, or such other addresses of which they hereafter notify each other in writing under the provisions of this Section.

      To Licensor:
          President
          Blue Marlin Corp.
          540 Florida Street
          San Francisco, California 94410

      To Licensee:
          Concept One
          362 Fifth Avenue, 2nd floor
          New York, NY 10001

          With a copy to:
          Steve Gerber
          666 Fifth Avenue
          25th floor
          New York, NY 10103

17.8.    Entire Agreement.  This Agreement states the entire agreement between the parties, and supersedes all prior negotiations and agreements between the parties concerning its subject matter.  This writing is intended as the final, complete and exclusive statement of the terms of the Agreement between the parties and cannot be changed or terminated orally.  Each party to this Agreement acknowledges that no representations, inducements, promises, or agreements, oral or otherwise, have been made by either party, or anyone acting on behalf of either party, which are not embodied herein and no other agreement, statement, or promise not contained in this Agreement shall be valid or binding.  Each party further states that such party is not relying upon any promise, representation, inducement or agreement, oral or otherwise, which is not expressly stated in this Agreement.

17.9.    Interpretation and Rules of Construction.  Sections and section headings contained in this Agreement are for reference purposes only, and shall not affect in any manner the meaning or interpretation of this Agreement.  Whenever the context requires, references to the singular shall include the plural and the plural the singular and any gender shall include any other gender.  The parties acknowledge that each party has reviewed this Agreement, and no provision of this Agreement shall be interpreted for or against any party because such party or its representative drafted such provision.

17.10.   Survival.  All obligations of the parties relating to protection of the Licensed Mark and indemnification, and such other provisions are intended to survive the termination or expiration of this Agreement.

17.11.    Severability.  If any provision of this Agreement, or the application thereof to any person, place or circumstance, shall be held by a court of competent jurisdiction to be invalid, void or otherwise unenforceable, such provision shall be enforced to the maximum extent possible so as to effect the intent of the parties, or, if incapable of such enforcement, shall be deemed to be deleted from this Agreement, and the remainder of this Agreement and such provisions as applied to other persons, places and circumstances shall remain in full force and effect.

17.12.    Binding Agreement.  This Agreement shall be binding on and inure to the benefit of the parties and their respective successors, agents, affiliates, representatives and permitted assigns.

17.13.    Counterparts.  This Agreement may be executed in any number of counterparts, each of which shall be deemed an original of this Agreement, but all of which together shall constitute on and the same instrument.

IN WITNESS WHEREOF, the parties have executed this Agreement to be effective as of the Effective Date.

LICENSEE:                                    LICENSOR:

By: _____                      By: _____
Its' Authorized Officer                          Its' Authorized Officer

## SCHEDULE A

1.   Trademarks, Logos, etc.:

   Serial # 76/370876:

   

   "BLUE MARLIN"

   Serial #: 78/152681:
   "★★★"
   ★★
   "BLUE MARLIN
   FIVE STAR VINTAGE"

   Serial #: 76/325790:
   "BLUE MARLIN
   FIVE STAR VINTAGE"

   Serial #: 76/325789:
   "★★★"
   ★★
   "FIVE STAR
   VINTAGE"

   Serial #: 76/370837:
   "★★★"
   ★★

2.   Licensed Products

   (a)   Men's, women's, and young men's Hats including but not limited to Knitted hats

BM CO FINAL
Last printed 2/17/2004 12:42 PM

BM INIT  CO INIT

29

**Exhibit B**

12-21-06   19:45   FROM·                                           T-621   P 001/001   F-323

Trademark Electronic Search System (TESS)                          Page 1 of 2


**United States Patent and Trademark Office**

Home|Site Index|Search|FAQ|Glossary|Guides|Contacts|eBusiness|eBiz alerts|News|Help

## Trademarks > Trademark Electronic Search System(Tess)

*TESS was last updated on Fri Aug 18 04 20 58 EDT 2006*



[ Logout ] Please logout when you are done to release system resources allocated for you

[ Start ] List At:    OR [ Jump ] to record:    **Record 12 out of 42**

**TARR Status**   **ASSIGN Status**   **TDR**   **TTAB Status**   *( Use the "Back" button of the Internet Browser to return to TESS)*



BLUE MARLIN FIVE STAR VINTAGE

| | |
|---|---|
| Word Mark | BLUE MARLIN FIVE STAR VINTAGE |
| Goods and Services | (ABANDONED) IC 025  US 022 039  G & S: Vintage style apparel, namely hats, caps dresses, jackets, jeans, jogging suits, warm-up suits, lounge wear, nightshirts, sweaters, vests, halter tops, undershirts, t-shirts, sweatshirts, shorts, gym shorts, sweat shorts, trousers, khakis; and woven shirts |
| Mark Drawing Code | (3) DESIGN PLUS WORDS, LETTERS, AND/OR NUMBERS |
| Design Search Code | 01 01 03 - Comets; Stars with five points<br>01 01 10 - Stars, three or more; Three or more stars |
| Serial Number | 78152681 |
| Filing Date | August 9, 2002 |
| Current Filing Basis | 1B |
| Original Filing Basis | 1B |
| Published for Opposition | June 17, 2003 |
| Owner | (APPLICANT) Blue Marlin Corp  CORPORATION CALIFORNIA 540 Florida Street San Francisco CALIFORNIA 94110 |
| Attorney of Record | Jerry D Hunt |
| Prior Registrations | 2354501;2408486;2639177;2656473;2671863;AND OTHERS |

12-21-06    13:45    FROM-                                          T-621   P 001/001   F-323

Trademark Electronic Search System (TESS)                                    Page 2 of 2

| Disclaimer | NO CLAIM IS MADE TO THE EXCLUSIVE RIGHT TO USE "VINTAGE" APART FROM THE MARK AS SHOWN |
| Type of Mark | TRADEMARK |
| Register | PRINCIPAL |
| Live/Dead Indicator | DEAD |
| Abandonment Date | March 10, 2004 |

| TESS HOME | NEW USER | STRUCTURED | FREE FORM | BROWSE DICT | SEARCH OG | TOP | HELP | PREV LIST | CURR LIST |
| NEXT LIST | FIRST DOC | PREV DOC | NEXT DOC | LAST DOC |

| HOME | SITE INDEX| SEARCH | eBUSINESS | HELP | PRIVACY POLICY

**Exhibit C**

12-21-06    13:45    FROM-                                    T-621    P.001/001    F-323

-----Original Message-----
From: Alec Patience [mailto:alecp@bluemarlincorp.com]
Sent: Wednesday, May 25, 2005 3:46 PM
To: Erik Stuebe; Joshua Lorr
Cc: Debra Medley
Subject: Re: blue marlin interior hat label/care label

Hey Guys-

Here's the blue marlin crest logo.  Since we're using the crest for the
originals we're using the 5 stars only for Five star.

Adios

Alec

----

Hello Josh,

i wasn't aware you were making new labels.
For Fall '05, Blue Marlin will have all new labels with an updated logo.
Alec - could you please send Josh a digital copy of artwork so he can
incorporate it in his artwork.

Also, Josh, we thought it was highly productive when you were out here.

Any
plans to visit again?

Erik

----- Original Message -----
From: "joshua lorr" <joshua@concept1.com>
To: "Erik Stuebe" <estuebe@bluemarlincorp.com>
Cc: "Debra Medley" <debra@concept1.com>
Sent: Tuesday, May 24, 2005 5:08 PM
Subject: blue marlin interior hat label/care label

> erik,
> just wanted your thoughts/ok on this revised version.

1

12-21-06    13:45    FROM-                                    T-621   P 001/001   F-323

```
> -joshua
>
>
```

_____ NOD32 1928 (20061219) Information _____ .____

This message was checked by NOD32 antivirus system
http://www.eset.com







Exhibit D

-----Original Message-----
From: Rody Moreira
Sent: Friday, September 30, 2005 2:39 PM
To: Joshua Lorr; Cecilia Tavarez
Cc: Debra Medley; Andrea S.; Jennifer Rodriguez; Peter Vorrias
Subject: RE: blue marlin branding

I have heard and agree on all of your points mentioned below with the exception of
removing the 5 stars side logo on styles that we are re-ordering.  I have not been advised
to remove the 5 starts from these styles.

Rody

-----Original Message-----
From: Joshua Lorr
Sent: Friday, September 30, 2005 2:37 PM
To: Cecilia Tavarez
Cc: Debra Medley; Andrea S.; Rody Moreira; Jennifer Rodriguez; Peter Vorrias
Subject: blue marlin branding

andrea/deb chime in if i forgot anything?
this has to do with updating existing blue marlin styles that we are reordering, cecilia
told me that peter wanted the old art that we are not supposed to use any more

the five stars alone are no longer blue marlin branding.

blue marlin is two lions with a shield and is on the new interior label bm0015

the visor labels were asked to be removed by blue marlin from all styles starting with
fall of this year (already shipped)

five starD by blue marlin now uses the five stars by themselves on the cheaper line which
goes to the larger chains and uses cheaper materials.

spring/summer sam removed all blue marlin logo side embroideries on the team hats.

so going forward this is where i was with the team hats as of summer 06:

1) no visor labels
2) do not use 5-stars on blue marlin (only 5-star brand)
3) sam doesnt like the new logo as a replacement to the 5-stars- so leave it off
altogether
4) team hats now have no exterior blue marlin branding - only team graphics (this is how
blue marlin originally produced them)

1

12-21-06   13:45   FROM-        (                                    (     T-621  P 001/001  F-323

going forward- when reproducing old styles we should update branding according to the
wishes of blue marlin and sam's direction and use the most current interior branding.

joshua

_____ NOD32 1928 (20061219) Information _____

This message was checked by NOD32 antivirus system.
http://www.eset.com

going forward- when reproducing old styles we should update branding according to the
wishes of blue marlin and sam's direction and use the most current interior branding.

joshua

_____ NOD32 1928 (20061219) Information _____

This message was checked by NOD32 antivirus system.
http://www.eset.com

Exhibit E

12-21-06   13:45   FROM-                                  T-621  P.001/001  F-323

------- Forwarded Message
From: joshua lorr <joshua@concept1.com>
Date: Thu, 02 Mar 2006 19:21:25 -0500
To: Brue McHayle <bruem@bluemarlincorp.com>
Cc: Imani Lanier <imani1@bluemarlincorp.com>, Debra Medley
<debra@concept1.com>
Conversation: Blue marlin originals holiday
Subject: Blue marlin originals holiday

Hello,
I am writing to you because I am a little confused by the all of the
additional Monday changes.

I had a question on the military cancellations, last week we went
through
style by style on those shapes on the phone and
I thought we were clear about the fabrics/techniques. The Monday night
email
cancelled all but one miltary shape and asked that that one be made in
fleece. I have some concern here because we have never had any luck
selling
that kind of shape in fleece except for children's/juniors programs.
Please see attached photos of the swatches we were working with up until
the
cancellations  Brasil=hb twill, cccp=felt, osaka=suiting

1

Also I am concerned that the knit offering is now too small. For knits we
focused on scarves and there was not indication that there would be
additional changes to the rest, I thought that you had reviewed the cads and
these were your comments (last week on the phone).
There are now 4 knit hats and 6 scarves. I think it might be unbalanced

It would be a great help to have comments as specific as possible.
A few styles were noted: "cancel or create something stronger" if you have
examples of what you consider to be strong or weak in a hat, great. Or what
you consider to be strong from your offering  I think personal taste will
dictate a different selection of what might be a compelling graphic/etc.
depending on the person. I e.-You feel your deer silhouette graphic does not
represent your line when done as a jacquard, this would be good to know
earlier. Let us know what areas of the line to focus on for direction  It
will get easier as we learn your tastes.

also If you have ideas on which core baseball hats you want colors flipped,
please indicate. Time is short for holiday  It was unlcear if you wanted
home/away both colors per team or just wanted to flip the colors.

I hope we can resolve something on the military shapes  The salespeople have
been getting requests for this shape in BM. I can't give them a sales sheet
of only one in fleece. There will be a larger offering in 5-star of this
shape, but for the originals customers we need to offer more than one.

If you could let me know who to submit the designs to directly in the future
so there is clear communication for both blue marlin and 5-star.
A lot has changed with blue marlin and I just want to be sure who my new
contacts are for design/art/etc. for each brand

Thanks a million,
Talk to you soon,
Joshua

Joshua Lorr
Design Director
Concept One Accessories
362 Fifth Avenue, 2nd Fl
New York, NY 10001
212 868 2590 ext 152
http://www.concept1 com


------- End of Forwarded Message


_____ NOD32 1926 (20061218) Information _____

This message was checked by NOD32 antivirus system.
http://www.eset com

**PROOF OF SERVICE**
[C C P , §§1013(a) and 2015 5]

STATE OF CALIFORNIA          )    Case No  CGC-06-453170
                             )
COUNTY OF SAN FRANCISCO      )

    I am employed in the county of Los Angeles, State of California.  I am over the age of 18 and not a party to the within action; my business address is 2029 Century Park East, 14th Floor, Los Angeles, California 90067

    On December 21, 2006, I served the foregoing document described as **OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION; DECLARATIONS OF SAM HAFIF, DEBRA MEDLEY AND JENNIFER RODRIGUEZ** on all interested parties in this action by placing the original/true copies thereof enclosed in (a) sealed envelope(s) addressed as stated below:

Randall Riccardo, Esq.
299 Kansas Street
San Francisco, CA 94103
Facsimile: (415) 252-9633

☐   **BY MAIL**   I am "readily familiar" with the firm's practice of collection and processing of correspondence for mailing  Under that practice it would be deposited with U.S  Postal Service on that same day with postage thereon fully prepaid at Los Angeles, California in the ordinary course of business  I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit

☐   **BY (PERSONAL SERVICE)**   I caused the envelope to be delivered by hand to the address listed above.

☒   **BY (EXPRESS MAIL)**   I deposited such envelope in the receptacle for **FedEx** and requested that it be delivered to the above-named attorneys/parties by way of priority next day delivery (to be delivered by 10:00 a m. the following morning)

    I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct

    Executed on December 21, 2006, at Los Angeles, California.

                             _____
                                  Leslie Fritz

12-21-06   17:39   FROM-                                    T-939   P.002/002   F-356
                                                              T-621   P.001/001   F-923

1   David M. Bass (State Bar No. 117199)
    Peter M. Cho (State Bar No. 213870)
2   DAVID M. BASS & ASSOCIATES
    2029 Century Park East, 14th Floor
3   Los Angeles, California 90067
    Telephone: (310) 789-1152
4   Facsimile: (310) 789-1149
    E-mail: dbass@basslawla.com
5

6   Attorneys for Defendant USPA ACCESSORIES,
    LLC dba CONCEPT ONE ACCESSORIES
7

ENDORSED
F I L E D
*San Francisco County Superior Court*

DEC 2 1 2006

GORDON PARK-LI, Clerk
BY ___ TAKU MOROHOSHI
                    Deputy Clerk

8                   SUPERIOR COURT OF THE STATE OF CALIFORNIA

9                        FOR THE COUNTY OF SAN FRANCISCO

10

11  | BLUE MARLIN CORP.,                          | Case No. CGC-06-453170 |

12  |                          Plaintiff,          | Hon. Ronald E. Quidachay |
                                                     Law & Motion Department 302
13  |                vs.                           |

14  | USPA ACCESSORIES, LLC dba                    | OPPOSITION TO MOTION FOR
      CONCEPT ONE ACCESSORIES,                       PRELIMINARY INJUNCTION;
15  |                                              | DECLARATIONS OF SAM HAFIF, DEBRA
                          Defendant                  MEDLEY AND JENNIFER RODRIGUEZ
16

17  USPA ACCESSORIES, LLC dba
    CONCEPT ONE ACCESSORIES, a New       Date:      January 3, 2006
18  York limited liability company,       Time:      9:00 a.m.
                                          Place:     Department 302
19                    Cross-Complainant,

20              vs                        Complaint Filed:        June 15, 2006

21  BLUE MARLIN CORP., a California
    corporation; and ROES 1 to 25, inclusive,
22
                    Cross-Defendants.
23

24  ///

25  ///

26  ///

27  ///

28  ///

FedEx | Ship Manager | Label 7911 9585 3583

Page 1 of 1

From:    Origin ID:  (310)789-1152
David Bass
DAVID M. BASS & ASSOCIATES
2029 CENTURY PARK EAST
14th Floor
LOS ANGELES, CA 90067



Ship Date: 21DEC06
ActWgt: 2 LB
System#: 3632461/INET2500
Account#: S *********

REF: USPA/Blue Marlin



Delivery Address Bar Code

SHIP TO:    (415)215-2951        BILL SENDER
Randall Riccardo

299 Kansas Street

San Francisco, CA 94103



**STANDARD OVERNIGHT**                              **FRI**
                                                Deliver By:
TRK#  7911 9585 3583    FORM 0201               22DEC06
                                            **SFO**    A1

94103    -CA-US

**82 NDBA**

Shipping Label: Your shipment is complete

1.  Use the 'Print' feature from your browser to send this page to your laser or inkjet printer.

2.  Fold the printed page along the horizontal line.

3.  Place label in shipping pouch and affix it to your shipment so that the barcode portion of the label can be read and scanned.

**Warning: Use only the printed original label for shipping. Using a photocopy of this label for shipping purposes is fraudulent and could result in additional billing charges, along with the cancellation of your FedEx account number.**

Use of this system constitutes your agreement to the service conditions in the current FedEx Service Guide available on fedex.com. FedEx will not be responsible for any claim in excess of $100 per package, whether the result of loss, damage, delay, non-delivery, misdelivery, or misinformation, unless you declare a higher value, pay an additional charge, document your actual loss and file a timely claim. Limitations found in the current FedEx Service Guide apply. Your right to recover from FedEx for any loss, including intrinsic value of the package, loss of sales, income interest, profit, attorney's fees, costs, and other forms of damage whether direct, incidental, consequential, or special is limited to the greater of $100 or the authorized declared value. Recovery cannot exceed actual documented loss. Maximum for items of extraordinary value is $500. e.g. jewelry, precious metals, negotiable instruments and other items listed in our Service Guide. Written claims must be filed within strict time limits, see current FedEx Service Guide.

12/21/2006

FedEx | Ship Manager | Label 7911 9585 3583

Page 1 of 1

From:    Origin ID:   (310)789-1152
David Bass
DAVID M. BASS & ASSOCIATES
2029 CENTURY PARK EAST
14th Floor
LOS ANGELES, CA 90067



Ship Date: 21DEC06
ActWgt: 2 LB
System#: 3632461/INET2500
Account#: S *********

REF: USPA/Blue Marlin

Delivery Address Bar Code

SHIP TO:    (415)215-2951        BILL SENDER
**Randall Riccardo**

**299 Kansas Street**

**San Francisco, CA 94103**

**STANDARD OVERNIGHT**                                **FRI**
                                                      Deliver By:
TRK#  **7911  9585  3583**      FORM        22DEC06
                                0201
                                        **SFO**      A1
**94103**    -CA-US

**82 NDBA**

Shipping Label: Your shipment is complete
1  Use the 'Print' feature from your browser to send this page to your laser or inkjet printer
2  Fold the printed page along the horizontal line
3  Place label in shipping pouch and affix it to your shipment so that the barcode portion of the label can be read and scanned
**Warning: Use only the printed original label for shipping. Using a photocopy of this label for shipping purposes is fraudulent and could result in additional billing charges, along with the cancellation of your FedEx account number.**

Use of this system constitutes your agreement to the service conditions in the current FedEx Service Guide, available on fedex.com. FedEx will not be responsible for any claim in excess of $100 per package, whether the result of loss, damage, delay, non-delivery, misdelivery, or misinformation, unless you declare a higher value, pay an additional charge, document your actual loss and file a timely claim. Limitations found in the current FedEx Service Guide apply. Your right to recover from FedEx for any loss, including intrinsic value of the package, loss of sales, income interest, profit, attorney's fees, costs, and other forms of damage whether direct, incidental, consequential, or special is limited to the greater of $100 or the authorized declared value. Recovery cannot exceed actual documented loss. Maximum for items of extraordinary value is $500, e.g. jewelry, precious metals, negotiable instruments and other items listed in our Service Guide. Written claims must be filed within strict time limits, see current FedEx Service Guide

https://www.fedex.com/cgi-bin_it/unity/5DcZu8DH1w2lcSi7EeRt3x62ZxaEHxV5Gc     12/20/2006

Shipping Label: Your shipment is complete

1   Use the 'Print' feature from your browser to send this page to your laser or inkjet printer

2   Fold the printed page along the horizontal line.

3   Place label in shipping pouch and affix it to your shipment so that the barcode portion of the label can be read and scanned

**Warning: Use only the printed original label for shipping. Using a photocopy of this label for shipping purposes is fraudulent and could result in additional billing charges, along with the cancellation of your FedEx account number.**

Use of this system constitutes your agreement to the service conditions in the current FedEx Service Guide, available on fedex.com. FedEx will not be responsible for any claim in excess of $100 per package, whether the result of loss, damage, delay, non-delivery, misdelivery, or misinformation, unless you declare a higher value, pay an additional charge, document your actual loss and file a timely claim. Limitations found in the current FedEx Service Guide apply. Your right to recover from FedEx for any loss, including intrinsic value of the package, loss of sales, income interest, profit attorney's fees, costs, and other forms of damage whether direct, incidental, consequential, or special is limited to the greater of $100 or the authorized declared value. Recovery cannot exceed actual documented loss. Maximum for items of extraordinary value is $500, e.g. jewelry, precious metals, negotiable instruments and other items listed in our Service Guide. Written claims must be filed within strict time limits, see current FedEx Service Guide

---

STANDARD OVERNIGHT

THU

Deliver By:
21DEC06

TRK# 7922 6076 3943     FORM
0201

SFO     A1

94103     -CA-US

**82 NDBA**

Delivery Address Bar Code

REF: Admin
Account#: S
System#: 3652461/INET2500
AdWgt: 1 LB
Ship Date: 20DEC06


FedEx
Express

BILL SENDER

SHIP TO: (415)503-0900
Irene Llval
Worldwide Messenger Service
520 Townsend Street
Suite D
San Francisco, CA 94103

CL5909AL/5721

From:   Origin ID: (310)789-1152
David Bass
DAVID M. BASS & ASSOCIATES
2029 CENTURY PARK EAST
14th floor
LOS ANGELES, CA 90067

12-21-06   17:39   FROM-                                        T-638   P 001/002   F-356

# WORLDWIDE NETWORK, INC.
## 520 TOWNSEND ST., STE D
## SAN FRANCISCO, CA 94103
### (415) 503-0900  (415) 503-0909 FAX

## FACSIMILE TRANSMITTAL SHEET

| TO: LESLIE TRIPP | FROM: **LOUANN LAGUISMA** |
|---|---|
| COMPANY: DAVID M. PINGS & ASSOC. | DATE: 12/21/06 |
| FAX NUMBER: (310) 789-1149 | TOTAL NO. OF PAGES INCLUDING COVER: 2 |
| PHONE NUMBER: | CONTROL# 003080 |

RE:

☐ URGENT   ☑ FOR REVIEW   ☐ PLEASE COMMENT   ☐ PLEASE REPLY   ☐ PLEASE RECYCLE

FEDEX # 8575 3376 0812