1  David M. Bass (State Bar No. 117199)
   Peter M. Cho (State Bar No. 213870)
2  DAVID M. BASS & ASSOCIATES
   2029 Century Park East, 14th Floor
3  Los Angeles, California 90067
   Telephone: (310) 789-1152
4  Facsimile: (310) 789-1149
   E-mail: dbass@basslawla.com
5

6  Attorneys for Defendant and Counterclaim
   Plaintiff USPA ACCESSORIES, LLC
7

8                UNITED STATES DISTRICT COURT

9            NORTHERN DISTRICT OF CALIFORNIA

10                  SAN FRANCISCO DIVISION

11

12  BLUE MARLIN CORP.,                    Case No. C-07-3368-EMC

13          Plaintiff,                    **CERTIFICATE OF SERVICE OF**
                                          **NOTICE TO ADVERSE PARTY OF**
14      vs.                               **REMOVAL TO FEDERAL COURT**

15  USPA ACCESSORIES, LLC dba
    CONCEPT ONE ACCESSORIES,
16
            Defendant.
17

18  USPA ACCESSORIES, LLC dba
    CONCEPT ONE ACCESSORIES,
19
            Counterclaim Plaintiff,
20
        vs.
21
    BLUE MARLIN CORP., a California
22  corporation; and ROES 1 to 25, inclusive,

23          Counterclaim Defendants.

24  / / /

25  / / /

26  / / /

27  / / /

28  / / /

---

CERTIFICATE OF SERVICE OF NOTICE TO ADVERSE PARTY OF REMOVAL TO FEDERAL COURT
[NO. C-07-3368-EMC]

1      I, Leslie G. Fritz, certify and declare as follows:

2      1.    I am over the age of 18 years and not a party to this action.

3      2.    My business address is 2029 Century Park East, 14th Floor, Los Angeles,

4  California 90067, which is located in the city, county and state where the mailing described

5  below took place.

6      3.    On June 27, 2007, I deposited in the United States mail at Los Angeles,

7  California, a copy of the Notice to Adverse Party of Removal to Federal Court dated June 26,

8  2007. (A true and correct copy of this Notice to Adverse Party of Removal to Federal Court is

9  attached to this Certificate as Exhibit A.)

10      I declare under penalty of perjury under the laws of the United States of America that

11  the foregoing is true and correct.

12

13  Dated:  June 27, 2007            _____

14                                     Leslie G. Fritz

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CERTIFICATE OF SERVICE OF NOTICE TO ADVERSE PARTY OF REMOVAL TO FEDERAL COURT



Exhibit A

David M. Bass (State Bar No. 117199)
Peter M. Cho (State Bar No. 213870)
DAVID M. BASS & ASSOCIATES
2029 Century Park East, 14th Floor
Los Angeles, California 90067
Telephone: (310) 789-1152
Facsimile: (310) 789-1149
E-mail: dbass@basslawla.com

Attorneys for Defendant and Counterclaim
Plaintiff USPA ACCESSORIES, LLC dba
CONCEPT ONE ACCESSORIES

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

## FOR THE COUNTY OF SAN FRANCISCO

| | |
|---|---|
| BLUE MARLIN CORP., | Case No. CGC-06-453170 |
| Plaintiff, | **NOTICE TO ADVERSE PARTY OF REMOVAL TO FEDERAL COURT** |
| vs. | |
| USPA ACCESSORIES, LLC dba CONCEPT ONE ACCESSORIES, | |
| Defendant. | |
| USPA ACCESSORIES, LLC dba CONCEPT ONE ACCESSORIES, | |
| Cross-Complainant, | |
| vs. | |
| BLUE MARLIN CORP., a California corporation; and ROES 1 to 25, inclusive, | |
| Cross-Defendants. | |

///
///
///
///
///
///
///

NOTICE TO ADVERSE PARTY OF REMOVAL TO FEDERAL COURT

1    **TO PLAINTIFF AND ITS ATTORNEYS OF RECORD:**

2        PLEASE TAKE NOTICE that a Notice of Removal of this action was filed in the

3    United States District Court for the Northern District of California, San Francisco Division, on

4    June 27, 2007, case number C-07-3368. A copy of this Notice of Removal is attached hereto as

5    Exhibit 1.

6

7    Dated:  June 27, 2007                     DAVID M. BASS & ASSOCIATES

8

9                                By: _____
                                         Peter M. Cho

10                               Attorneys for Defendant and Cross-
                              Complainant USPA ACCESSORIES, LLC dba

11                               CONCEPT ONE ACCESSORIES

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## PROOF OF SERVICE
[*C C P*, §§1013(a) and 2015 5]

2

3    **STATE OF CALIFORNIA**            )    Case No. CGC-06-453170
                                        )
4    **COUNTY OF SAN FRANCISCO**        )

5        I am employed in the county of Los Angeles, State of California. I am over the age of
6    18 and not a party to the within action; my business address is 2029 Century Park East,
     14th Floor, Los Angeles, California 90067.

7        On June 27, 2007, I served the foregoing document described as **NOTICE TO
     ADVERSE PARTY OF REMOVAL TO FEDERAL COURT** on all interested parties in this
8    action by placing the original/true copies thereof enclosed in (a) sealed envelope(s) addressed
     as stated below:

9

10       Randall Riccardo, Esq.            Stephen A. Sommers, Esq.
         299 Kansas Street                 Sommers Law Group
         San Francisco, CA 94103           870 Market Street
11                                         Suite 1142
                                           San Francisco, CA 94102

12

13   ☒    **BY MAIL**    I am "readily familiar" with the firm's practice of collection and
     processing of correspondence for mailing. Under that practice it would be deposited
     with U.S. Postal Service on that same day with postage thereon fully prepaid at Los
14   Angeles, California in the ordinary course of business. I am aware that on motion of the
     party served, service is presumed invalid if postal cancellation date or postage meter
15   date is more than one day after date of deposit for mailing in affidavit.

16   ☐    **BY (PERSONAL SERVICE)**        I caused the envelope to be delivered by hand to
     the address listed above.

17

18   ☐    **BY (EXPRESS MAIL)**    I deposited such envelope in the receptacle for **FedEx** and
     requested that it be delivered to the above-named attorneys/parties by way of priority
     next day delivery (to be delivered by 10:00 a.m. the following morning).

19

20       I declare under penalty of perjury under the laws of the State of California that the
     foregoing is true and correct.

21       Executed on June 27, 2007, at Los Angeles, California.

22

23                                   *Leslie*
                                       Leslie Fritz

24

25

26

27

28



Exhibit 1

ORIGINAL
FILED

JUN 2 7 2007

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

1  David M. Bass (State Bar No. 117199)
   Peter M. Cho (State Bar No. 213870)
2  DAVID M. BASS & ASSOCIATES
   2029 Century Park East, 14th Floor
3  Los Angeles, California 90067
   Telephone: (310) 789-1152
4  Facsimile: (310) 789-1149
   E-mail: dbass@basslawla.com   E-filing
5
6  Attorneys for Defendant and Counterclaim
   Plaintiff USPA ACCESSORIES, LLC
7

8                    UNITED STATES DISTRICT COURT

9                 NORTHERN DISTRICT OF CALIFORNIA              EMC

10                    SAN FRANCISCO DIVISION

11                                          C 07   3368

12  BLUE MARLIN CORP.,                 Case No.

13              Plaintiff,             NOTICE OF REMOVAL OF ACTION
                                       UNDER 28 U.S.C. § 1441(b) (FEDERAL
14        vs.                          QUESTION)

15  USPA ACCESSORIES, LLC dba          [Pleadings and Orders from State Court
    CONCEPT ONE ACCESSORIES,           Action filed concurrently herewith]
16
                Defendant.
17
18  USPA ACCESSORIES, LLC dba
    CONCEPT ONE ACCESSORIES,
19
                Counterclaim Plaintiff,
20
          vs.
21
    BLUE MARLIN CORP., a California
22  corporation; and ROES 1 to 25, inclusive,

23              Counterclaim Defendants.

24  ///

25  ///

26  ///

27  ///

28  ///

**TO THE CLERK OF THE ABOVE-ENTITLED COURT:**

PLEASE TAKE NOTICE that Defendant USPA Accessories, LLC ("USPA") hereby removes to this Court the state court action described below.

1    On June 15, 2006, an action was commenced in the Superior Court of the State of California in and for the County of San Francisco, entitled *Blue Marlin Corp. v. USPA Accessories, LLC*, case number CGC-06-453170 ("State Court Action") (A true and correct copy of the Summons and Complaint from the State Court Action is attached hereto as Exhibit A.)

2    On June 21, 2007, Plaintiff in the State Court Action, Blue Marlin Corp. ("Blue Marlin"), filed a First Amended Complaint, which added claims for federal copyright and trademark infringement. First Amended Complaint, ¶¶ 25-37, 50-54. (A true and correct copy of the First Amended Complaint is attached hereto as Exhibit B.) The new claims (i) substantially change the nature of this action, *see Wilson v. Intercollegiate Conference Athletic Association*, 668 F.2d 962 (7th Cir. 1982), and (ii) include a copyright claim over which the federal courts have exclusive jurisdiction, *see* 28 U.S.C. § 1338.

3    This action is a civil action of which this Court has original jurisdiction under 28 U.S.C. §§ 1331 and 1338, and is one which may be removed to this Court by USPA pursuant to the provisions of 28 U.S.C. § 1441(b) in that it arises under federal copyright and trademark laws, 17 U.S.C. §§ 501 *et seq.* and 15 U.S.C. §§ 1111 *et seq.*

4    A copy of the pleadings and orders of the State Court Action is filed concurrently herewith pursuant to 28 U.S.C. § 1446(a).

Dated: June 26, 2007

DAVID M. BASS & ASSOCIATES

By: _____
Peter M. Cho
Attorneys for Defendant and Counterclaim
Plaintiff USPA ACCESSORIES, LLC

1

NOTICE OF REMOVAL OF ACTION UNDER 28 U.S.C. § 1441(B)

## PROOF OF SERVICE

[*C.C.P.*, §§1013(a) and 2015.5]

UNITED STATES DISTRICT COURT    )    Case No.
                                )
NORTHERN DISTRICT OF CALIFORNIA )

I am employed in the county of Los Angeles, State of California. I am over the age of 18 and not a party to the within action; my business address is 2029 Century Park East, 14th Floor, Los Angeles, California 90067.

On June 26, 2007, I served the foregoing document described as **NOTICE OF REMOVAL OF ACTION UNDER 28 U.S.C. § 1441(b) (FEDERAL QUESTION)** on all interested parties in this action by placing the original/true copies thereof enclosed in (a) sealed envelope(s) addressed as stated below:

Randall Riccardo, Esq.                Stephen A. Sommers, Esq.
299 Kansas Street                     Sommers Law Group
San Francisco, CA 94103               870 Market Street
                                      Suite 1142
                                      San Francisco, CA 94102

☐  **BY MAIL**    I am "readily familiar" with the firm's practice of collection and processing of correspondence for mailing. Under that practice it would be deposited with U.S. Postal Service on that same day with postage thereon fully prepaid at Los Angeles, California in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

☐  **BY (PERSONAL SERVICE)**    I caused the envelope to be delivered by hand to N/A.

☒  **BY (OVERNIGHT COURIER)**    I deposited such envelope in the receptacle for Federal Express and requested that it be delivered to the above-named attorneys/parties by way of priority next day delivery (to be delivered by 10:00 a.m. the following morning).

I declare that I am employed in the offices of a member of the bar of this court at whose direction the service was made.

Executed on June 26, 2007, at Los Angeles, California.

_____
Leslie Pinz

Exhibit A

SUM-100

## SUMMONS
### (CITACION JUDICIAL)

| | FOR COURT USE ONLY<br>(SOLO PARA USO DE LA CORTE) |
|---|---|

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*
USPA Accessories, LLC dba Concept One Accessories

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTA DEMANDANDO EL DEMANDANTE):*
Blue Marlin Corp

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (www.lawhelpcalifornia.org), the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), or by contacting your local court or county bar association.

Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.courtinfo.ca.gov/selfhelp/espanol), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.

Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.courtinfo.ca.gov/selfhelp/espanol) o poniéndose en contacto con la corte o el colegio de abogados locales.

| The name and address of the court is:<br>*(El nombre y dirección de la corte es):*<br>Superior Court of California, County of San Francisco<br>400 McAllister Street<br>San Francisco, CA 94107-4514 | CASE NUMBER:<br>*(Número del Caso):* | CGC-06-453170 |
|---|---|---|

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
Randall Riccardo
299 Kansas Street, San Francisco, CA 94103

| DATE:<br>*(Fecha)* | Clerk, by<br>*(Secretario)* | , Deputy<br>*(Adjunto)* |
|---|---|---|

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citación use el formulario Proof of Service of Summons (POS-010)).*

**NOTICE TO THE PERSON SERVED:** You are served

1. [ ] as an individual defendant.
2. [ ] as the person sued under the fictitious name of *(specify)*:

3. [ ] on behalf of *(specify)*:

   under: [✓] CCP 416.10 (corporation)  [ ] CCP 416.60 (minor)
   [ ] CCP 416.20 (defunct corporation)  [ ] CCP 416.70 (conservatee)
   [ ] CCP 416.40 (association or partnership)  [ ] CCP 416.90 (authorized person)
   [ ] other *(specify)*:

4. [ ] by personal delivery on *(date)*:

Page 1 of 1

1 | Randall Riccardo, Esq. (#224672)
299 Kansas Street
2 | San Francisco, CA 94103
Telephone: 415-252-9630
3 | Fax: 415-252-9633

4 | Attorney for Plaintiff

ENDORSED
F I L E D
San Francisco County Superior Court

JUN 1 5 2006

GORDON PARK-LI, Clerk
BY: __ CRISTINA E. BAUTISTA
Deputy Clerk
CASE MANAGEMENT CONFERENCE SET

NOV 1 7 2006   9ᴬᴹ AM

DEPARTMENT 212

SUPERIOR COURT OF CALIFORNIA

COUNTY OF SAN FRANCISCO

| | |
|---|---|
| BLUE MARLIN CORP., | Case No. CGC-06-453170 |
| Plaintiff, | COMPLAINT FOR DAMAGES UPON OPEN ACCOUNT, ACCOUNT STATED AND BREACH OF CONTRACT |
| vs. | |
| USPA ACCESSORIES, LLC dba CONCEPT ONE ACCESSORIES, | AMOUNT DEMANDED EXCEEDS $10,000 |
| Defendant | |

Plaintiff alleges:

## PARTIES AND JURISDICTION

1. At all material times hereto plaintiff, Blue Marlin Corp., has been a California corporation doing business as an apparel wholesaler.

1

2.   Plaintiff is informed and believes and thereon alleges, that at all material times hereto, defendant, USPA Accessories, LLC, and Does 1-10, has been a New York Corporation, located in the city of New York.

3.   The true names and capacities of defendants named herein as Does 1-10 inclusive are unknown to plaintiff at this time, who therefore sues defendants by such fictitious names and plaintiff will ask leave of court to amend this complaint to insert the true names and capacities of such fictiously named defendants when they have been ascertained. Plaintiff alleges on information and belief that such defendants are responsible for the debts hereinafter alleged.

4.   Jurisdiction is properly exercised by this Court because the claims and obligations sued upon herein were made and entered into and are due and payable in this judicial district. Additionally, under the terms of the contract entered into between the parties, such contract being subject of the instant action, the defendant has voluntarily agreed to submit all disputes arising under such contract to this Court.


## GENERAL ALLEGATIONS

5.   Blue Marlin was founded in 1994 as a headwear wholesaler. Its initial line of product was inspired by teams from the Negro Leagues, the Latin Leagues, the Pacific Coast Leagues, and other defunct baseball teams from the early 1900's. Its early product offering featured baseball caps; these hats were in an instant success and were soon worn by various celebrities including Bruce Springsteen, Dusty Baker, Bruce Willis, Bono and others.

2

6. Beginning in 1996, Blue Marlin expanded into vintage-inspired sportswear consisting of sweatshirts, sweatpants, track jackets, polo shirts, T-shirts, jeans, bags, belts, footwear, and other items. Blue Marlin is currently sold in over 500 stories nationwide including Bloomingdale's, Macy's, Marshall Field's, Lord & Taylor, Nordstorm and a variety of specialty stores.

7. January 1, 2004, defendant entered into a contract agreement under which USPA would design, manufacture, market and sell Blue Marlin caps under a license agreement (hereinafter the "License Agreement"). The License Agreement term ran from February 1, 2004 through June 30, 2007 (See Exhibit A). Under the terms of the License Agreement defendant obligated itself to pay guaranteed minimum royalties of $75,000 for the first year of the license, $120,000 for the second year of the license and $150,000 for the third year of the license. The license royalty was 8% on any amounts exceeding the minimum guaranteed royalty. These minimum royalties are due and payable regardless of the quantity of product defendant actually sells. Additionally, the defendant must to pay a 2% advertising royalty and expend another 2% on advertising on the defendant's net sales.

8. Through March 1, 2006, defendant has underpaid plaintiff on the guaranteed minimum royalties and advertising royalties and contributions by $78,139.23.

9. On March 29, 2006, defendant's CEO, Sam Hafif, sent an email to Erik Stuebe, CEO for plaintiff, in which Hafif stated, inter alia, that "we would not agree to pay the minimum royalties as stated in the contract.." and "there is no point in tiptoeing around this issue, so I am stating directly that we will not accept that obligation. "

(See Exhibit B)  Defendant, through Hafif, also expressed the same message to CEO Stuebe in a telephone conversation on March 21, 2006.

10. On June 14, 2006, plaintiff, through the undersigned counsel, sent a letter via Federal Express, to defendant informing defendant that they were in breach of the License Agreement and demanding payment.  This notice of breach was required under the terms of the attached License Agreement. Plaintiff demanded that defendant remit payment for royalties currently owed under the License, totaling $78,139.23. Defendant was also informed that if it wished to not honor its obligations under the License Agreement, plaintiff would accept immediate payment of $234,139.23; such amount constituting the balance owed on the License Agreement along with the outstanding royalty payments.

11. Plaintiff has at all times performed all conditions, covenants and promises required to be performed in accordance with the terms of the License.

12. Based on the unequivocal statements made by the defendant, through the attached email, and statements made orally to the plaintiff's CEO, Erik Stuebe,  plaintiff considers defendant to have anticipatorily breached the Agreement and has instituted this action, whereby it alleges:

## FIRST CAUSE OF ACTION
### (Open Book Account)

13. Within four years preceding the commencement of this action, the defendant entered into the aforementioned License Agreement, obligating and indebting itself on a book account for a sum of $358,800. as defined by §337 of the California Code of Civil

4

Procedure for payments to be made under a written agreement. While demand has

been made, no payment has been made, and there is now due, owing and unpaid the

sum $234,139.23 together with legal interest thereon at the legal rate of 10% per

annum from March 31, 2006.

## SECOND CAUSE OF ACTION

### (Account Stated)

14. Plaintiff incorporates the allegations of paragraphs 1-13 of the general allegations and

first cause of action as though fully set forth.

15. Within four years preceding the commencement of this action, an obligation on an

account was stated in writing by and between plaintiff and defendant, wherein it was

agreed that defendant was indebted to the plaintiff in the sum of no less than

$358,800. together with interest thereon at the legal rate of 10% per annum from

March 31, 2006 which amount remains unpaid despite defendants promise to pay.

## THIRD CAUSE ACTION

## BREACH OF CONTRACT

### (Common Count)

16. Plaintiff incorporates the allegations of paragraphs 1-15 of the general allegations and

first and second causes of action as though fully set forth.

17. On January 1, 2004, plaintiff and defendant entered into a written contract, the

License Agreement, (a copy of which has been attached as Exhibit A and made a part

of this pleading). On March 29, 2006, defendant, by email (a copy of which is

5

1   attached as Exhibit B and made part of this pleading) gave notice that defendant

2   would not perform the contract, whereby defendant totally repudiated the License

3   Agreement. Defendant's repudiation has not been retracted despite plaintiff's

4   demand that defendant perform its obligations and pay $234,139.23.

5   18. At the time plaintiff received defendant's repudiation, plaintiff had performed all of

6   the conditions on its part to be done and performed, and was ready, able and willing

7   to perform those conditions.

8

9

10  WHEREFORE, plaintiff respectfully prays for judgment against defendant as follows.

11  19. For damages on the first, second and third causes of action in the amount of

12      $234,139.23.

13  20. For interest thereon at the legal rate of 10% per annum.

14  21. For costs of suit incurred herein;

15  22. For attorney's fees incurred in this action;

16  23. For such other and further relief as the Court deems just and equitable.

17

18

19  Dated: June 14, 2006

20

21

22

23                          R. Randall Riccardo
                            Attorney for Plaintiff

24

25

6

EXHIBIT A

## EXCLUSIVE LICENSE AGREEMENT

This Exclusive License Agreement (the "Agreement") is made and entered into effective January 1, 2004 (the "Effective Date") by and between Blue Marlin Corp., a California corporation with its principal place of business at 540 Florida Street, San Francisco, California 94110 ("Licensor") and USPA Accessories, LLC dba Concept One Accessories, a New York corporation with its principal place of business at 362 Fifth Ave, 2nd Fl, New York, NY 10001 ("Licensee").

### RECITALS

A.     Licensor is the owner of certain names, labels and trademarks and related rights which Licensor uses in the manufacture and sale of various products, including the name, label and trademark Blue Marlin and related trademark and design rights, depictions and logos and variations and derivations thereof, as more particularly set forth in Schedule A (the "Trademark").

B.     Licensee desires to utilize the Trademark and related rights in the manufacture, distribution, promotion and sale of the products as set forth on Schedule A attached hereto. Products which bear the Trademark are hereinafter referred to as the "Licensed Products".

C.     Licensor's Trademark and related rights, and the goodwill associated therewith, are of great value to Licensor, making adherence to the quality control standards provided in this Agreement essential to maintaining the significant value of Licensor's Trademark and related rights and such associated goodwill.

D.     Licensor is willing to license Licensee to use the Trademark and related rights on Licensed Products, but only under the terms and conditions set forth in this Agreement.

NOW, THEREFORE, in consideration of the mutual promises and representations set forth herein, Licensor and Licensee agree as follows:

1.  Definitions.  The following terms shall have the meanings set forth in this Section for purposes of this Agreement:

1.1.    "Affiliates" means any person or entity controlling, controlled by or under common control of any party now or in the future.

1.2.    "Advertising Materials" means all advertising, publicity and promotional programs and materials related to any Licensed Product.

BM CO FINAL
Last printed 2/16/2004 10:00 AM

- 1 -

BM INIT CO INIT

8

1.3.    "Channels of Distribution" – Better department stores and specialty stores within the Territory. In addition, non-full price stores and such other accounts, with Licensors' prior written approval, for retail sale (excluding Mail order and the Internet) within the Territory. Final sales to off price retailers shall be permitted with an aggregate limit of ten (10) percent of the current quarter's regular Net Sales.

1.4.    "Contract Year" means the period of time from the Effective Date of this Agreement until June 30, 2005 (the "First Contract Year") and each successive one year period during the Term, including, if applicable, extensions of the Term under Section 4.2, except that the first Contract Year shall date from the Effective Date through the 30th day of June, 2005.

1.5.    "Designs" means (a) all designs for the Licensed Products and any and all copyrights and other intangible or intellectual property rights therein and in any package design, label, insert or Marketing or other material displaying the Trademarks; (b) all drawings, sketches and other materials furnished by Licensor; (c) any and all modifications or improvements or derivative works of the foregoing; and (d) any and all copyrights or other intangible or intellectual property rights in the foregoing. For purposes hereof all designs submitted to Licensor for approval shall have been created exclusively for Licensor and shall not have been offered for sale by Licensee or its agents prior to submission to Licensor.

1.6.    "Licensed Product" means the product as listed on Schedule A hereof, either physically bearing the Trademarks or to which the Trademarks are affixed, that are manufactured either by Licensee directly or by a sub-contractor of Licensee.

1.7.    "Net Sales" means Gross Sales of the Licensed Products by Licensee (including its Affiliates and specifically excluding non-final sales transactions between Affiliates of Licensee) less only (i) returns actually received from customers; (ii) actual Trade Discounts and documented discounts given pursuant to retailer programs; (iii) allowances and post invoice credits granted to customers, but only to the extent that Licensee documents that the allowance or post invoice credit relates to its sale of Licensed Products; (iv) product sales to the Licensor as defined in Section 3.4.3; (v) sales taxes, excise taxes and duties or other taxes paid by customers; and (vi) freight charges actually incurred by the Licensee, all calculated as stated in Section 7.5.

1.8.    "Packaging" means all packaging, cartons, containers, hang-tags, interior woven labels, inserts, in-packs, wrapping materials and artwork, copy and literary text incorporated therein for the Licensed Products.

1.9.    "Person" shall mean any individual, firm, company, corporation, limited liability company, unincorporated association, partnership, trust, joint venture, governmental authority or other entity of any kind in any jurisdiction, and shall include any successor (by merger or otherwise) of such entity.

BM INIT____ CO INIT ____

- 2 -

1.10.    "Sell" or "Sale" (or any such derivation of the word "sale") means any and all sales, transfers, distributions or other dispositions of any kind or nature, directly or through third persons, of units of the Licensed Products at any level of wholesale or retail distribution channels, including final Sales to Affiliates of Licensee.

1.11.    "Territory" - United States, its territories, possessions and military bases.

1.12.    "Trade Discounts" - Reductions in the list wholesale selling price of the Licensed Products by line item or by invoice sub-total, granted by Licensee in writing prior to or after delivery.

1.13.    "Trade Secrets" - Information including any formula, pattern, compilation, program, device, method, technique, or process, that derives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use and that is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

2.  Grants of Rights.

2.1.    Trademark and Design Rights.  Licensor hereby grants to Licensee the exclusive, non-transferable, non-assignable license to use the Trademark on or in connection with the design, merchandising, manufacture, advertising, promotion, distribution and sale of Licensed Products solely in the Territory to customers in the Channels of Distribution provided; however, that Licensee may utilize the Trademark in connection with the manufacture of the Licensed Products outside the Territory but only for the Sale of such Licensed Products within the Territory.

2.2.    Rights Reserved To Licensor.  All rights other than those expressly granted to Licensee are reserved to Licensor, including but not limited to the right to use, license and sublicense the manufacture, merchandising, promotion, distribution and sale of (a) products of any and all types and descriptions other than the Licensed Products in the Territory; (b) Licensed Products outside of the Territory, except for the right to manufacture outside the Territory as provided for in Section 2.1; and (c) all products of any and all types and descriptions sold under names, labels and trademarks other than the Trademark.

2.3.    Efforts.  At all times while this Agreement is in effect, Licensee shall use commercially reasonable efforts to exploit the rights herein granted on a commercially reasonable basis throughout the Territory, including but not limited to, endeavoring to sell the maximum quantity of Licensed Products to retail stores in the Channels of Distribution consistent with good business practices and the quality standards set forth in this Agreement; offering Licensed Products for sale such that they may be sold to the

- 3 -

BM INIT $\mathcal{E}\mathcal{S}$    CO INIT $\mathcal{U}$

consumer on a timely basis; and maintaining a sales force sufficient to provide effective distribution to the Channels of Distribution throughout the Territory.

2.4.     Conduct of Business. Licensee shall conduct its business at all times in a manner that will reflect positively on the Trademarks. Licensee shall use the Trademarks in a manner that does not derogate Licensor's rights in the Trademarks or the value of the Trademarks, and shall take no action that would interfere with, diminish or tarnish those rights or value of the goodwill of Licensor in such Trademarks.

3.   Limitations on Rights Granted.

3.1.     Third Parties.  The license granted conveys no right to grant any sublicense, concession, right or privilege relating to the Trademark or Licensed Products, and the license granted is not to be deemed transferable by operation of law for any purpose and is indivisible and non-assignable, including, but not limited to, any affiliates and/or business successors of Licensee except with Licensor's prior written consent, which shall not be unreasonably withheld.

3.2.     Licensee shall adopt and utilize reasonable commercial procedures to monitor all persons and entities, including domestic and foreign subcontractors, engaged in the manufacture or sale of Licensed Products to endeavor to confirm that they comply fully with all applicable laws, rules and regulations, including without limitation, all applicable state, federal and local wage and hour, child labor, overtime and other labor laws.

3.3.     In furtherance of the foregoing, and in a timely manner, Licensee shall cooperate with Licensor, and shall provide such information to Licensor, as is reasonably required for Licensor to comply with any and all reasonable or legally enforceable demands or requests by any governing or judicial entity for any information regarding any or all manufacturers and subcontractors who have or are manufacturing components of the Licensed Products. Such information to include all necessary information to clearly identify which Licensed Products and related components such manufacturers and subcontractors have produced or are producing. The Licensor shall maintain all such information under this section in strict confidence and shall not use any such information for its own benefit, commercial or otherwise, or other than in accordance with this Agreement and the purposes contemplated herein. Licensee shall be responsible for keeping such related records in safekeeping for a period not to exceed three (3) years from the expiry of this Agreement.

3.4.     Distribution of Licensed Products. The parties acknowledge that the manner and scope of the distribution of the Licensed Products are critical to the promotion and enhancement of Licensor's image, and to the protection of the Trademark and associated goodwill. Accordingly, Licensee agrees to abide by the following restrictions throughout the Territory:

3.4.1   Licensee shall use the Trademark solely in connection with the manufacture and wholesale distribution of the Licensed Products.

3.4.2   Licensee shall sell the Licensed Products only for resale in retail establishments within the Channels of Distribution.

3.4.3.  At the request of the Licensor, Licensee shall sell, at its regular wholesale price, less twenty percent (20%), any Licensed Product, to the Licensor for Licensor's distribution to end user's through Licensor's Internet sales channel. Such sales shall be excluded from the definition of Net Sales in Section 1.5. Licensor shall sell such product at no less than regular retail price.

3.4.4.  No Extraterritorial Sales.   Notwithstanding any contrary provision of this Agreement, Licensee agrees and covenants that it shall Sell the Licensed Products solely within the Licensed Territory; and that Licensee shall not, either directly or indirectly through its affiliates or other third persons, export or Sell any of the Licensed Products to (i) any person outside of the Licensed Territory, or (ii) any person within the Licensed Territory whom Licensee knows or has good reason to know intends or is likely to export or Sell Licensed Articles in any country or region outside of the Licensed Territory, except by specific written approval of Licensor in a specific case granted in its sole discretion.

3.4.5.  Licensee shall, upon request and within thirty (30) days of such written notice but no more than twice annually, advise Licensor, in writing, of its specific marketing plans.

3.5.   Licensee's Use of Other Marks.   Licensee shall not, on any Licensed Products or in conjunction with any use of the Trademark, use or associate the Trademark with any other name, trademark, character or personality, except with prior written consent or as permitted under this Agreement.

3.6.   No Premiums.   In addition to the other limitations hereunder, the rights of Licensee shall not include the right to, and Licensee warrants and represents that neither Licensee nor any of its affiliates will, use the Trademark or the Licensed Products for an endorsement of any other product or service. Licensee shall not use or permit the use of any Licensed Product as a premium except with the prior written consent of Licensor and shall not distribute any Licensed Product to any person which Licensee has good reason to believe would distribute such Licensed Product in contravention of the foregoing. "Premium" shall mean any Licensed Product distributed at no charge or minimal charge for the purpose of increasing the sale of any other article of merchandise or product, or any service, including any distribution or display for publicity, promotional purposes, combination sales, giveaways or in any other similar transaction.

3.7.   Design Non-Infringement.   Licensee agrees not to infringe on any of Licensor's past, current or future designs and/or trade dress, including but not limited to, "Vintage

BM INIT _____   CO INIT _____

BM CO FINAL
Last printed 2/16/2004 10:00 AM

- 5 -

Sportswear" image(s) or other intellectual property rights belonging to Licensor in any of Licensees' affiliates' and/or subsidiaries' business activities without the express written approval of the Licensor.

4   Term of Agreement

4.1.    Term.  The "Term" of this Agreement shall commence on the Effective Date and expire on June 30, 2007, unless renewed as provided herein.

4.2.    Renewal Terms.  Licensee shall have one (1) option ("Renewal Option") to renew the term of this Agreement; the option period shall be for a period of three Contract Years (36 months).  The Renewal Option shall be for the period dating from the 1st day of July 2007 through June 30, 2010. Licensee shall exercise its option to renew, if at all, by delivering written notice of renewal to Licensor at any time prior to ninety (90) days prior to the expiration of the then existing Term. As used in this Agreement, the "Term" shall be deemed to consist of the initial term described in Section 4.1.  Notwithstanding the foregoing, Licensee shall not have any further rights to renew in the event that, before Licensee's exercise of its' renewal right: (a) Licensee breaches this Agreement and fails to cure such breach within the applicable cure period, if any, specified in Section 16 of this Agreement; as a result of which Licensor elects in writing to terminate this Agreement; (b) Licensee fails to meet ninety (90) percent of any of the sales minimums in paragraph 7.3 during the Term; (c) Licensee breaches any monetary provision (i.e., a provision requiring payment of money by Licensee) of this Agreement and fails to cure such breach within ten (10) days of written notice of such breach as a result of which Licensor elects in writing to terminate this Agreement.

4.3.    Any transaction between the parties following the termination or expiration of this Agreement shall not be construed as a renewal or extension or waiver hereof, but as a separate transaction terminable at will by either party without cause.

5.  Ownership and Protection of Intellectual Properties.

5.1.    Ownership.  Licensee acknowledges Licensor's ownership of the Trademark and each and all of the Designs and further acknowledges that all of Licensee's uses of the Trademark and Designs shall inure to the exclusive benefit of Licensor. If not created by Licensor, the Designs shall be deemed "works made for hire" for the Licensor within the meaning of United States Copyright Law or any other applicable industrial or intellectual property law. If the Designs do not so qualify, the Designs and all intangible or intellectual property rights therein will be deemed irrevocably transferred and assigned by Licensee under this Agreement to Licensor on a continuous basis as of the time or creation or development, without the payment of additional consideration. The provision of this Section 5.1 shall survive the expiration or earlier termination of this Agreement.

Licensee also represents that it has not registered and in the future will not attempt to register the Trademark in its own name or for its own benefit in any country or territory in the world. For the purposes of protection of ownership in the Trademark only, all uses of the Trademark made by or on behalf of the Licensee will be deemed to have been made by Licensor. During the term of this Agreement and thereafter, Licensee shall not:

5.1.1.  Claim ownership of or attempt to register the Trademarks in any country or state;

5.1.2.  Do or commit any act which would adversely affect the validity of the Trademarks in any country;

5.1.3.  Infringe the Trademarks anywhere in the world;

5.1.4.  Attack the validity of this Agreement;

5.1.5.  Display the Trademarks in a manner which might mislead purchasers into believing that Licensee was itself Licensor or an affiliate or subsidiary thereof; and

5.1.6.  Engage in any other activity which can reasonably be expected to materially dilute or otherwise materially impair the right, title and interest of Licensor in the Trademark;

5.1.7.  provided that before Licensor declares a breach of Section 5.1.6 above, Licensor shall advise Licensee of its claim of breach and afford Licensee a reasonable period of time, not to exceed thirty (30) days, to rectify such breach.

5.2.    Registrations.  Licensee shall, at Licensor's expense, cooperate with Licensor in the execution, filing and prosecution of any trademark, copyright or patent application that Licensor may desire to file, and shall supply Licensor with Licensed Products, samples, containers, labels and all uses of the Trademark as may be reasonably requested for use in connection therewith.  Licensee shall cooperate with Licensor in making and terminating registered user entries.  Licensor shall pay all costs and fees in connection with filing and prosecution of trademarks, copyrights and patents.  The obligations under this Section 5.2 shall survive termination of this Agreement.

5.3.    No Implied Licenses.  Nothing in this Agreement shall constitute the grant of any implied licenses or rights.

5.4.    Infringements.  Licensee shall immediately give notice to Licensor, in writing, of any infringement or misuse of any Trademark by any third party of which Licensee becomes aware.  Licensor shall have the option to commence legal action regarding any such misuse at its expense.  Upon Licensor's request, Licensee shall cooperate fully and promptly in any infringement action commenced by Licensor (which cooperation shall not require Licensee to initiate legal action against a third party); provided, however, that

any and all costs incurred by Licensee in connection with such litigation shall be borne solely by Licensor. If Licensee decides to take any action against an infringement or misuse, Licensee may do so at its own expense (and shall be entitled to keep all of any recovery) provided it obtains the prior written consent of Licensor, in which event Licensee shall indemnify Licensor against all loss, damage, attorneys' fees, judgments and other costs or expenses incurred or suffered by Licensor as a result of such action. Licensee shall not settle any such action without Licensor's prior written approval of the settlement terms and conditions, which approval shall not be withheld unreasonably.

6. Quality Control and Approvals.

6.1    Quality Standards. Licensee acknowledges that the maintenance of the high quality of the Licensed Products, and the control by Licensor over the nature, quality and manner of distribution of all Licensed Products are essential elements of the license being granted herein. Therefore, the quality of the Licensed Products and the quality of all promotional and packaging materials bearing the Trademark shall be at least as high as the best quality of similar products and promotional, advertising and packaging material presently shipped, distributed, manufactured or sold by Licensee in the Territory and shall conform fully with all applicable laws and regulations.

6.2    Standards for Licensor Approval. In order to maintain the high quality standard prescribed by Licensor, Licensee may not manufacture, use, offer for sale, advertise, promote, ship or distribute any Licensed Product, promotional or packaging materials or advertising materials bearing the Trademark until approved in writing by Licensor. All matters in this Agreement requiring approval of Licensor or the exercise of its discretion shall be at the reasonable discretion of Licensor. Any matter not approved, in writing, by Licensor within fifteen (15) days from submission shall be deemed disapproved, unless the Licensee shall submit a second written request within seven (7) days of the fifteenth (15th) day and the Licensor does not provide a written response within seven (7) days of receipt, either approving or disapproving of the request, the second request shall be considered approved. Approval by Licensor does not constitute, nor shall it be construed as, a determination that the approval matter complies with any applicable laws, rules or regulations.

6.3. Approval of Specific Elements.

6.3.1. Licensee shall submit for Licensor's prior written approval all final designs, specifications, fabrications, color information, Packaging and Advertising. Licensor shall exercise its best efforts to advise Licensee in writing of its approval or disapproval of any approval request from Licensee within fifteen (15) days of receipt by Licensor, provided that no request shall be deemed approved by Licensor unless such approval is given in writing.

BM CO FINAL                            -8-                    BM INIT ⟨S⟩  CO INIT ⟨NⱮ⟩
Last printed 2/16/2004 10:00 AM

15

6.3.2.  Prior to the production of each line of Licensed Products, Licensee shall submit to Licensor at least one (1) final sample of each style in the collection.  Samples submitted for approval shall be of at least equal quality as the Licensed Products that are produced and distributed.  Once a proposed element of a Licensed Product has been approved, Licensee shall not deviate in any material respect from the elements so approved.  No disapproved proposed Licensed Product shall be manufactured or sold as a Licensed Product under this Agreement.  Licensee may revise any disapproved sample and resubmit it for approval.

6.3.3.  Following commencement of the first of each seasonal production run of the Licensed Products (or, if production of the various styles of the Licensed Product commences at different times, within two weeks after commencement of each style's first production run), Licensee shall deliver to Licensor a finished production sample of each style of Licensed Product solely for the purpose of confirming that the production goods are at least equal in quality as the approved samples.  If the production sample is not at least equal in quality to that of the sample previously approved, Licensee shall immediately make all changes necessary to conform fully to the original sample approved by Licensor.  Any Licensed Product which is not of at least equal quality may only be sold upon mutual written agreement, except in the event there are minor defects or difference from the sample approved by Licensor, such changes or corrections may be made per a "running change" as soon as reasonably practical.

6.3.4.  To the extent not approved concurrently with a Licensed Product, Licensee shall submit for Licensor's prior written approval, as provided above, at least one sample of all promotional, labeling and packaging materials bearing the Trademark.  No disapproved promotional, labeling or packaging materials shall be used in commerce by Licensee in connection with the Trademark.

6.3.5.  Licensee shall be solely responsible for taking commercially reasonable action to endeavor to ensure that all Licensed Products comply fully, to the extent applicable, with the Textile Fiber Product Identification Act, the Flammable Fabrics Act and all other applicable consumer product and safety laws, rules and regulations.  Licensee will prior to shipment of any Licensed Product for which flammability standards have been issued, amended or continued in effect under the Flammable Fabrics Act, reasonable and representative tests as prescribed by the Consumer Products Safety Commission have been or prior to shipment for sale will be performed, which show that such Licensed Products conform to all applicable flammability standards.  Licensee shall promptly investigate and respond to product safety concerns and/or complaints made by consumers who purchase Licensed Products upon Licensee being made aware of the same.

6.3.6.  Licensee shall affix to all Licensed Products such legends, markings and notices as required by laws and regulations in the Territory or reasonably required by

Licensor, including but not limited to, information about the proper care and use of the Licensed Products.

6.3.7.  Anti-Counterfeiting.  Licensee and its sub-contractors at all times shall each comply with all shipment tracking, identification and anti-counterfeiting systems and labels and procedures that Licensor may reasonably establish from time to time, provided not commercially prohibitive.  Licensee further shall use commercially reasonable measures to endeavor to ensure that all of its distributors and retailers purchasing Licensed Products each comply with such anti-counterfeiting systems and labels and procedures.

6.3.8.  Use of Sub-contractors.  Licensee shall be entitled to sub-contract directly with third party sub-contractors solely for the manufacturing of the Licensed Products by such firms ("sub-contractors"); provided however that (i) all sub-contracting work shall be limited to manufacturing units of the Licensed Products for the sole account of Licensee and for the sole use or Sale by Licensee under its own name or under the name of Licensor; (ii) all quality standards and specifications provided for in this Section shall be followed at all times by such sub-contractors; (iii) prior to the start of manufacturing Licensee and each sub-contractor shall enter into a legally enforceable written agreement in the English language that (1) prohibits the manufacturing of any Licensed Article for any third person or for its own account; (2) grants Licensor the right to directly enforce such contract as a third party beneficiary; (3) prohibits all Sales or transshipping or grey marketing of any Licensed Products or any other goods incorporating any of the Trademark by such sub-contractor or its affiliates or agents for any purpose; (4) requires compliance by the sub-contractor with Applicable Laws and Applicable Standards (as herein defined) at all times; and (5) otherwise shall contain such terms and conditions and be in the form reasonably approved in advance by Licensor in each case. Licensee shall be directly liable to and shall fully indemnify Licensor for any breach by any sub-contractor.

6.3.9.  Applicable Laws.  Licensee will and Licensee will endeavor to cause its sub-contractors to comply with all applicable laws, rules, regulations, ordinances, treaties, governmental orders and employment standards in connection with the manufacturing, assembly, labeling, packaging, Sale, promotion or marketing of the Licensed Products or the Packaging or Advertising Materials or any components; including but not limited to laws concerning import, export, customs, certificate licenses, quota allocations, country or origin, safety, public health, employment standards; wages and benefits, child or involuntary labor, working hours and employee health and safety (collectively "Applicable Laws").  Licensee shall obtain at its own expense all approvals of all governmental authorities as may be necessary in connection with its performance under this Agreement.

6.3.10. Applicable Standards.  Licensee will and Licensee will endeavor to cause its sub-contractors to comply with all established industry standards and good

manufacturing and storage practices related to the Licensed Products or the Packaging; and shall maintain a commercially reasonable quality control and safety assurance program with the respect to the Licensed Products and the Packaging (collectively "Applicable Standards"). Where no such standards and practices are established, the Licensed Products and the Packaging shall meet the higher of (i) the level of quality used for similar products of Licensee, or (ii) the level of quality comparable to the quality standards and practices generally accepted for other leading brands of the same type of product in similar markets.

6.3.11. Material Breach. Licensee agrees and acknowledges that its compliance with each of the foregoing standards and requirements shall be deemed material to this Agreement.

6.4.    Uses of the Trademark. Licensee agrees that the Trademark will appear on each Licensed Product and its packaging, if any. Licensee shall use only those promotional and packaging materials which have been approved in writing by Licensor. Licensee shall have the right to place its corporate designation on any packaging, the form of which shall have the prior written approval of the Licensor as specified above. No other combination of third party logos, marks, trade names or characters shall be used with the Trademark unless specifically approved by Licensor as specified above.

6.5. Advertising and Promotion.

6.5.1. All advertising and promotion of the Licensed Products undertaken or approved by Licensee must be consistent with the quality, image and standards of Licensor. All advertising copy and art work and any other advertising materials (including without limitation any proposed advertising to be submitted or provided to retailers or customers of Licensee for any use by them) and all display and merchandising materials and merchandising aids which will be provided or approved by Licensee for use in retail stores or showrooms shall be submitted to Licensor in writing for its prior approval; any such item which is not approved by Licensor within fifteen (15) days shall be deemed disapproved. Licensee shall comply with all Licensor decisions in such matters. If Licensor provides Licensee with written guidelines regarding use of the Trademarks in retail advertising, Licensee shall promptly provide such guidelines to its customers.

6.5.2. Advertising Expenditures. Licensee shall expend the minimum of two percent (2%) of the Net Sale Proceeds for each respective period as defined in Schedule A for advertising Licensed Articles via television, print media, radio, billboards, in-store advertising, point of purchase displays, trade shows or any other form of advertising or marketing (the "Direct Advertising Expenditure").

6.5.3   Where not unreasonable, any advertising or promotional or packaging materials which refer to Licensee's name shall state that Licensee is a licensee of Licensor, the owner of the Trademark.

6.5.4.   Licensee shall furnish Licensor, royalty-free, with two of each SKU of each finished Licensed Product in each line.   Upon request, Licensee shall furnish Licensor with a reasonable number of additional royalty-free production samples of finished Licensed Products for use in Licensor's showroom, for advertising and for sales presentations, and Licensor shall reimburse Licensee for Licensee's cost for such samples

7.   Payments and Reports.

7.1.   Trademark Royalty and Advertising Royalty.   With respect to each Contract Year of the Term of this Agreement, Licensee shall pay to Licensor and account for a royalty (the "Trademark Royalty") in an amount equal to eight (8%) percent of the Licensee's Net Sales of Licensed Products during each Contract Year.   With respect to each Contract Year of the term of this Agreement, Licensee shall pay to Licensor as and for a contribution ("Advertising Contribution") to Licensor's advertising fund for the advertising and promotion of the Licensed Products an amount equal to two (2%) percent of the Licensee's actual Net Sales. This Advertising Contribution shall be in addition to the amount specified as Advertising Expenditures in Section 6.5.2. Payment of any advertising royalty shall be made with the payment of the Trademark Royalty as provided in Section 7.4.

7.2.   Advance Payment.   At the time of execution of this Agreement, the Licensee will pay to Licensor the sum of thirty-seven thousand, five hundred ($37,500) Dollars as a non-refundable advance payment ("Advance").   The Advance may be credited against any Trademark Royalty due for the Term and no Royalty shall be payable until all such cumulative Royalty due exceeds the total amount of the Advance.

7.3.   Minimum Net Sales and Minimum Royalty.   The following are the Minimum Net Sales and Guaranteed Minimum payments (Trademark Royalty and Advertising Contribution) required for each of the periods referred to below:

| Contract Year | Net Sales | Guaranteed Minimum Payments |
|---|---|---|
| **Initial Term** | | |
| Year 1: February 1, 2004 – June 30, 2005 (17 months) | $750,000 | $75,000 |
| Year 2: July 1, 2005 – June 30, 2006 (12 months) | $1,200,000 | $120,000 |
| Year 3: July 1, 2006 – June 30, 2007 (12 months) | $1,500,000 | $150,000 |
| **Renewal Option Period:** | | |
| Year 1: July 1, 2007 – June 30, 2008 | $2,000,000 | $200,000 |
| Year 2: July 1, 2008 – June 30, 2009 | $2,250,000 | $225,000 |
| Year 3: July 1, 2009 – June 30, 2010 | $2,500,000 | $250,000 |

7.4.    <u>Royalty Payments and Reports</u>.  Within forty-five (45) days of the end of each calendar quarter during the Term, regardless of whether any Trademark Royalty payment is then due, Licensee shall submit a report of the number, description and invoice price of each Licensed Product sold, the gross sales, returns actually received, trade discounts and allowances granted, the Net Sales of all Licensed Products and any other information that may be required under any other provisions of this Agreement.  Each report shall be certified as correct by the Chief Financial Officer of Licensee.  Concurrently with delivery of such report, Licensee shall pay Licensor the Trademark Royalty due for that quarter.  In addition, for each calendar quarter, to the extent the Trademark Royalty paid by Licensee for the Contract Year through that date does not equal or exceed the Pro Rata Guaranteed Royalty Minimum, Licensee shall pay Licensor the difference between the Trademark Royalty paid through such date and the Pro Rata Guaranteed Minimum Royalty as of such date.  As used herein, "Pro Rata Guaranteed Minimum Royalty" means the Guaranteed Royalty Minimum for such Contract Year divided by four and multiplied by the number of quarters which have elapsed during such Contract Year (except that during the Initial Term, for purposes of determining the Pro Rata Guaranteed Minimum Royalty, the amount of the Guaranteed Minimum Royalty for the Initial Term less the Advance, shall be divided by five (5) and payment of the quarterly payments to the extent applicable shall commence on the first day of the second quarter of the Initial Term and shall be made on each of the next succeeding four quarters of the initial term).  Once Licensee has paid Licensor an amount equal to the Guaranteed Royalty payable for a Contract Year, Licensee shall only be required to pay the applicable Royalty for the

remainder of such Contract Year to the extent it exceeds the amount payable for the Guaranteed Royalty for that year. Trademark Royalties which exceed the Guaranteed Royalty shall be credited to the succeeding Contract Years or quarter if part of the same Term. All royalties shall be paid in good funds and in U.S. Dollars.

7.5. Calculation of Net Sales and Royalties.

7.5.1. All sales of Licensed Products to any related company or any shareholders, directors, officers or employers of Licensee or a related company shall be calculated at the average invoice price at which such Licensed Products are sold to unrelated customers in arm's-length transactions and Trademark Royalties shall be payable on the price received on account of all such sales.

7.5.2. Licensee will bear all taxes, duties and other governmental charges in the Territory relating to or arising under this Agreement, including without limitation, any income taxes, withholding income taxes and other taxes, any stamp or documentary taxes or duties, turnover, sales or use taxes, value added taxes, excise taxes, customs or exchange control duties or any other charges relating to or on any royalty payable by Licensee to Licensor hereunder; except that Licensor shall be responsible for any tax imposed on Licensor's income by the United States or any state thereof.

7.6. Additional Statements and Reports.

7.6.1. Upon reasonable request, Licensee shall submit invoices, credit memoranda and/or a computer printout confirming any information reflected in its calculations of royalties, in addition to a summary of sales by customer and product code and supporting documentation, if available.

7.6.2. With each Royalty Report as defined in 7.4, Licensee shall submit to Licensor a list containing the names of all its customers and others who have purchased the Licensed Products with product identities, quantities, unit prices, discounts and charge backs to confirm its compliance with this Agreement.

7.6.3. Receipt or acceptance by Licensor of any statement furnished, or of any sums paid by Licensee, shall not preclude Licensor from questioning their correctness at any time within thirty-six (36) months of receipt by the Licensor; provided, however, that reports submitted by Licensee shall be binding and conclusive on Licensee in the event of any termination based on a breach by Licensee arising out any payment or report.

7.6.4. Within ninety (90) days after the end of each Contract Year, Licensee shall furnish Licensor with a summary report of Licensee's sales of Licensed Products during the Contract Year. The summary report shall be certified by the Chief

BM CO FINAL
Last printed 2/16/2004 10:00 AM

- 14 -

BM INIT _____    CO INIT _____

21